**COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
David M. Bass, Esq.
Attorneys for Marcal Paper Mills, Inc.,
Debtor-in-Possession

|  |  |
|---|---|
| In re:<br><br>MARCAL PAPER MILLS, INC.,<br><br>              Debtor-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE MORRIS STERN<br>CASE NO. 06-21886 (MS)<br><br>          Chapter 11 |

## DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Dated: June 25, 2007

## TABLE OF CONTENTS

ARTICLE I. DEFINITIONS AND CONSTRUCTION OF TERMS ...............................................1

ARTICLE II. TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, DIP
FACILITY CLAIMS AND PRIORITY TAX CLAIMS................................22

ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ........................25

ARTICLE IV. TREATMENT OF CLAIMS AND EQUITY INTERESTS ................................25

ARTICLE V. PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER
THE PLAN AND TREATMENT OF DISPUTED, CONTINGENT
AND UNLIQUIDATED CLAIMS AND EQUITY INTERESTS.................31

ARTICLE VI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................40

ARTICLE VII. PROVISIONS REGARDING CORPORATE GOVERNANCE AND
MANAGEMENT OF THE REORGANIZED DEBTOR .............................45

ARTICLE VIII. IMPLEMENTATION AND EFFECT OF CONFIRMATION OF PLAN.........47

ARTICLE IX. CAUSES OF ACTION ..........................................................................................54

ARTICLE X. CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE......................56

ARTICLE XI. RETENTION OF JURISDICTION........................................................................61

ARTICLE XII. MISCELLANEOUS PROVISIONS ....................................................................64

39517/0001-2341013v15

## INTRODUCTION TO PLAN

The above-captioned debtor and debtor-in-possession, Marcal Paper Mills, Inc., proposes

the following Plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code.[1]

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject this Plan cannot

be solicited from a Holder of a Claim until such time as the Disclosure Statement has been

approved by the Bankruptcy Court and distributed to Holders of Claims.  ALL HOLDERS OF

CLAIMS ARE ENCOURAGED TO READ THE PLAN AND DISCLOSURE STATEMENT

IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

The Plan contemplates that the Debtor will be a reorganized entity after consummation of

the Plan.  The Distributions to be made to Holders of Claims, in each of the Classes of Claims

and Old Equity Interests for the Debtor, are set forth in Article III herein.

## ARTICLE I.

### DEFINITIONS AND CONSTRUCTION OF TERMS

Definitions.  As used herein, the following terms have the respective meanings specified

below, unless the context otherwise requires:

1.1    Administrative Expense Claim means any right to payment constituting a cost or

expense of administration of the Chapter 11 Case under sections 503(b) and 507(a)(2) of the

Bankruptcy Code including, without limitation, any Claims arising under the DIP Facility,

Section 503(b)(9) Administrative Claims, any actual and necessary costs and expenses of

preserving the Estate of the Debtor, any actual and necessary costs and expenses of operating the

business of the Debtor, any indebtedness or obligations incurred or assumed by the Debtor-in-

---

[1] Capitalized terms used herein shall have the meaning ascribed to them in Article I of the Plan.

Possession in connection with the conduct of its business including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estate of the Debtor under section 1930 of chapter 123 of Title 28 of the United States Code.

1.2     Administrative Expense Claim Bar Date means [August 15], 2007, the last date fixed by the Administrative Expense Claim Bar Date Order, by which all applications for treatment of an Administrative Expense Claim as an Allowed Administrative Expense Claim, other than (A) Professional Compensation and Reimbursement Claims, (B) Section 503(b)(9) Administrative Claims, (C) Other Administrative Expense Claims, or (D) as otherwise excused from filing pursuant to the Administrative Expense Claim Bar Date Order, must be filed with the Bankruptcy Court and/or the Claims Agent.

1.3     Administrative Expense Claim Bar Date Order means that Order: (i) Fixing a Bar Date for Filing Chapter 11 Administrative Claims; (ii) Approving Form, Manner and Sufficiency of Notice Thereof; and (iii) Approving Administrative Expense Proof of Claim Form, dated [June 29], 2007.

1.4     Affiliate shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

1.5     Allowed means, with reference to any Claim or Old Equity Interests, any Claim or Old Equity Interests, proof of which was timely and properly filed or, if no proof of Claim or Old Equity Interest was filed, which has been or hereafter is listed by the Debtor in its Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and, in each case,

as to which: (A) no objection to allowance has been interposed within the applicable period fixed

by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (B) an

objection has been interposed and such Claim has been allowed, in whole or in part, by a Final

Order; provided, however, that any Claims allowed solely for the purpose of voting to accept or

reject the Plan pursuant to an Order of the Bankruptcy Court shall not be considered "Allowed

Claims" hereunder.  Unless otherwise specified herein or by Order of the Bankruptcy Court,

"Allowed Administrative Expense Claim," or "Allowed Claim," shall not, for purposes of

computation of distributions under the Plan, include interest on such Administrative Expense

Claim or Claim from and after the Commencement Date.

      1.6    <u>Amended Debtor Bylaws</u> means the amended and restated Bylaws of the

Reorganized Debtor, which shall be in substantially the form contained in the Plan Supplement.

      1.7    <u>Amended and Restated Debtor Certificate of Incorporation</u> means the amended

and restated Certificate of Incorporation of the Reorganized Debtor, which shall be in

substantially the form contained in the Plan Supplement.

      1.8    <u>Apollo</u> means Apollo Capital Management.

      1.9    <u>Apollo Expense Reimbursement Motion</u> means that certain motion filed by the

Debtor contemporaneously with the Disclosure Statement, pursuant to which the Debtor seeks

authority to reimburse all fees and expenses of the Apollo Investor and its affiliates and their

respective representatives (including reasonable fees and expenses of legal counsel and other

advisors) incurred in connection with its due diligence investigation of the Debtor and the

preparation, negotiation, execution and consummation of the Subscription Agreement and the

other Transaction Documents and to be paid as set forth in the Apollo Expense Reimbursement

Motion.

3

1.10    _Apollo Investor_ means one or more affiliated investment entities of Apollo.

1.11    _Apollo Investor Equity Investment Amount_ shall have the meaning ascribed in Section 8.1(B)(iii)(e) of the Plan.

1.12    _Avoidance Actions_ means any and all Causes of Action that the Debtor may assert under Chapter 5 of the Bankruptcy Code or any similar applicable law, regardless of whether or not such Causes of Action are commenced to prosecute such Avoidance Actions as of the Effective Date.

1.13    _Ballot_ means the form of ballot to be distributed with the Disclosure Statement and Plan to each Holder of an impaired Claim or Old Equity Interests in a Class entitled to vote on the Plan on which is to be indicated acceptance or rejection of the Plan.

1.14    _Balloting Agent_ means Logan & Company, Inc.

1.15    _Balloting Deadline_ means the date and time, as fixed by an Order of the Bankruptcy Court and set forth in the Disclosure Statement, by which all Ballots must be received by the Balloting Agent at the address set forth on the Ballot, as such date may be extended by an Order of the Bankruptcy Court.

1.16    _Bankruptcy Code_ means Title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

1.17    _Bankruptcy Court_ means the United States Bankruptcy Court for the District of New Jersey, having jurisdiction over the Chapter 11 Case, or if such Court ceases to exercise jurisdiction over the Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of New Jersey.

1.18    <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, and any Local Rules of the Bankruptcy Court, as amended from time to time, and as applicable to the Chapter 11 Case.

1.19    <u>Bar Date</u> means May 15, 2007, and June 14, 2007, the last date fixed by Order of the Bankruptcy Court for Creditors and Governmental Units, respectively, to File proofs of Claim in the Chapter 11 Case.

1.20    <u>Business Day</u> means any day other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.21    <u>Cash</u> means legal tender of the United States of America and equivalents thereof.

1.22    <u>Causes of Action</u> means, without limitation, any and all actions, proceedings, causes of action, suits, accounts, controversies, promises to pay, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise by, on behalf of or in the name of the Debtor against any Person which exists on or before the Effective Date, including, without limitation, the Avoidance Actions.  Causes of Action shall include, but shall not be limited to, all claims and causes of action described in the Disclosure Statement and the Schedules.

1.23    <u>Chapter 11 Case</u> means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor, styled *In re Marcal Paper Mills, Inc.*, Chapter 11 Case No. 06-21886 (MS), currently pending in the Bankruptcy Court.

1.24    Claim shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

1.25    Claims Agent means Logan & Company, Inc., the entity retained by the Debtor pursuant to an Order of the Bankruptcy Court to serve as agent of the Clerk pursuant to 28 U.S.C. § 156(c).

1.26    Claims Objection Deadline means the date which is sixty (60) days after the Effective Date, as the same may be from time to time extended by the Bankruptcy Court.

1.27    Claims' Register means the document generated by the Bankruptcy Court or the Claims Agent which reflects the proofs of Claim filed by Holders of Claims and/or Old Equity Interests.

1.28    Class means any group of substantially similar Claims or Old Equity Interests classified by the Plan pursuant to section 1123(a)(1) of the Bankruptcy Code.

1.29    Clerk means the clerk of the Bankruptcy Court.

1.30    Collateral means any property or interest in property of the Estate of the Debtor subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

1.31    Confirmation means entry by the Bankruptcy Court of the Confirmation Order.

1.32    Commencement Date means November 30, 2006, the date on which the Debtor commenced the Chapter 11 Case.

1.33    Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Docket.

1.34   <u>Confirmation Hearing</u> means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.35   <u>Confirmation Order</u> means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.36   <u>Cooperating Parties Group</u> means the group of potentially responsible parties cooperating with and providing funding for the Lower Passaic River Study Area.

1.37   <u>Creditor</u> means any Person that is the Holder of a Claim against the Debtor.

1.38   <u>Creditors' Committee</u> means the statutory committee of unsecured creditors appointed in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

1.39   "<u>Cure</u>" means with respect to the assumption of an executory contract or unexpired lease pursuant to Section 365(b) of the Bankruptcy Code, (A) the distribution of Cash, or the distribution of such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties under an executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law or (B) the taking of such other actions as may be agreed upon by the parties or ordered by the Bankruptcy Court.

1.40   <u>Debtor</u> means Marcal Paper Mills, Inc.

1.41   <u>Debtor-in-Possession</u> means the Debtor in its capacity as debtor-in-possession in the Chapter 11 Case pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.42   <u>DIP Agents</u> means NexBank SSB, as administrative agent for the DIP Lenders, and The CIT Group\Business Credit, Inc., as documentation agent for the DIP Lenders.

1.43    <u>DIP Facility</u> means that certain Debtor-in-Possession Credit Agreement dated as of January 12, 2007, as amended, restated, supplemented or otherwise modified from time to time, and all documents executed in connection therewith, among the Debtor, the DIP Agents, and the DIP Lenders.

1.44    <u>DIP Facility Claim</u> means all Claims of the DIP Agents and the DIP Lenders arising under or pursuant to the DIP Facility, including, without limitation, principal and interest on the DIP Facility, plus all reasonable fees and expenses arising under the DIP Facility.

1.45    <u>DIP Financing Order</u> means the Final Order (I) Authorizing Post-Petition Secured Superpriority Financing Pursuant to Bankruptcy Code Sections 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d); (II) Authorizing the Debtor's Use of Cash Collateral Pursuant to Bankruptcy Code Section 363(c); (III) Authorizing Repayment of Indebtedness Owing to the Pre-Petition Lenders; (IV) Granting Adequate Protection Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code; and (V) Modifying Automatic Stay, entered by the Bankruptcy Court January 5, 2007.

1.46    <u>DIP Lenders</u> means the lenders who are parties to the DIP Facility.

1.47    <u>Disbursing Agent</u> shall have the meaning set forth in Section 5.3(K) of the Plan.

1.48    <u>Disclosure Statement</u> means the disclosure statement relating to the Plan including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.49    <u>Disputed</u> means, with reference to any Claim or Old Equity Interest, any Claim or Old Equity Interest proof of which was timely and properly filed and which has been or hereafter is listed on the Schedules as unliquidated, disputed or contingent and, in either case, or in the case of an Administrative Expense Claim, any Administrative Expense Claim, Claim or Old

Equity Interest which is disputed under the Plan or as to which the Debtor or, if not prohibited by

the Plan, any other party in interest has interposed a timely objection and/or request for

estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018,

which objection and/or request for estimation has not been withdrawn or determined by a Final

Order, and any Claim or Old Equity Interest proof of which was required to be filed by Order of

the Bankruptcy Court but as to which a proof of claim or interest was not timely or properly

filed.

1.50    <u>Disputed Claim Amount</u> means the amount set forth in the proof of Claim relating

to a Disputed Claim or, if an amount is estimated with respect to a Disputed Claim in accordance

with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, the amount so estimated

pursuant to an Order of the Bankruptcy Court.

1.51    <u>Docket</u> means the docket in the Chapter 11 Case maintained by the Clerk.

1.52    <u>Effective Date</u> means the date specified by the Debtor (after consultation with the

the Apollo Investor and the Creditors' Committee) as the date on which this Plan shall take

effect, which date shall not be more than five (5) Business Days after the conditions specified in

Section 10.2 of the Plan have been satisfied or waived.

1.53    <u>Entity</u> means an entity as defined in section 101(15) of the Bankruptcy Code.

1.54    <u>Environmental Claim</u> means any Claim including, but not limited to, actions,

suits, judgments, or orders under any federal, state, or local environmental law or regulation for

any damages (including contribution claims and natural resource damages), injunctive relief,

losses, fines, penalties, fees, expenses (including financial assurance obligations and reasonable

fees and expenses of attorneys and consultants) or costs relating to (A) the release or threatened

release of hazardous materials or substances to the environment, (B) any actual or alleged

violation or non-compliance with any applicable federal, state or local environmental statute, regulation or order, or (C) other similar Claim asserted against the Debtor that has not been compromised and settled or otherwise resolved.

1.55    ERISA means Title IV of the Employee Retirement Income Security Act, as amended, 29 U.S.C. § 1301 et seq. (2000 & Supp. III 2003).

1.56    Estate means the estate created upon the commencement of the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

1.57    Exit Facility means the senior secured credit and/or term loan facility to be entered into, as of the Effective Date, by the Reorganized Debtor, the Holding Company and the Exit Facility Lender, and all ancillary agreements and instruments related thereto.

1.58    Exit Facility Lender means that certain lender or those certain lenders (together with its or their successors or assigns), as parties to the Exit Facility, by original execution or assignment thereof.

1.59    Face Amount means (A) with respect to any Claim, proof of which is Filed, an amount equal to: (i) the liquidated amount, if any, set forth therein; and/or (ii) any other amount estimated by the Court in accordance with section 502(c) of the Bankruptcy Code and the relevant provisions of the Plan; or (B) if no proof of Claim is Filed and such Claim is scheduled in the Debtor's Schedules, the amount of the Claim scheduled as undisputed, noncontingent and liquidated.

1.60    Fee Application means an application by a Professional for a Fee Claim.

1.61    Fee Claim means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services rendered from the Commencement Date through and including the Confirmation Date.

1.62 <u>File, Filed, or Filing</u> means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Case.

1.63 <u>Final Order</u> means an Order of the Bankruptcy Court or a Court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or, if pending, as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtor or the Reorganized Debtor (as applicable), <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rules under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such Order shall not cause such Order to not be a Final Order.

1.64 <u>Founding Investor</u> means MARFAMONY LLC, a New Jersey limited liability company, a newly formed investment entity of the Principal Family Stockholders.

1.65 <u>Fraudulent Conveyance Claims</u> means all fraudulent transfer Causes of Action under sections 544, 548 and 550 of the Bankruptcy Code or applicable state law.

1.66 <u>GAAP</u> means United States generally accepted accounting principles, consistently applied.

1.67 <u>General Unsecured Claim</u> means any Unsecured Claim against the Debtor that is not a Secured Claim, Other Secured Claim, Administrative Expense Claim, Priority Tax Claim, or Other Priority Claim, but including, without limitation, Claims arising from the rejection of an unexpired lease or executory contract pursuant to the Plan or otherwise.

1.68　　Governmental Unit shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

1.69　　Holder means the beneficial holder of any Claim or Old Equity Interest.

1.70　　Holding Company means the corporate entity to be formed by the Founding Investor on or before the Confirmation Date to acquire and own one hundred percent of the issued and outstanding shares of the New Common Stock of the Reorganized Debtor on and after the Effective Date.

1.71　　Holding Company Board of Directors means the board of directors of the Holding Company.

1.72　　Holding Company Bylaws means the Bylaws of the Holding Company, which shall be in substantially the form contained in the Plan Supplement.

1.73　　Holding Company Certificate of Incorporation means the Certificate of Incorporation of the Holding Company, which shall be substantially in the form contained in the Plan Supplement.

1.74　　Holding Company Common Stock means the common stock of the Holding Company.

1.75　　Initial Disbursing Agent means Wilmington Trust Corporation.

1.76　　Initial Distribution Date means the date that is sixty (60) days after the Effective Date, or as soon thereafter as is practicable.

1.77　　Insider Landlords means each landlord of the Debtor that is, or is an Affiliate of, any shareholder of the Founding Investor.

1.78　　Insured Claim means any Claim arising from an incident or occurrence that is covered under the Debtor's insurance policies.

1.79    Lien shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

1.80    Liquidity Event shall having the meaning ascribed in Section 8.1(B)(iii)(d) of the Plan.

1.81    Lower Passaic River Restoration Claims means all claims currently pending or arising after the date hereof in connection with the Lower Passaic River Study Area or any related Proceedings, made against the Company by or on behalf of the United States Environmental Protection Agency or any other Governmental Authority, including, without limitation, the State of New Jersey or any subdivision or agency thereof, or by or on behalf of the Cooperating Parties Group or any related group or entity, which shall be resolved in a manner acceptable to the Apollo Investor in its sole discretion and discharged pursuant to a final and non-appealable order of the Bankruptcy Court or other court of competent jurisdiction.

1.82    Lower Passaic River Study Area means the 17-mile tidal stretch of the Lower Passaic River from the Dundee Dam to Newark Bay in northern New Jersey which is currently the subject of remedial investigations by USEPA, the State of New Jersey and certain private parties.

1.83    Management Equity Incentive Program means a management equity incentive program that shall be implemented on or as soon as reasonably practicable after the Effective Date to provide designated members of senior management of the Reorganized Debtor with stock appreciation rights, Holding Company Common Stock and/or options to purchase shares of Holding Company Common Stock.

1.84    Marcalus Notes means certain promissory notes, loans and advances and all accrued and unpaid interest due and payable thereon to Robert L. Marcalus in an aggregate

amount of $10,342,268.92 and to 35 Market Street, L.P. in an aggregate amount of $525,000, in each case, as the same may have been amended from time to time.

1.85    <u>New Board of Directors</u> means the board of directors of the Reorganized Debtor.

1.86    <u>New Common Stock</u> means the common stock of the Reorganized Debtor authorized and to be issued in accordance with the Plan.

1.87    <u>New Corporate Documents</u> shall have the meaning set forth in Section 7.4 of the Plan.

1.88    <u>New Holders</u> means the Apollo Investor and the Founding Investor, who together shall acquire 100% of the capital stock of the Holding Company.

1.89    <u>Note Purchase Agreement</u> means that certain agreement pursuant to which the Note Purchasers will acquire the Senior Notes.

1.90    <u>Note Purchasers</u> means the Apollo Investor and such other person or persons that acquire the Senior Notes in accordance with the Note Purchase Agreement.

1.91    <u>Old Equity Interest</u> means any share of preferred stock, common stock or other instrument evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant, right or other interest, contractual or otherwise, convertible or exercisable into or exchangeable for, or otherwise providing the right to acquire any such interest.

1.92    <u>Order</u> means an order or judgment of the Bankruptcy Court as entered on the Docket.

1.93    <u>Other Administrative Expense Claims</u> means Administrative Expense Claims that accrued between July 1, 2007 and the Effective Date (other than (a) Professional Compensation and Reimbursement Claims, which are subject to the provisions of Section 2.2 of the Plan, (b) a liability incurred and payable in the ordinary course of business by a Debtor (and not past due),

(c) claims of the Apollo Investor under its Order authorizing the reimbursement of its expenses, or (d) an Other Administrative Expense Claim that has been Allowed on or before the Effective Date))

1.94    Other Administrative Expense Claim Bar Date means the date by which all applications for treatment of a Claim as an Allowed Other Administrative Expense Claim must be filed with the Bankruptcy Court and/or the Claims Agent which date shall be, unless subject to an assumed executory contract which shall be afforded the treatment under Article XI of the Plan, the 30th day after the Confirmation Date.

1.95    Other Priority Claim means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.96    Other Secured Claim means any Secured Claim arising prior to the Commencement Date against the Debtor, other than a Pre-Petition Secured Lender Claim and not otherwise paid or satisfied by the DIP Financing Order or other Order authorizing the payment of such Other Secured Claim before the Effective Date.

1.97    PBGC means the Pension Benefit Guaranty Corporation.

1.98    Pension Plan means the Marcal Paper Mills, Inc. Retirement Plan #1 for Union Employees, a tax qualified defined benefit Pension Plan covered by Title IV of the Employee Retirement Income Security Act, as amended, 29 U.S.C. § 1301 et seq. (2000 & Supp. III 2003).

1.99    Person shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

1.100   Plan means this chapter 11 plan of reorganization including, without limitation, the Plan Supplement and all exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time.

1.101   Plan Documents means the agreements, documents and instruments entered into on or as of the Effective Date as contemplated by, and in furtherance of, the Plan.

1.102   Plan Supplement means the forms of documents specified in Section 12.15 of the Plan.

1.103   Pledged Properties means (A) the ten (10) acre parcel of land owned by Green Acre Woodlands, Inc. located in Elmwood Park, New Jersey, and (B) the property owned by the Robert L Marcalus Revocable Inter Vivos Trust located in Chicago, Illinois.

1.104   Post-Effective Date Committee has the meaning set forth in Section 12.4(B) of this Plan.

1.105   Post-Effective Date Committee Expense Cap means an amount agreed upon by the Debtor, the Apollo Investor and the Committee.

1.106   Preference Claims means all Causes of Action pursuant to sections 547 of the Bankruptcy Code.

1.107   Pre-Petition Second Lien Agent means NexBank SSB as agent for the Pre-Petition Secured Lenders.

1.108   Pre-Petition Secured Lenders means those lenders who are parties to that certain Loan and Security Agreement dated as of December 30, 2005.

1.109   Pre-Petition Secured Lender Claims means the Claims of NexBank SSB, as Second Lien Agent for certain lenders pursuant to that certain Loan and Security Agreement dated as of December 30, 2005.

1.110   <u>Principal Family Stockholders</u> means Charles Bonin, Nicholas R. Marcalus, Peter A. Marcalus, and Robert L. Marcalus; provided, that with respect to any indemnity obligations of the Principal Family Stockholders, Robert L. Marcalus shall be liable for amounts not to exceed, individually or in the aggregate, $5,000,000.

1.111   <u>Priority Tax Claim</u> means any Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.112   <u>Pro Rata, Ratable or Ratable Share</u> means a number (expressed as a percentage) equal to the proportion that an Allowed Claim in a particular Class bears to the aggregate amount or number of: (A) Allowed Claims plus (B) Disputed Claims (in the aggregate Face Amount) in such Class as of the date of determination.

1.113   <u>Professionals</u> means (A) any professional employed in the Chapter 11 Case pursuant to section 327 or 1103 of the Bankruptcy Code or otherwise pursuant to an Order of the Bankruptcy Court and (B) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

1.114   <u>Professional Compensation and Reimbursement Claims</u> means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred after the Commencement Date and prior to and including the Effective Date.

1.115   <u>Quarter</u> means the period beginning on the Effective Date and ending on the next of December 31, March 31, June 30 and September 30, and each three month period thereafter.

1.116   <u>Record Date</u> means the day that is five (5) days from and after the Confirmation Date.

1.117   Registration Rights Agreement means the registration rights agreement relating to the resale of the New Common Stock distributed pursuant to the Plan, to be entered into as of the Effective Date by the Reorganized Debtor for the benefit of certain Holders of the New Common Stock.  The Registration Rights Agreement shall be substantially in the same form contained in the Plan Supplement.

1.118   Released Actions means any actions, proceedings, causes of action, suits, accounts, controversies, promises to pay, rights to legal remedies, rights to equitable remedies, rights to payment, claims, obligations, litigations, judgments, damages, rights and liabilities of any nature whatsoever, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, foreseen or unforeseen, assertable directly or assertable derivatively, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act, omission, transaction, event or other occurrence relating to or in connection with any of the Debtor or its property.  Notwithstanding anything herein to the contrary, the Released Actions shall not include the Avoidance Actions.

1.119   Reorganized Debtor means the Debtor on and after the Effective Date.

1.120   Reserve shall have the meaning set forth in Section 5.3(I) of the Plan.

1.121   Retained Actions means any Cause of Action, including but not limited to (A) all claims, rights of action, setoffs, recoupments, suits and proceedings, whether in law or in equity, whether known or unknown, which the Debtor may hold against any Person, including, without limitation, any Avoidance Actions and any Causes of Action brought by the Debtor prior to the Commencement Date, and actions against any Persons for failure to pay for products or services provided or rendered by the Debtor, (B) all claims, Causes of

Action, suits and proceedings relating to strict enforcement of the Debtor's intellectual property rights, including patents, copyrights and trademarks, (C) all warranty and indemnification claims under any contract or agreement with the Debtor for goods and services, (D) all claims or Causes of Action seeking the recovery of the Debtor's accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtor's businesses, including, without limitation, claim overpayments and tax refunds, and such other claims or Causes of Action, as are identified in the Debtor's Schedules, the Disclosure Statement or Schedule II hereto, but excludes the Released Actions (and to the extent applicable, Avoidance Actions) released under Article X of the Plan.

1.122    Sale Leaseback means the sale/leaseback transaction to be entered into, as of the Effective Date, by the Reorganized Debtor, the Holding Company and the Exit Facility Lender and all ancillary agreements and instruments thereto.

1.123    Schedules means the schedules of assets and liabilities, the list of Holders of Old Equity Interests and the statements of financial affairs Filed by the Debtor under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto through the Confirmation Date.

1.124    Section 503(b)(9) Claims Bar Date means May 15, 2007, the last date fixed by Order of the Bankruptcy Court for Creditors to File a proof of a Section 503(b)(9) Administrative Claim in the Chapter 11 Case.

1.125    Section 503(b)(9) Administrative Claim means a Claim against the Debtor alleged to be entitled to an administrative expense priority under 11 U.S.C. §503(b)(9) for goods sold to the Debtor in the ordinary course of the Debtor's business and received by the Debtor within 20 days before the Commencement Date.

1.126    Secured Claim means any Claim which is secured by a Lien on Collateral and has

been perfected properly as required by applicable law, but only to the extent of the value of such

Collateral as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the

event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent

of such setoff.

1.127    Securities Act means the Securities Act of 1933, as amended, and the rules and

regulations promulgated thereunder.

1.128    Senior Notes means those certain Senior Secured Notes, the form of which is

included in the Plan Supplement, issued by the Holding Company pursuant to the Note Purchase

Agreement.

1.129    Subscription Agreement means that certain Subscription Agreement entered into

by the Debtor, the Founding Investor, the Apollo Investor and Holdco, a copy of which, without

exhibits and schedules, is attached hereto as Exhibit A.

1.130    Subsequent Distribution Date means the twentieth (20th) day after the end of the

Quarter following the Quarter in which the Initial Distribution Date occurs and the twentieth

(20th) day after the end of each subsequent Quarter; provided, however, that the first and second

Subsequent Distribution Dates shall occur on the twentieth (20th) day after the end of the second

(2nd) and fourth (4th) Quarters, respectively, following the Quarter in which the Initial

Distribution Date occurs.

1.131    Surplus Distributions shall have the meaning set forth in Section 5.3(I)(iii) of the

Plan.

1.132   <u>Tort Claim</u> means any Claim relating to personal injury, property damage or products liability or other similar Claim asserted against the Debtor that has not been compromised and settled or otherwise resolved.

1.133   <u>Transaction Documents</u> mean the Subscription Agreement, the Stockholders' Agreement, Registration Rights Agreement, the Notes, Note Purchase Agreement, Mortgages and all other documents, agreements and instruments executed and delivered in connection herewith and therewith, in each case, as amended, modified or supplemented from time to time.

1.134   <u>TTM EBITDA</u> means, as of the date of determination, net income, determined in accordance with GAAP, as adjusted for interest, taxes, depreciation, and amortization, of the Company and/or any of its Subsidiaries over the trailing twelve month period ending on such date of determination.

1.135   <u>Unsecured Claim</u> means any Claim against the Debtor that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Commencement Date and that is not a Secured Claim, Other Secured Claim, Administrative Expense Claim, Priority Tax Claim or Other Priority Claim.

1.136   <u>Voting Instructions</u> means the instructions for voting on the Plan contained in the section of the Disclosure Statement entitled "SOLICITATION; VOTING PROCEDURES" and in the Ballots.

1.137   <u>Waste Paper Recycling Revenue Bonds</u> means those certain $16,510,000 Waste Paper Recycling Revenue Bonds, Series 1994 issued by the New Jersey Economic Development Authority and guaranteed by the Casino Reinvestment Development Authority.

1.138   <u>Interpretation; Application of Definitions and Rules of Construction</u>.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall

include both the singular and the plural and pronouns stated in the masculine, feminine or neuter

gender shall include the masculine, feminine and neuter.  Unless otherwise specified, all section,

article, schedule or exhibit references in the Plan are to the respective Section in, Article of,

Schedule to, or Exhibit to the Plan.  The words "herein," "hereof," "hereto," "hereunder" and

other words of similar import refer to the Plan as a whole and not to any particular section,

subsection or clause contained in the Plan.  The rules of construction contained in section 102 of

the Bankruptcy Code shall apply to the construction of the Plan.  A term used herein that is not

defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that

term in the Bankruptcy Code.  The headings in the Plan are for convenience of reference only

and shall not limit or otherwise affect the provisions of the Plan.

## ARTICLE II.

### TREATMENT OF ADMINISTRATIVE
### EXPENSE CLAIMS, DIP FACILITY CLAIMS AND PRIORITY TAX CLAIMS

2.1    Administrative Expense Claims.  Except to the extent that any entity entitled to

payment of any Allowed Administrative Expense Claim agrees to a different treatment, each

Holder of an Allowed Administrative Expense Claim, including Allowed Section 503(b)(9)

Administrative Claims, shall receive Cash in an amount equal to such Allowed Administrative

Expense Claim on the later of the Effective Date and seven (7) Business days after the entry of a

Final Order Allowing such Administrative Expense Claim, or as soon thereafter as is practicable;

provided, however, that Allowed Administrative Expense Claims representing liabilities incurred

in the ordinary course of business by the Debtor or liabilities arising under loans or advances to

or other obligations incurred by the Debtor, to the extent approved by the Bankruptcy Court if

such approval was required under the Bankruptcy Code, shall be paid in full and performed by

the Reorganized Debtor in the ordinary course of business in accordance with the terms and

subject to the conditions of any agreements or Bankruptcy Court Orders governing, instruments

evidencing or other documents relating to, such transactions.

2.2    Professional Compensation and Reimbursement Claims.  Any Person seeking an

award by the Bankruptcy Court of compensation for services rendered or reimbursement of

expenses incurred through and including the Confirmation Date under sections 503(b)(2),

503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code: (A) shall file their respective final Fee

Applications for services rendered and reimbursement of expenses incurred through the

Confirmation Date no later than sixty (60) days after the Confirmation Date or such other date as

may be fixed by the Bankruptcy Court and, (B) if granted such an award by the Bankruptcy

Court, shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) seven (7)

days after such Professional Compensation and Reimbursement Claim becomes an Allowed

Professional Compensation and Reimbursement Claim, or as soon thereafter as is practicable, or

(ii) upon such other terms as may be mutually agreed upon between such Holder of an Allowed

Professional Compensation and Reimbursement Claim and the Debtor-in-Possession or, on and

after the Effective Date, the Reorganized Debtor.  Failure to file a final Fee Application timely

shall result in the Fee Claim being forever barred and discharged.

2.3    Priority Tax Claims. Each Holder of an Allowed Priority Tax Claim shall receive

in full satisfaction of such Allowed Priority Tax Claim, at the election of the Debtor, in its sole

discretion, either (A) Cash equal to the amount of such Claim on the later of (i) the Effective

Date and (ii) seven (7) Business Days after entry of a Final Order Allowing such Priority Tax

Claim, or as soon thereafter as is practicable, but in no event later than thirty (30) days after entry

of the Final Order, unless such Holder shall have agreed to different treatment of such

Allowed Claim, (B) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code,

Cash payments in equal quarterly installments commencing on the first Business Day of the succeeding quarter in which the Effective Date occurs and continuing on the first Business Day of each quarter thereafter, until the quarter which is five (5) years after the Commencement Date totaling the principal amount of such Claim plus interest on any outstanding balance from the Effective Date calculated at the interest rate equal to the applicable federal rate as determined in accordance with section 1274(d) of the Internal Revenue Code of 1986, as amended and the regulations promulgated thereunder, or (C) such other treatment as to which the Holder of such Allowed Priority Tax Claim shall have agreed in writing; provided, however, that any Claim or demand for payment of a penalty (other than a penalty of the type specified in section 507(a)(8)(G) of the Bankruptcy Code) shall be disallowed pursuant to this Plan and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtor, its Estate, the Reorganized Debtor, the Holding Company or any property of such Entities.

2.4    DIP Facility Claims Against the Debtor.  On the Effective Date, in full satisfaction of the DIP Facility Claims against the Debtor, the DIP Agents (for the benefit of the DIP Lenders, as applicable) shall receive Cash in an amount equal to the then outstanding amount of the DIP Facility Claims (including, without limitation, all accrued and unpaid interest, fees and expenses and any other amounts that may then be due and payable under the DIP Facility) and any undrawn letters of credit issued pursuant to the DIP Facility shall be returned and marked cancelled and shall be replaced by letters of credit issued under the Exit Facility.

# ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Claims, other than Administrative Expense Claims, Professional Compensation and

Reimbursement Claims, Priority Tax Claims and DIP Facility Claims are classified for all

purposes, including voting, confirmation and distribution pursuant to the Plan, as follows:

| Class | Status |
|---|---|
| Class 1 - Other Priority Claims | Unimpaired |
| Class 2 - Pre-Petition Lender Secured Claims | Unimpaired |
| Class 3 - Other Secured Claims | Unimpaired |
| Class 4 - General Unsecured Claims | Impaired |
| Class 5 - Old Equity Interests | Impaired |

# ARTICLE IV.

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1    **Impairment Dispute.**  If a Holder of a Claim or Old Equity Interest files a timely

objection with the Bankruptcy Court as to whether any Claims or Old Equity Interests, or any

Class of Claims or Old Equity Interests, are impaired under the Plan, the Bankruptcy Court shall,

after notice and a hearing, determine such objection.

4.2    **CLASS 1 - OTHER PRIORITY CLAIMS.**

(A)    **Impairment and Voting.**  Class 1 is unimpaired by the Plan.  Each Holder

of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is

not entitled to vote to accept or reject the Plan.

(B)    **Distributions.**  Each Holder, as of the Record Date, of an Allowed Other

Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim on

the later of the Effective Date and seven (7) Business Days after entry of a Final Order Allowing

such Other Priority Claim, or as soon thereafter as is practicable; provided, however, that no

employee of the Debtor that holds an Allowed Other Priority Claim on account of accrued but

unused pre-Commencement Date vacation, sick or personal days and that remains employed by

the Reorganized Debtor shall receive any distributions in Cash on account of such Claim as such

employees' Allowed Other Priority Claims shall be satisfied in full by the employees' utilizing

their respective accrued but unused pre-Commencement Date vacation, sick or personal days

from and after the Commencement Date and Confirmation Date, as the case may be.

    4.3    <u>CLASS 2 – PRE-PETITION SECURED LENDER CLAIM</u>.

    (A)    <u>Impairment and Voting</u>.  Class 2 is unimpaired by the Plan.  Each Holder

of an Allowed Pre-Petition Secured Lender Claim is conclusively presumed to have accepted the

Plan and is not entitled to vote to accept or reject the Plan.

    (B)    <u>Treatment and Distributions</u>.  The Pre-Petition Secured Lender Claims

shall be Allowed in an amount equal to the sum of (i) the principal amount of the Pre-Petition

Secured Lender Claims as of the Commencement Date, plus all unpaid interest and fees which

have accrued and are unpaid through the Commencement Date, plus (ii) all interest and fees (if

any) to which the Pre-Petition Secured Lenders are entitled under section 506(b) of the

Bankruptcy Code, and (C) any other amounts owed by the Debtor under the DIP Financing

Order, to the extent not already paid to the Pre-Petition Secured Lenders pursuant to the DIP

Financing Order.  On the Effective Date, in full satisfaction of all of the obligations of the

Debtor in respect of the Pre-Petition Secured Lender Claims, the Disbursing Agent shall

distribute to the Pre-Petition Second Lien Agent (for the benefit of the Pre-Petition Secured

Lenders) and without further notice, application or hearing, Cash in an amount equal to the

principal and all interest accrued on the Pre-Petition Secured Lender Claims through the

Effective Date plus all unreimbursed fees and expenses incurred by the Pre-Petition Second

Lien Agent through the Effective Date.

4.4    CLASS 3 - OTHER SECURED CLAIMS.  Class 3 consists of separate sub-

Classes for each Other Secured Claim against the Debtor.  Each sub-Class is deemed to be a

separate Class for all purposes under the Bankruptcy Code.

(A)    Impairment and Voting.  The Debtor asserts that Class 3 and all sub-

Classes are unimpaired by the Plan and as such each Holder of an Allowed Other Secured Claim

is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject

the Plan.

(B)    Treatment.  On the Effective Date, as shall have been determined by the

Debtor in its sole discretion, either (i) the legal, equitable, and contractual rights of each Holder

of an Allowed Other Secured Claim shall be reinstated in accordance with the provisions of

section 1124(2) of the Bankruptcy Code notwithstanding any contractual provision or applicable

nonbankruptcy law that entitles the Holder of an Allowed Other Secured Claim to demand or

receive payment of such Allowed Other Secured Claim before the stated maturity of such

Allowed Other Secured Claim from and after the occurrence of a default, provided, however,

that any contractual right that does not pertain to the payment when due of principal and interest

on the obligation on which such Claim is based, including, but not limited to, financial covenant

ratios, negative pledge covenants, covenants or restrictions on merger or consolidation,

covenants regarding corporate existence, or covenants prohibiting certain transactions or actions

contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not

be enforceable as to any breach that occurred on or prior to the Effective Date or any breach

determined by reference back to a date preceding the Effective Date; (ii) each Holder of an

Allowed Other Secured Claim shall (a) retain a Lien securing such Allowed Other Secured

Claim and (b) receive deferred Cash payments totaling at least the amount of such Allowed

Other Secured Claim, of a value, as of the Effective Date, of at least the value of such Holder's interest in the Estate's interest in such property; (iii) the collateral securing such Allowed Other Secured Claim shall be surrendered to the Holder of such Allowed Other Secured Claim in full satisfaction of such Allowed Other Secured Claims; or (iv) each Holder of an Allowed Other Secured Claim shall be paid in full on the Effective Date.  The failure to object to any Other Secured Claim in the Chapter 11 Case shall be without prejudice to the Debtor's or the Reorganized Debtor's right to contest or otherwise defend against such Claim in the appropriate forum when and if such Claim is sought to be enforced by the Holder of  such Other Secured Claim.

Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of the Debtor held with respect to an Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Claim until such Allowed Claim is paid in full, at which time such Liens shall be released, shall be deemed null and void, and shall be unenforceable for all purposes; provided, however, that the Reorganized Debtor may condition delivery of any final payment upon receipt of an executed release of the Liens.  Nothing in this Section or elsewhere in the Plan shall preclude the Debtor or the Reorganized Debtor from challenging the validity of any alleged Lien on any asset of a Debtor or the value of the property that secures any alleged Lien.

4.5    CLASS 4 - GENERAL UNSECURED CLAIMS.

(A)    Impairment and Voting.  Class 4 is impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

(B)    Distributions.  Each Holder, as of the Record Date, of an Allowed General

Unsecured Claim shall receive, on account of such Holder's Allowed General Unsecured Claim,

its *pro rata* share of an amount up to $31.72 million in the aggregate, provided that no such

Holder of an Allowed General Unsecured Claim will receive more than 52% of such Holder's

Allowed Claim, payable in installments as set forth below.

(C)    Employees of the Debtor that hold an Allowed General Unsecured Claim

on account of accrued but unused pre-Commencement Date vacation, sick or personal days and

that remain employed by the Reorganized Debtor shall not receive any distribution on account of

such Claim as such employees' Allowed General Unsecured Claims shall be satisfied in full by

the employees' utilizing their respective accrued but unused pre-Commencement Date vacation,

sick or personal days from and after the Commencement Date and the Confirmation Date, as the

case may be.

(D)    Distributions to Holders of Allowed General Unsecured Claims shall be

made as follows:  Subject to the conditions set forth in the Plan, up to $31.72 million shall be

paid, in the aggregate, to the Holders of Allowed Class 4 Unsecured Claims in four (4)

installments, as follows: (i) 45% of such Holders Allowed Claims on the Initial Distribution Date

(the "First Installment"), (ii) an additional 2.33% of such Holders Allowed Claim on the twelve

month anniversary of the Effective Date (the "Second Installment"), (iii) an additional 2.33% of

such Holders Allowed Claim on the fifteen month anniversary of the Effective Date (the "Third

Installment") and (iv) and additional 2.34% of such Holders Allowed Claim on the eighteen

month anniversary of the Effective Date (the "Final Installment"), provided, however, that upon

payment of the Final Installment no such Holder of an Allowed General Unsecured Claim will

have received more than 52% of such Holder's Allowed Claim.  The amounts to be distributed to

General Unsecured Creditors on account of their Allowed Claims shall not accrue any interest and no interest will be paid in respect of distributions to General Unsecured Creditors. The Reorganized Debtor may prepay the distribution to Holders of Allowed Unsecured Claims at any time without any penalty or interest in complete and full satisfaction of the Allowed Unsecured Claims in Class 4. If the Claim is Disputed, distributions shall be as provided in Section 5.3(I) of this Plan.

      4.6    <u>CLASS 5 - OLD EQUITY INTERESTS</u>.

      (A)    <u>Impairment and Voting</u>. Class 5 is impaired by the Plan. Each Holder of Old Equity Interests included in Class 5 is conclusively presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

      (B)    <u>Distributions</u>. Each Holder, as of the Record Date, of Old Equity Interests shall receive no distributions on account of such Old Equity Interests. On the Effective Date, all Old Equity Interests shall be cancelled, extinguished, and of no further force and effect.

      4.7    <u>Modification of Treatment of Claims and Old Equity Interests</u>. The Debtor, after consultation with the Apollo Investor, reserves the right to modify the treatment of any Allowed Claim or Old Equity Interests in any manner adverse only to the Holder of such Claim or Old Equity Interests at any time after the Effective Date upon the consent of the Holder of the Claim or Old Equity Interests whose Allowed Claim or Old Equity Interests, as the case may be, is being adversely affected.

      4.8    <u>Special Provisions Regarding Insured Claims</u>. Distributions under the Plan to each Holder of an Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified; <u>provided</u>, <u>however</u>, that the maximum amount of any distribution under the Plan on account of an Allowed Insured Claim

shall be limited to an amount equal to the applicable self-insured retention under the relevant

insurance policy; provided further, however, that, to the extent a Holder has an Allowed Insured

Claim, the amount of which exceeds the total coverage available from the relevant insurance

policies of the Debtor, such Holder shall have an Allowed Claim in the amount by which such

Allowed Insured Claim exceeds the coverage available from the relevant Debtor's insurance

policies.  Nothing in this Section shall expand the scope of, or alter in any other way, the rights

and obligations of the Debtor's insurers under their policies nor shall anything in this section

constitute a waiver of any rights or Causes of Action the Debtor may hold against any Person,

including the Debtor's insurers under any policies of insurance; and nothing in this section is

intended to, shall, or shall be deemed to preclude any Holder of an Allowed Insured Claim from

seeking and/or obtaining a distribution or other recovery from any insurer of the Debtor in

addition to (but not in duplication of) any distribution such Holder may receive under the Plan;

provided, however, that the Debtor and the Estate do not waive, and expressly reserve all rights

to assert that any insurance coverage is property of the Estate.

ARTICLE V.

PROVISIONS REGARDING VOTING AND DISTRIBUTIONS
UNDER THE PLAN AND TREATMENT OF DISPUTED,
CONTINGENT AND UNLIQUIDATED CLAIMS AND EQUITY INTERESTS

5.1    Voting of Claims and Certain Interests.  Each Holder of an Allowed Claim in an

impaired Class of Claims shall be entitled to vote separately to accept or reject the Plan as

provided in such Order as is entered by the Bankruptcy Court establishing certain procedures

with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other

Order or Orders of the Bankruptcy Court.

5.2    Nonconsensual Confirmation.  If any impaired Class of Claims or Old Equity

Interests entitled to vote shall not accept the Plan by the requisite statutory majorities provided in

sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, the Debtor reserves the right

to amend the Plan in accordance with Section 12.8 hereof, or to undertake to have the

Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

     5.3    Method of Distributions Under the Plan

     (A)    In General.  Subject to Bankruptcy Rule 9010, and except as otherwise

provided in this Section, all distributions under the Plan shall be made by or on behalf of the

Reorganized Debtor to the Holder of each Allowed Claim at the address of such Holder as listed

on the Schedules as of the Record Date unless the Debtor or the Reorganized Debtor has been

notified in writing of a change of address including, without limitation, by the Filing of a proof

of claim by such Holder that provides an address for such Holder different from the address

reflected on the Schedules.

     (B)    No Interest on Claims.  Unless otherwise specifically provided for in this

Plan, the Confirmation Order, the DIP Financing Order, or the DIP Facility, post-

Commencement Date interest shall not accrue or be paid on Claims, and no Holder of any

Claim or Equity Interest shall be entitled to interest accruing on or after the

Commencement Date.

     (C)    Distributions of Cash.  Any payment of Cash made by the Reorganized

Debtor pursuant to the Plan shall be made by check drawn on a domestic bank, by electronic

wire, or by other form of wire transfer.

     (D)    Timing of Distributions.  Any payment or distribution required to be made

under the Plan on a day other than a Business Day shall be made on the next succeeding

Business Day.

(E)      Minimum Distributions.  No payment of Cash less than fifty dollars ($50.00) shall be made by the Reorganized Debtor to any Holder of a Claim unless a request therefor is made in writing to the Reorganized Debtor.

(F)      Fractional Dollars.  Any other provisions of the Plan to the contrary notwithstanding, no payments of fractions of dollars will be made.  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down).

(G)      Unclaimed Distributions.  Any distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be revested in the Reorganized Debtor and any entitlement of any Holder of any Claim to such distributions shall be extinguished and forever barred.

(H)      Distributions to Holders as of the Record Date.  As of the close of business on the Record Date, the Claims' Register shall be closed, and there shall be no further changes in the record Holders of any Claims.  The Debtor and the Reorganized Debtor shall have no obligation to recognize any transfer of any Claims occurring after the Record Date.  The Debtor and the Reorganized Debtor shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan) with only those record Holders stated on the Claims' Register as of the close of business on the Record Date.

(I)      Distributions Withheld for Disputed General Unsecured Claims.

(i)      Establishment and Maintenance of Reserve.  On the Initial Distribution Date and each Subsequent Distribution Date, the Reorganized Debtor shall reserve from the distributions to be made on such dates to the Holders of Allowed General Unsecured Claims, an amount of Cash equal to one-hundred percent (100%) of the distributions to which

Holders of Disputed General Unsecured Claims would be entitled under the Plan as of such dates

if such Disputed General Unsecured Claims were Allowed Claims in their Disputed Claim

Amounts (the "Reserve").

(ii)    Distributions Upon Allowance of Disputed General Unsecured

Claims.  The Holder of a Disputed General Unsecured Claim that becomes an Allowed Claim

subsequent to the Initial Distribution Date shall receive distributions of Cash from the Reserve

on the next Subsequent Distribution Date that follows the Quarter during which such Disputed

General Unsecured Claim becomes an Allowed Claim pursuant to a Final Order.  Such

distributions shall be made in accordance with the Plan based upon the distributions that would

have been made to such Holder under the Plan if the Disputed General Unsecured Claim had

been an Allowed Claim on or before the Effective Date.

(iii)    Surplus Distributions.  The following consideration shall constitute

surplus distributions pursuant to the Plan (the "Surplus Distributions"): (i) distributions under the

Plan to Holders of Allowed General Unsecured Claims that are unclaimed for a period of one (1)

year after distribution thereof; and (ii) to the extent that a Disputed General Unsecured Claim is

not Allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount,

the excess of the amount of Cash in the Reserve over the amount of Cash actually distributed on

account of such Disputed General Unsecured Claim.  Any Surplus Distributions shall be revested

in the Reorganized Debtor and any entitlement of any Holder of any Claim to such distributions

shall be extinguished and forever barred.

(J)    Personal Injury Tort Claims and Environmental Claims.  All personal

injury Tort Claims and Environmental Claims are Disputed Claims.  Any personal injury Tort

Claim or Environmental Claim as to which a proof of Claim was timely filed in the Chapter 11

Case shall be determined and liquidated in the administrative or judicial tribunal(s) in which it is

pending on the Effective Date or, if no action was pending on the Effective Date, in any

administrative or judicial tribunal of appropriate jurisdiction, or in accordance with any

alternative dispute resolution or similar proceeding as same may be approved by Order of the

Bankruptcy Court.  Any personal injury Tort Claim or Environmental Claim determined and

liquidated (i) pursuant to a judgment obtained in accordance with this Section and applicable

nonbankruptcy law which is no longer appealable or subject to review, or (ii) in any alternative

dispute resolution or similar proceeding as same may be approved by Order of the Bankruptcy

Court, shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance

with the Plan.  Nothing contained in this Section shall impair the Debtor's right to seek

estimation of any and all personal injury Tort Claims and Environmental Claims in a court or

courts of competent jurisdiction or constitute or be deemed a waiver of any Cause of Action that

the Debtor may hold against any entity, including, without limitation, in connection with or

arising out of any personal injury Tort Claim or Environmental Claim.

(K)     <u>Disbursing Agents</u>.  Wilmington Trust Corporation shall serve as the

Initial Disbursing Agent for the purpose of receipt and distribution of all funds required to be

disbursed on the Effective Date (collectively, the "Confirmation Funds").  On the Effective Date,

the Reorganized Debtor shall deposit in an escrow account with the Initial Disbursing Agent an

amount in Cash equal to the amount of the Confirmation Funds (the "Confirmation Funds

Escrow Account").  At least three (3) days before the Confirmation Hearing, each Professional

asserting a Fee Claim shall serve on the Initial Disbursing Agent an estimate of the maximum

amount of compensation and reimbursement of expenses to be asserted in the Chapter 11 Case

from the Commencement Date through the Confirmation Date (the "Estimated Fee Claims") and,

within five (5) business days after the Effective Date, the Reorganized Debtor shall deposit in the

Confirmation Funds Escrow Account an amount in Cash equal to the Estimated Fee Claims.

The Reorganized Debtor, or such Person(s) as the Reorganized Debtor may

designate upon written notice to the Committee or the Post-Effective Date Committee without

the need for a further Order of the Bankruptcy Court, will act as Disbursing Agent under the Plan

with respect to all distributions to Holders of Claims (other than the Marcalus Note Claims,

which distributions shall be utilized in accordance with the terms of this Plan to partially fund the

Founding Investor's acquisition of the New Common Stock) and will make all distributions

required to be distributed under the applicable provisions of the Plan, including to the extent

necessary on account of the Management Equity Incentive Program due after the Confirmation

Date.  To the extent that the Disbursing Agent is someone other than the Debtor, the Disbursing

Agent shall be required to post a bond.

Any Disbursing Agent may employ or contract with other entities to assist in or

make the distributions required by the Plan.  Each Disbursing Agent will serve without bond, and

each Disbursing Agent, other than the Reorganized Debtor, will receive, without further

Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant

to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with

such services from the Reorganized Debtor on terms acceptable to the Reorganized Debtor.  The

Disbursing Agents shall hold all reserves and accounts pursuant to the Plan, including the

Reserve.

The Reorganized Debtor shall indemnify and hold harmless the Disbursing

Agents and their agents and attorneys from and against all liabilities, losses, damages, claims,

costs and expenses (including, but not limited to, attorneys' fees) arising out of or due to their

actions or omissions, or consequences of such actions or omissions, other than as a result of their

gross negligence or willful misconduct, with respect to the Reorganized Debtor or the

implementation of the Plan.

(L)    Setoffs and Recoupment.  The Debtor or the Reorganized Debtor, as the

case may be, may, but shall not be required to, set off against or recoup from any Claim and the

payments to be made pursuant to the Plan in respect of such Claim, any Claims of any nature

whatsoever that the Debtor or the Reorganized Debtor, as the case may be, may have against the

claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall

constitute a waiver or release by the Debtor or the Reorganized Debtor of any such Claim or

right it may have against such Claimant.

(M)    Bar Date for Fee Applications.  Unless another date is set by Final Order

entered by the Bankruptcy Court, all Fee Applications shall be filed within sixty (60) days after

the Effective Date or be forever barred.

(N)    Bar Date for Other Administrative Expense Claims.

(i)    A notice setting forth the Other Administrative Claim Bar Date

will be (a) filed on the Bankruptcy Court's docket and (b) posted on Logan's website at

www.loganandco.com.  No other notice of the Other Administrative Claim Bar Date will be

provided.

(ii)    All requests for payment of Other Administrative Expense Claims

(i.e., Administrative Expense Claims that accrued between July 1, 2007 and the Effective Date

(other than (a) Professional Compensation and Reimbursement Claims, which are subject to the

provisions of Section 2.2 of the Plan, (b) a liability incurred and payable in the ordinary course

of business by a Debtor (and not past due), (c) claims of the Apollo Investor under its Order

authorizing the reimbursement of its expenses, or (d) an Other Administrative Expense Claim

that has been Allowed on or before the Effective Date)) must be filed with the Claims Agent and

served on counsel for the Debtor by the Administrative Claim Bar Date. Any requests for

payment of Other Administrative Expense Claims pursuant to this Section 5.3(N) that are not

properly filed and served by the Other Administrative Claim Bar Date shall not appear on the

register of claims maintained by the Claims Agent and shall be disallowed automatically without

the need for any objection from the Debtor or the Reorganized Debtor or any action by the

Bankruptcy Court.

**Failure to file and serve such notice timely and properly shall result in the Other**

**Administrative Expense Claim being forever barred and discharged.**

(iii)    Subject to Section 12.4(B) below, the Reorganized Debtor, in its

sole and absolute discretion, may settle Other Administrative Expense Claims in the ordinary

course of business without further Bankruptcy Court approval.

(iv)    Unless the Debtor or the Reorganized Debtor objects to a timely-

filed and properly served Other Administrative Expense Claim by the Claims Objection

Deadline, such Other Administrative Expense Claim shall be deemed allowed in the amount

requested. In the event that the Debtor or the Reorganized Debtor objects to an Other

Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing

that, the Bankruptcy Court shall determine whether such Other Administrative Expense Claim

should be allowed and, if so, in what amount.

(v)    **The Other Administrative Claims Bar Date set forth in this**

**Section 5.3(N) does not apply to (a) Administrative Expense Claims that accrued prior to**

**the Administrative Expense Claims Bar Date, or (b) any Section 503(b)(9) Administrative**

**Claims. The Administrative Expense Claims Bar Date and the Section 503(b)(9)**

**Administrative Claims Bar Date, respectively, controls those claims.**

(O)   <u>Objections to and Resolution of Claims.</u>  Except to the extent provided by

Section 12.4(B) of this Plan, the Reorganized Debtor shall have the exclusive right to make and

file objections to Administrative Expense Claims (including Fee Applications), Other

Administrative Expense Claim and Claims after the Effective Date; <u>provided</u>, <u>however</u>, that prior

to the termination of the Creditors' Committee as provided by Section 12.4(A) below, the

Creditors' Committee may object to any Administrative Expense Claims (including Fee

Applications), Other Administrative Expense Claim and Other Administrative Expense Claims.

All objections shall be litigated to entry of a Final Order; <u>provided</u>, <u>however</u>, that the

Reorganized Debtor shall have the authority to compromise, settle, otherwise resolve or

withdraw any objections, without approval of the Bankruptcy Court; <u>provided</u>, <u>further</u> <u>however</u>,

that, with respect to the settlement of any Claim, Administrative Claim, or Other Administrative

Claim for an amount exceeding $500,000, the Reorganized Debtor (i) shall provide written

notice of the terms of such settlement by email, facsimile or overnight or hand delivery to the

attorneys for the Creditors' Committee or Post-Effective Date Committee, as applicable, and (ii)

may then proceed with such settlement unless they receive a written objection (addressed to the

attorneys for the Reorganized Debtor identified in such notice) by 4:00 p.m. (prevailing Eastern

Time) on the day that is 10 calendar days from the date the Reorganized Debtor provide such

written notice.  If the Reorganized Debtor receives such an objection from the Creditors'

Committee or the Post-Effective Date Committee, as the case may be, the parties will confer and

attempt to resolve any differences.  Failing that, the Reorganized Debtor may petition the

Bankruptcy Court for approval of any proposed settlement.  Unless otherwise Ordered by the

Bankruptcy Court, the Reorganized Debtor or the Post-Effective Date Committee (acting within

its authorized rights and powers as provided by Section 12.4(B) hereof) shall file all objections to

Administrative Expense Claims or Other Administrative Expense Claim that are the subject of

proofs of Claim or requests for payment filed with the Bankruptcy Court and Claims and serve

such objections on the Holder of the Administrative Expense Claim, Other Administrative

Expense Claim or Claim as to which the objection is made no later than sixty (60) days after the

Effective Date or such later date as may be approved by the Bankruptcy Court.

<u>ARTICLE VI.</u>

EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1     <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>.

(A)     <u>Executory Contracts and Unexpired Leases</u>.  Pursuant to sections 365(a)

and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist

between the Debtor and any Person shall be deemed assumed by the Debtor and assigned to the

Reorganized Debtor as of the Effective Date, except for any executory contract or unexpired

lease (i) which has been assumed pursuant to an Order of the Bankruptcy Court entered before

the Confirmation Date, (ii) which has been rejected pursuant to an Order of the Bankruptcy

Court entered before the Confirmation Date, (iii) as to which a motion for approval of the

rejection of such executory contract or unexpired lease has been filed and served before the

Confirmation Date or (iv) which is set forth in Schedule I-A (executory contracts) or Schedule I-

B (unexpired leases), which Schedules shall be included in the Plan Supplement; <u>provided</u>,

<u>however</u>, that the Debtor reserves the right, after consultation with, and with the consent of, the

Apollo Investor, on or before the Confirmation Date, to amend Schedules I-A or I-B to delete

any executory contract or unexpired lease therefrom or to add any executory contract or

unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be

deemed to be, respectively, assumed or rejected.  The Debtor shall provide notice of any amendments to Schedules I-A or I-B to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedules I-A or I-B shall not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder.

(B)    Schedules of Rejected Executory Contracts and Unexpired Leases; Inclusiveness.  Each executory contract and unexpired lease listed or to be listed on Schedules I-A or I-B shall include (i) modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules I-A or I-B and (ii) executory contracts or unexpired leases appurtenant to the premises listed on Schedules I-A or I-B including, without limitation, all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vault, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem relating to such premises to the extent any of the foregoing are executory contracts or unexpired leases, unless any of the foregoing agreements previously have been assumed.

(C)    Insurance Policies.  Each of the Debtor's insurance policies and any agreements, documents or instruments relating thereto, including, without limitation, any retrospective premium rating plans relating to such policies, are treated as executory contracts under the Plan.  Notwithstanding the foregoing, distributions under the Plan to any Holder of a Claim covered by any of such insurance policies and related agreements, documents or instruments that are assumed hereunder, shall be in accordance with the treatment provided

under Section 4.8 of this Plan.  Nothing contained in this Section shall constitute or be deemed a waiver of any Cause of Action that the Debtor may hold against any entity including, without limitation, the insurer under any of the Debtor's policies of insurance.

(D)    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.  Entry of the Confirmation Order shall constitute the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the (i) assumption of the executory contracts and unexpired leases to be assumed pursuant to Section 6.1(A) hereof, and (ii) rejection of the executory contracts and unexpired leases to be rejected pursuant to Section 6.1(A) hereof.

(E)    Cure of Defaults.  Except as may otherwise be agreed to by the parties, within ninety (90) days after the Effective Date, or as due in the ordinary course of business, the Reorganized Debtor shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code or in accordance with agreements previously negotiated by the parties in respect of the reduction of pre- Commencement Date Claims, as applicable.  Notice of the cure amount is set forth on Schedules I-A or I-B, as applicable, to the Plan. If no Cure amount is set forth on those Schedules, the Debtor believes no cure amount is due.  Notwithstanding the foregoing, in the event of a dispute regarding (i) the nature or amount of any cure obligation, (ii) the ability of the Reorganized Debtor or any assignee to provide "adequate assurances of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed or assigned, or (iii) any other matter pertaining to any such assumption, the cure obligation shall be satisfied no later than thirty (30) days of the entry of a Final Order determining the obligation, if any, of the Debtor or the Reorganized Debtor with respect thereto, or as may otherwise be agreed to by the parties.

(F)    <u>Cure Procedure</u>.  The Plan shall constitute notice to any non-Debtor party to any executory contract or unexpired lease to be assumed pursuant to the Plan of the amount of any cure amount owed, if any, under the applicable executory contract or unexpired lease.  **Any non-Debtor party that fails to respond or object on or before the deadline scheduled by the Bankruptcy Court for objections to the Plan, shall be deemed to have consented to such proposed amount.**

(G)    <u>Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan</u>.  Claims arising out of the rejection of an executory contract or unexpired lease, after the Bar Date, pursuant to Section 6.1(A) of this Plan must be filed with the Bankruptcy Court and served upon the Claims Agent or as otherwise may be provided in the Confirmation Order, by no later than thirty (30) days after notice of entry of the Confirmation Order and/or notice of an amendment to Schedules I-A or I-B.  Any Claims not filed within such time will be forever barred from assertion against the Debtor and its Estate and the Reorganized Debtor and its property.  Any Claim arising out of the rejection, prior to the Bar Date, of an executory contract or unexpired lease, shall have been filed with the Bankruptcy Court and served upon the Claims Agent prior the Bar Date or is forever barred from assertion against the Debtor and its Estate and the Reorganized Debtor and its property.  Unless otherwise Ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as General Unsecured Claims under the Plan.

(H)    <u>Indemnification Obligations</u>.  For purposes of the Plan, the obligations of the Debtor to defend, indemnify, reimburse or limit the liability of its present directors, officers or employees who were directors, officers or employees, respectively, on or after the Commencement Date against any Claims or obligations pursuant to the Debtor's certificates of

incorporation or bylaws, applicable state law, or specific agreement, or any combination of the

foregoing, shall: (i) be assumed by the Reorganized Debtor; (ii) survive confirmation of the Plan;

(iii) remain unaffected thereby; and (iv) not be discharged, irrespective of whether

indemnification, defense, reimbursement or limitation is owed in connection with an event

occurring before, on or after the Commencement Date.

(I)    Modified Compensation and Benefit Programs.  Except as reflected in the

Management Equity Incentive Program or any Orders of the Bankruptcy Court entered on or

before the Confirmation Date, all employment and severance practices and policies, and all

compensation and benefit plans, policies, and programs of the Debtor applicable to its current

directors, officers or employees including, without limitation, all savings plans, retirement plans,

health care plans, severance benefit plans, incentive plans, workers' compensation programs, and

life, disability and other insurance plans are treated as executory contracts under the Plan and are

hereby assumed pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code; provided,

however, that the Reorganized Debtor reserves the right to modify and reject any and all such

compensation and benefit practices, plans, policies, and programs, including any deferred

compensation agreements it has with its employees.

(J)    Management Equity Incentive Program.  On or soon as reasonably

practicable after the Effective Date, the Holding Company BOD (as defined below) shall

implement the Management Equity Incentive Program pursuant to the terms thereof  to provide

designated members of senior management of the Reorganized Debtor with stock appreciation

rights, Holding Company Common Stock and/or options to purchase shares of Holding

Company Common Stock.  The Management Equity Plan will contain terms and conditions that

shall be determined by the Holding Company BOD.  The Management Equity Incentive Program

and the definitive documentation of the Management Equity Incentive Program shall be acceptable to the Apollo Investor.

## ARTICLE VII.

### PROVISIONS REGARDING CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTOR

7.1     General.  On the Effective Date, the management, control and operation of the Reorganized Debtor and the Holding Company shall become the general responsibility of the Board of Directors of the Reorganized Debtor and the Holding Company, respectively.

7.2     Meetings of the Reorganized Debtor's Stockholders.  In accordance with the Amended and Restated Debtor Certificate of Incorporation and the Amended Debtor Bylaws, as the same may be amended from time to time, the first annual meeting of the stockholders of the Reorganized Debtor shall be held on a date in 2007 selected by the New Board of Directors and subsequent meetings of the stockholders of the Reorganized Debtor shall be held at least once annually each year thereafter.

7.3     Directors and Officers of the Reorganized Debtor and the Holding Company.

(A)     Board of Directors.  The New Board of Directors of the Reorganized Debtor (the "Reorganized Debtor BOD") shall initially comprise seven (7) members, consisting of four (4) Founding Investor board designees and three (3) Apollo Investor board designs.  The Holding Company Board of Directors (the "Holding Company BOD") shall initially consist of the same members as the Reorganized Debtor BOD.  If the Reorganized Debtor fails to achieve certain minimum EBITDA targets, the Apollo Investor shall be entitled to increase the size of the Holding Company BOD and the Reorganized Debtor BOD and appoint new members and/or remove Board members appointed by the Founding Investor, in each case, such that the Apollo Investor controls a majority of the Holding Company BOD and the Reorganized Debtor BOD.

No designation of a Person as a director of the Reorganized Debtor or the Holding Company shall create a contract of employment.

(B)    <u>Officers</u>.  The officers of the Debtor immediately before the Effective Date shall serve as the initial officers of the Reorganized Debtor on and after the Effective Date.

7.4    <u>Amended Bylaws and Amended Certificates of Incorporation for the Reorganized Debtor; New Bylaws and Certificates of Incorporation for the Holding Company</u>.  The bylaws, certificate of incorporation and any other organizing documents of the Debtor (which, together with the Holding Company Corporate Documents, as defined below, shall hereinafter be referred to as the "New Corporate Documents") shall be amended and restated as of the Effective Date to the extent necessary to: (A) pursuant to section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of such certificates of incorporation and bylaws as permitted by applicable law; and (B) effectuate the provisions of the Plan, in each case, without any further action by the stockholders or directors of the Debtor or the Reorganized Debtor.

As of the Confirmation Date, the Holding Company shall adopt bylaws, file a certificate of incorporation with the Delaware Secretary of State, and issue or adopt any other organizing documents as shall be necessary to effectuate the provisions of the Plan (the "Holding Company Corporate Documents").

7.5    <u>Issuance of New Securities</u>.  The issuance of all securities by the Reorganized Debtor is hereby authorized without further act or action under applicable law, regulation, Order or rule.  The Confirmation Order shall provide that the issuance of New Common Stock and any

other new securities under the Plan shall be exempt from the registration requirements of the

Securities Act of 1933, as amended, in accordance with section 1145 of the Bankruptcy Code.

7.6    Commitment Fee; Consulting Fee.  From and after the Effective Date, Apollo

shall be entitled to a fee for management and consulting services to the Reorganized Debtor and

the Holding Company pursuant to the terms of a consulting agreement between the Holding

Company and Apollo (or one or more of its affiliates or designees) that provides for (a) a

commitment fee equal to $1.5 million and (b) annual consulting fees equal to $250,000.  The

commitment fee and consulting fees due for this year shall be paid on the Effective Date.

## ARTICLE VIII.

## IMPLEMENTATION AND EFFECT OF CONFIRMATION OF PLAN

8.1    Means for Implementation of the Plan.  In addition to the provisions set forth

elsewhere in the Plan, the following shall constitute the means for implementation of the Plan:

(A)    Exit Financing.  On the Confirmation Date, the transactions contemplated

by the Exit Facility shall be approved.  On the Effective Date, the transactions contemplated by

the Exit Facility shall be consummated and thereupon become effective.

(B)    Formation of the Holding Company and Contribution of New Common

Stock Thereto.  On or before the Confirmation Date, the Founding Investor shall cause the

Holding Company to be formed.  On the Effective Date, the Reorganized Debtor shall issue and

deliver to the Holding Company all issued and outstanding shares of stock in the Reorganized

Debtor in exchange for which the Holding Company shall contribute to the Reorganized Debtor

$63.744 million in cash for the funding of the payments due under the Plan (the "Investment

Amount").  The sources of the Investment Amount shall be as follows:

(i)    The Apollo Investor shall contribute $6.724 million in cash to the

Holding Company for the purchase of 6,724,000 shares of Holding Company Common Stock.

(ii)    The Note Purchasers shall contribute $52.416 million through the purchase of the Senior Notes.

(iii)    The Founding Investor shall contribute $6.86 million in value for 6,860,000 shares of Holding Company Common Stock, as follows:

(a)    $1 million in cash;

(b)    $1 million in the form of the waiver of any and all lease cure costs due the Insider Landlords;

(c)    $4.86 million, which shall be funded from the distributions due under the Plan with respect to the Marcalus Notes, and all distributions payable on the Marcalus Notes shall be allocated to the outstanding principal amount thereof;

(d)    $1 million in the form of a letter of credit, the beneficiary of which shall be the Apollo Investor, which may be drawn upon, prior to the occurrence of a Liquidity Event (as defined in the Stockholders' Agreement, a copy of which is attached hereto as Exhibit B), if TTM EBITDA falls below $15 million and is not cured within six (6) months (it being understood that a "cure" requires that TTM EBITDA exceed $15 million plus the cumulative amount of any such short fall).

(e)    To secure the Apollo Investor's investment in the Holding Company, the owners of the Pledged Properties (controlled by certain members of the Marcalus family, hereinafter the "Pledged Property Owners") shall grant a lien on the respective Pledged Properties to the Apollo Investor, and at closing the Apollo Investor shall record non-recourse mortgages on the Pledged Properties reflecting such liens and including customary obligations, restrictions, cross-defaults and cross-accelerations (the "Investor Mortgages").  With respect to the Pledged Properties, the Pledged Property Owners shall enter into agreements at closing

containing certain covenants regarding, among other things, (i) ownership and operation of the

Pledged Properties, (ii) prohibiting placing additional mortgages or other encumbrances on the

Pledged Properties and (iii) making timely payments of taxes and operating expenses on such

Pledged Properties (together with the obligations, restrictions, cross-defaults and cross-

accelerations in the Investor Mortgages, the "Covenants").

Subject to the terms of the Investor Mortgage, if, at any time prior to the

consummation of a Liquidity Event, (A) (i) the Debtor's TTM EBITDA falls below $15 million

and has not been cured within six (6) months (it being understood that a "cure" requires that

TTM EBITDA exceed $15 million plus the cumulative amount of any such shortfall) and (ii)

upon the consummation of a Liquidity Event, if the value of the proceeds of such sale of the

Holding Company or the equity value of the Holding Company held by the Apollo Investor in

the case of an initial public offering (as determined by the offering price of the primary shares

sold in such initial public offering), as the case may be, is insufficient to return to the Apollo

Investor the full amount of the then-current Apollo Investor Equity Investment Amount (as

defined in the Subscription Agreement) (such shortfall, the "Net Equity Investment Shortfall"),

or (B) there has been a default under any mortgage or any other agreement then in place between

the Apollo Investor and any mortgagor, respectively, with respect to the properties subject to the

Investor Mortgage, that has not been cured within any applicable cure periods, then the Apollo

Investor shall be entitled to foreclose on and/or take possession of the Pledged Properties subject

to the Investor Mortgage in accordance with the terms thereof and/or applicable law, and to

exercise all remedies available to it (including those under the Investor Mortgage) to recoup the

Net Equity Investment Shortfall; provided, that any amounts actually received by the Apollo

Investor (net of fees, expenses and taxes) above the Net Equity Investment Shortfall shall be returned to the mortgagors, as applicable.

(C)    <u>Effectiveness of Securities, Instruments and Agreements</u>.  On the Effective Date, all documents set forth in the Plan Supplement and all other agreements entered into or documents issued pursuant to the Plan including, without limitation, the New Common Stock and/or any agreement entered into or instrument issued in connection with any of the foregoing shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto and shall be deemed to become effective simultaneously.

(D)    <u>Corporate Action for the Reorganized Debtor</u>.  On the Effective Date, all matters and actions provided for under the Plan that would otherwise require approval of the stockholders, directors or members of the Debtor or the Reorganized Debtor or their successors-in-interest under the Plan including, without limitation, execution of all documents necessary to effectuate the Exit Facility, the issuance of New Common Stock and documents relating thereto, the issuance of the New Corporate Documents and all other Plan Documents, and the election or appointment, as the case may be, of directors and officers of the Reorganized Debtor and the Holding Company pursuant to the Plan, shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by shareholders, directors or the Reorganized Debtor.  On the Effective Date, the Reorganized Debtor shall file its amended certificates of incorporation with the New Jersey Secretary of State, the state in which the Reorganized Debtor is incorporated, in accordance with the applicable general corporation law of New Jersey.

(E)    <u>Approval of Agreements</u>.  The solicitation of votes on the Plan also shall be deemed as a solicitation for the approval of the Plan Documents and Plan Supplement and all

transactions contemplated by the Plan.  Entry of the Confirmation Order shall constitute approval

of the Plan Documents and Plan Supplement and all transactions contemplated thereby.

        (F)    <u>Cancellation of Existing Securities and Agreements</u>.  On the Effective

Date, the Old Equity Interests shall be canceled and extinguished, and the Holders thereof shall

have no rights and such instruments shall evidence no rights.

        (G)    <u>Special Procedures for Lost, Stolen, Mutilated or Destroyed Instruments</u>.

In addition to any requirements under the Debtor's certificate of incorporation or bylaws, any

Holder of a Claim evidenced by an instrument that has been lost, stolen, mutilated or destroyed

will, in lieu of surrendering such instrument, deliver to the Disbursing Agent: (i) evidence

satisfactory to the Disbursing Agent and the Debtor or the Reorganized Debtor, as the case may

be, of the loss, theft, mutilation or destruction; and (ii) such security or indemnity as may be

required by the Disbursing Agent to hold the Disbursing Agent and the Debtor or the

Reorganized Debtor, as the case may be, harmless from any damages, liabilities or costs incurred

in treating such individual as a Holder of an instrument.  Upon compliance with this Section, the

Holder of a Claim evidenced by any such lost, stolen, mutilated or destroyed instrument will, for

all purposes under the Plan, be deemed to have surrendered such instrument.

        (H)    <u>New Common Stock</u>.  In accordance with the Amended and Restated

Debtor Certificate of Incorporation and the Amended Debtor Bylaws, the Reorganized Debtor

shall issue 100 shares of New Common Stock.  The New Common Stock shall have a par value

of $.01 per share and such rights with respect to dividends, liquidation, voting and other matters

as are provided for by applicable nonbankruptcy law or in the Amended and Restated Debtor

Certificate of Incorporation and the Amended Debtor Bylaws.

(I)    Operation of the Debtor-in-Possession Between the Confirmation Date and the Effective Date.  The Debtor shall continue to operate as Debtor-in-Possession, subject to the supervision of the Bankruptcy Court, pursuant to the Bankruptcy Code, during the period from the Confirmation Date through and until the Effective Date, and any obligation incurred by the Debtor during that period shall constitute an Administrative Expense Claim.

(J)    Administration After the Effective Date.  After the Effective Date, the Reorganized Debtor may operate its businesses, and may use, acquire, and dispose of its property, free of any restrictions of the Bankruptcy Code and Bankruptcy Rules, but subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article XI of this Plan.

8.2    The Reorganized Debtor will continue to provide health insurance to its employees and will fulfill all of the Debtor's and the Reorganized Debtor's obligations to provide health insurance coverage for terminated employees, if any, in accordance with the Debtor's COBRA policy and as mandated by applicable state and federal law.

8.3    Revesting of Assets.

(A)    The property of the Estate of the Debtor shall revest in the Reorganized Debtor on the Effective Date.  Additionally, all employees and employee health and benefit plans, except and to the extent that such plans have been previously rejected or modified by an order of the Bankruptcy Court on or before the Confirmation Date, shall be transferred to the Reorganized Debtor on the Effective Date or as soon as practicable thereafter.  All employee policies in effect for the Debtor as of the Confirmation Date shall be in effect for the Reorganized Debtor, but may be amended thereafter at the Reorganized Debtor's sole discretion.

(B)    From and after the Effective Date, the Reorganized Debtor may operate its business, and may use, acquire and dispose of property without supervision or approval by the

Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, but subject to

the continuing jurisdiction of the Bankruptcy Court as set forth in Article XI of this Plan.

(C)    As of the Effective Date, all property of the Debtor and the Reorganized

Debtor shall be free and clear of all Liens, Claims and Old Equity Interests, except as provided in

the Plan or the Confirmation Order.

8.4    <u>Discharge of Debtor</u>.  The rights afforded herein and the treatment of all Claims

and Old Equity Interests herein shall be in exchange for and in complete satisfaction, discharge

and release of Claims and Old Equity Interests of any nature whatsoever, including any interest

accrued on such Claims from and after the Commencement Date, against the Debtor and the

Debtor-in-Possession, Estate, or any of its assets or properties.  Except as otherwise provided

herein, (A) on the Effective Date, all such Claims against and Old Equity Interests in the Debtor

shall be satisfied, discharged and released in full, and (B) all Persons are precluded and enjoined

from asserting against the Reorganized Debtor, its successors, or its assets or properties any other

or further Claims or Old Equity Interests based upon any act or omission, transaction or other

activity of any kind or nature that occurred before the Confirmation Date.

8.5    <u>Term of Bankruptcy Injunction or Stays</u>.  All injunctions or stays provided for in

the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in

existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Except as otherwise expressly provided in the Plan, the Confirmation Order or a separate Order

of the Bankruptcy Court, all entities who have held, hold or may hold Claims against or Old

Equity Interests in the Debtor, are permanently enjoined, on and after the Confirmation Date,

from (A) commencing or continuing in any manner any action or other proceeding of any kind

with respect to any such Claim or Old Equity Interests, (B) the enforcement, attachment,

collection or recovery by any manner or means of any judgment, award, decree or Order against

the Debtor on account of any such Claim or Old Equity Interests, (C) creating, perfecting or

enforcing any encumbrance of any kind against the Debtor or against the property or interests in

property of the Debtor on account of any such Claim or Old Equity Interests and (D) asserting

any right of setoff, subrogation or recoupment of any kind against any obligation due from the

Debtor or against the property or interests in property of the Debtor on account of any such

Claim or Old Equity Interests.  Such injunction shall extend to successors of the Debtor

(including, without limitation, the Reorganized Debtor) and their respective properties and

interests in property.

  8.6 <u>Exculpation</u>.  The Debtor, the Apollo Investor, the Note Purchasers, the

Reorganized Debtor, the Creditors' Committee, each of the members of the Creditors'

Committee, and their respective members, partners, officers, directors, employees and agents

(including any attorneys, financial advisors, investment bankers and other professionals retained

by such Persons) shall have no liability to any Holder of any Claim or Old Equity Interests for

any act or omission in connection with, or arising out of the Disclosure Statement, the Plan, the

Exit Facility, the Plan Documents, the solicitation of votes for and the pursuit of confirmation of

this Plan, the consummation of this Plan, or the administration of this Plan or the property to be

distributed under this Plan, except for willful misconduct or gross negligence as determined by a

Final Order of the Bankruptcy Court and, in all respects, shall be entitled to rely on the advice of

counsel with respect to their duties and responsibilities under this Plan.

### ARTICLE IX.

### CAUSES OF ACTION

  9.1 <u>Preservation of Causes of Action</u>.  Entry of the Confirmation Order shall not be

deemed or construed as a waiver or release by the Debtor of any Causes of Action.  In

accordance with section 1123(b)(3) of the Bankruptcy Code, and except as otherwise provided

in the Plan and/or the Confirmation Order, including, without limitation, as provided in Article

X of this Plan, the Reorganized Debtor shall retain and may (but is not required to) enforce all

Retained Actions, including Avoidance Actions and other similar claims arising under

applicable state laws, including, without limitation, Fraudulent Transfer Claims, if any, and all

other Causes of Action of a trustee and debtor-in possession under the Bankruptcy Code.  The

Debtor or the Reorganized Debtor, in their sole discretion, will determine whether to bring,

settle, release, compromise, or enforce any rights (or decline to do any of the foregoing)

with respect to the Retained Actions and the Avoidance Actions.  The Reorganized Debtor or

any successor may pursue such litigation claims in accordance with the best interests of the

Reorganized Debtor or any successors holding such rights of action.  Notwithstanding

anything to the contrary contained herein, upon the Effective Date, all Preference Claims that the

Debtor has or may have shall be fully and forever waived, released and discharged.  The failure

of the Debtor to specifically list any Claim, Causes of Action, right of action, suit or proceeding

in the Schedules, the Disclosure Statement or Schedule II hereto does not, and will not be

deemed to, constitute a waiver or release by the Debtor of such Claim, Causes of Action,

right of action, suit or proceedings, and the Reorganized Debtor will retain the right to pursue

such Claims, Causes of Action, rights of action, suits or proceedings in their sole discretion

and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion,

estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action,

suit or proceeding upon or after the Confirmation or consummation of the Plan.  Further,

recovery of any proceeds of Causes of Action shall be deemed "for the benefit of the Estate" as

set forth in section 550(a) of the Bankruptcy Code.

## ARTICLE X.

## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

10.1    <u>Conditions to Confirmation</u>.  The following conditions shall be met before

Confirmation of the Plan:

(A)    An Order shall have been entered finding that:

(i)    the Disclosure Statement contains adequate information pursuant

to section 1125 of the Bankruptcy shall have been issued by the Bankruptcy Court; and

(ii)    the Debtor, the Apollo Investor, the Note Purchasers, the

Creditors' Committee and their respective principals, officers, directors, attorneys, accountants,

financial advisors, advisory affiliates, employees, and agents solicited acceptance or rejection of

the Plan in good faith pursuant to 11 U.S.C. § 1125(e);

(B)    the Apollo Expense Reimbursement Motion shall have been approved by

an Order of the Bankruptcy Court no later than July 13, 2007; and

(C)    the proposed Confirmation Order shall be in form and substance

reasonably satisfactory to the Debtor, the Apollo Investor, the Note Purchasers, the Founding

Investor, the Exit Facility Lender or the agent for the Exit Facility Lender, and the Creditors

Committee and shall have been signed by the Bankruptcy Court and entered on the docket of this

Chapter 11 Case.

10.2    <u>Conditions Precedent to the Effective Date</u>.  The Plan shall not become effective

unless and until the following conditions shall have been satisfied or waived:

(A)    The Confirmation Order shall authorize and direct that the Debtor and the

Reorganized Debtor take all actions necessary or appropriate to enter into, implement and

consummate the contracts, instruments, releases, leases and other agreements or documents

created in connection with the Plan, including the Plan Documents and the transactions

contemplated thereby, including, without limitation, the transactions contemplated by the

Subscription Agreement by and among the Debtor, the Apollo Investor, the Founding Investor

and the other parties thereto, subject to the satisfaction of or waiver by either the Apollo Investor

or the Founding Investor, as applicable, of the conditions to each such party's obligations to

close the transactions contemplated thereby.

(B)     The Confirmation Order, and each Order referred to in Section 10.1

hereof, shall have become a Final Order.

(C)     The statutory fees owing to the United States Trustee shall have been paid

in full.

(D)     All Plan Documents shall be in a form satisfactory to the Debtor, the

Reorganized Debtor and the Apollo Investor in all respects and the conditions to the

effectiveness of the Subscription Agreement shall have been satisfied or waived.

(E)     The Exit Facility shall have been approved by the Bankruptcy Court,

entered into by all parties thereto and all conditions to the initial draw thereunder shall have been

satisfied in accordance with the terms thereof.

(F)     The New Corporate Documents referenced in Section 7.4 hereof shall

have been authorized and, to the extent necessary under applicable law, filed.

(G)     The Holding Company shall have been formed.

(H)     The Reorganized Debtor shall have obtained appropriate Directors &

Officers liability insurance.

(I)     All other actions, authorizations, consents and regulatory approvals

required (if any) and all Plan Documents necessary to implement the provisions of the Plan shall

have been obtained, effected or executed in a manner acceptable to the Debtor or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

10.3    Effect of Failure of Conditions.  If each condition to the Effective Date has not been satisfied or duly waived within thirty (30) days after the Confirmation Date, then (unless the period for satisfaction or waiver of conditions has been extended at the joint option of the Debtor and the Apollo Investor for a period not exceeding sixty (60) days) upon motion by any party in interest, made before the time that each of the conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by both the Debtor and the Apollo Investor before the Bankruptcy Court enters a Final Order granting such motion.  If the Confirmation Order is vacated pursuant to this Section 10.3, the Plan shall be deemed null and void in all respects including, without limitation, the discharge of Claims pursuant to section 1141 of the Bankruptcy Code and the assumptions or rejections of executory contracts and unexpired leases provided for herein, and nothing contained herein shall (A) constitute a waiver or release of any Claims by or against the Debtor or (B) prejudice in any manner the rights of the Debtor.

10.4    Waiver of Conditions to Confirmation and Effective Date.  Each of the conditions to Confirmation and the Effective Date may be waived in writing, in whole or in part, by the Debtor at any time, without notice or an Order of the Bankruptcy Court, but subject to the receipt by the Debtor of the written consent of the Apollo Investor.  The failure to satisfy or to waive any condition may be asserted by the Debtor regardless of the circumstances giving rise to

failure of such condition to be satisfied (including any action or inaction by the Debtor).  The

failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any

other rights, and each such right will be deemed an ongoing right that may be asserted at any

time.

       10.5    <u>Effects of Plan Confirmation</u>.

       (A)    <u>Limitation of Liability</u>.  Neither the Debtor, the Reorganized Debtor, the

Apollo Investor, the Note Purchasers, the Creditors' Committee, the members of the Creditors'

Committee, the Initial Disbursing Agent, the Disbursing Agent, nor any of their respective post-

Commencement Date employees, officers, directors, agents or representatives, or any

Professional (which, for the purposes of this Section 10.5, shall include any counsel of the

Debtor, the Reorganized Debtor, the Apollo Investor, the Note Purchasers or the Creditors'

Committee) employed by any of them, shall have or incur any liability to any Person whatsoever,

including, specifically, any Holder of a Claim or Old Equity Interests, under any theory of

liability (except for any Claim based upon willful misconduct or gross negligence), for any act

taken or omission made in good faith directly related to formulating, negotiating, preparing,

disseminating, implementing, confirming or consummating the Plan, the Plan Documents, the

Confirmation Order, or any contract, instrument, release, or other agreement or document created

or entered into, or any other act taken or omitted to be taken in connection with the Plan

Documents, provided that nothing in this paragraph shall limit the liability of any Person for

breach of any express obligation it has under the terms of the Plan, the Transaction Documents,

or under any agreement or other document entered into by such Person either after the

Commencement Date or in accordance with the terms of the Plan or for any breach of a duty of

care owed to any other Person occurring after the Effective Date.  In all respects, the Debtor, the

Reorganized Debtor, the Apollo Investor, the Note Purchasers, the Creditors' Committee, the

Initial Disbursing Agent, the Disbursing Agent, and each of their respective members, officers,

directors, employees, advisors and agents shall be entitled to rely upon the advice of counsel

with respect to their duties and responsibilities under the Plan.

(B)    <u>Subordination</u>.   The classification and manner of satisfying all Claims and

Old Equity Interests and the respective distributions and treatments under the Plan take into

account or conform to the relative priority and rights of the Claims and Old Equity Interests in

each Class in connection with any contractual, legal and equitable subordination rights relating

thereto, whether arising under general principles of equitable subordination, section 510(b) of the

Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released

pursuant to the Plan.  The Confirmation Order shall permanently enjoin, effective as of the

Effective Date, all Persons from enforcing or attempting to enforce any such contractual, legal

and equitable subordination rights satisfied, compromised and settled pursuant to this Article X.

(C)    <u>Mutual Releases</u>.  On the Effective Date, the Debtor, the Debtor-in-

Possession, the Apollo Investor, the Note Purchasers and the members of the Creditors'

Committee shall be deemed to have released each other, its, and such other's affiliates,

principals, officers, directors, attorneys, accountants, financial advisors, advisory affiliates,

employees, and agents from any and all Claims, direct actions, causes of action, demands, rights,

damages, judgments, debts, obligations, assessments, compensations, costs, deficiencies or other

expenses of any nature whatsoever (including, without limitation, attorneys' fees), whether fixed

or contingent, liquidated or unliquidated, direct or indirect, known or unknown which they ever

had, now have, or hereafter can, shall or may have, in law, equity or otherwise, for, upon or

arising out of or by reason of any fact, event, circumstance, matter, cause or thing whatsoever

taking place on or before the Effective Date in any way relating to the Debtor, the Debtor-in-

Possession, the members of the Creditors' Committee, the Chapter 11 Case, or the Plan;

provided, however, that the foregoing mutual release shall not apply to any claims, direct actions,

causes of action, demands, rights, damages, judgments, debts, obligations, assessments,

compensations, costs, deficiencies or other expenses of any nature whatsoever (including,

without limitation, attorneys' fees) (i) arising under or based on the Plan, the Plan Documents,

the Transaction Documents or any other document, instrument or agreement to be executed or

delivered thereunder or (ii) in the case of fraud.

## ARTICLE XI.

## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and

related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a)

and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(A)     To hear and determine all matters with respect to the assumption or

rejection of any executory contract or unexpired lease to which the Debtor is a party or with

respect to which the Debtor may be liable, including, if necessary, the nature or amount of any

required Cure or the liquidation or allowance of any Claims arising therefrom;

(B)     To hear and determine any and all adversary proceedings, applications and

contested matters, including, without limitation, adversary proceedings and contested matters

arising in connection with the prosecution of the Fraudulent Conveyance Claims and Preference

Claims and all other Causes of Action;

(C)     To hear and determine any objections to Claims and to address any issues

relating to Disputed Claims;

(D)     To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(E)     To issue such Orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(F)     To consider any amendments to or modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(G)     To hear and determine all Fee Applications; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtor shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(H)     To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(I)     Except as otherwise limited herein, to recover all assets of the Debtor and property of the Debtor's Estate, wherever located;

(J)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(K)     To hear any other matter not inconsistent with the Bankruptcy Code;

(L)     To enter a final decree closing the Chapter 11 Case;

(M)     To ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(N)    To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(O)    To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided herein;

(P)    To determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Plan Documents;

(Q)    To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

(R)    To adjudicate any adversary proceeding or other proceeding commenced in connection with the Operating Agreement with MPMI, Inc.and the Waste Paper Recycling Revenue Bonds;

(S)    To resolve disputes concerning any reserves with respect to Disputed Claims, Disputed Old Equity Interests or the administration thereof; and

(T)    To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the Claims Bar Date, the hearing on the approval of the Disclosure Statement as containing adequate information, the hearing on the confirmation of the

Plan for the purpose of determining whether a Claim, or Old Equity Interest is discharged

hereunder or for any other purpose.

ARTICLE XII.

MISCELLANEOUS PROVISIONS

12.1    <u>Effectuating Documents and Further Transactions</u>.  The Debtor or the

Reorganized Debtor is authorized to execute, deliver, file or record such contracts, instruments,

releases, and other agreements or documents and to take such actions as may be necessary or

appropriate to effectuate and further evidence the terms and conditions of the Plan and any

securities issued pursuant to the Plan; <u>provided</u> that such documents and actions may not be

inconsistent with the Subscription Agreement and transactions contemplated thereby without the

prior written consent of the Apollo Investor and the Founding Investor.

12.2    <u>Continuation of Pension Plan</u>.  The Debtor is, and will continue to be, the

contributing sponsor of the Pension Plan, as defined under 29 U.S.C. § 1301(a)(13) and CFR §

4001.2, or a member of the contributing sponsor's controlled group, as defined under 29 U.S.C.

§ 1301(a)(14) and CFR § 4001.2.  As the contributing sponsor (or member of the controlled

group) of the Pension Plan, the Debtor intends to fund the Pension Plan in accordance with the

minimum funding standards under ERISA, 29 U.S.C. § 1082 and section 412 of the Internal

Revenue Code, 26 U.S.C. § 412, pay all required PBGC insurance premiums, 29 U.S.C. § 1307,

and comply with all requirements of the Pension Plan and ERISA.  No provision of or

proceeding within the Debtor's reorganization proceedings, the Plan, nor the Confirmation Order

discharges, releases or relieves the Debtor, the Reorganized Debtor, or any other party in any

capacity, from any liability with respect to the Pension Plan or any other defined benefit Pension

Plan under any law, governmental policy or regulatory provision.  PBGC and the Pension Plan

are not enjoined or precluded from enforcing liability resulting from any of the provisions of the Plan or the Plan's confirmation.

12.3    <u>Exemption from Transfer Taxes</u>.  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

12.4    <u>Creditors' Committee</u>.

(A)    <u>Termination of Creditors' Committee</u>.  The appointment of the Creditors' Committee shall terminate on the later of the Effective Date and the date of the hearing to consider final Fee Applications.

(B)    <u>Post-Effective Date Committee</u>.

(i)    <u>Post-Effective Date Committee Existence</u>.  On the Effective Date, there shall be created a Post-Effective Date Committee (the "Post-Effective Date Committee"), which shall be subject to the jurisdiction of the Bankruptcy Court.  Unless the Post-Effective Date Committee votes to disband earlier, the existence of the Post-Effective Date Committee, and all powers associated therewith, shall terminate upon the eighteen month anniversary of the Effective Date.

(ii)    <u>Post-Effective Date Committee Membership</u>.

(a)     The Post-Effective Date Committee shall consist of three members, selected by the Creditors' Committee from among the members of the Creditors' Committee.  The Creditors' Committee shall notify the Debtor, in writing, of the identities of the three members of the Post-Effective Date Committee at least five Business Days prior to the Confirmation Hearing.

(b)     The Reorganized Debtor may seek the removal of a member of the Post-Effective Date Committee for cause.  In the event of a disagreement regarding the membership of the Post-Effective Date Committee, the Creditors' Committee or Post-Effective Date Committee, as applicable, may apply to the Bankruptcy Court for appropriate relief.  Pending a determination by the Bankruptcy Court, the member shall not be given access to confidential or proprietary information concerning the Reorganized Debtor.

(c)     In the event of the resignation or removal of a member of the Post-Effective Date Committee for any reason, a replacement shall be designated by the remaining members of the Post-Effective Date Committee.  If the Reorganized Debtor objects to the selection of any initial or replacement member of the Post-Effective Date Committee, such person shall not serve on the Post-Effective Date Committee; *provided, however,* that, in such an instance, the Creditors' Committee or Post-Effective Date Committee, as applicable, may apply to the Bankruptcy Court for appropriate relief.  Pending a determination by the Bankruptcy Court, the proposed member shall not be given access to confidential or proprietary information concerning the Reorganized Debtor.

(iii)     Post-Effective Date Committee Governance.  The Post-Effective Date Committee shall have the power to adopt rules of procedure and may choose one of its

members to act as chairperson.  The Post-Effective Date Committee shall act by majority vote of its members.

           (iv)    <u>Powers of the Post-Effective Date Committee</u>.  The Post-Effective Date Committee shall only have standing and power to participate in the following court proceedings as the deemed successor-in-interest to the Creditors' Committee: (a) any matters related to proposed modifications or amendments to the Plan solely that relate to the proposed distributions on account of Allowed General Unsecured Claims; (b) any applications for allowance of compensation of Professionals; (c) any actions to enforce, implement or interpret the Plan or to compel the Debtor to make distributions under the Plan solely that relate to the proposed distributions on account of Allowed General Unsecured Claims; (d) any appeals to which the Creditors' Committee is party as of the Effective Date solely that relate to the proposed distributions on account of Allowed General Unsecured Claims; (e) objections to, or estimations of, any Claims that have an estimated or face amount in excess of $500,000 to which either (x) the Creditors' Committee's position with respect to such objection is materially different from the position of the Debtor or the Reorganized Debtor or (y) the Post-Effective Date Committee has requested in writing that the Reorganized Debtor estimate or object and the Reorganized Debtor have failed to undertake such estimation or objection within 30 calendar days of such written request; and (f) such other matters as may be mutually agreed upon in advance and in writing by the Post-Effective Date Committee and the Reorganized Debtor, each in their sole discretion.

           (v)    <u>Limitations on the Powers of the Post-Effective Date Committee</u>.

           (a)    Notwithstanding anything contained in this Plan to the contrary, the rights and powers of the Post-Effective Date Committee are strictly limited to those

matters in this Section 12.4(B), and such rights and powers may only be exercised in a manner consistent with the terms and conditions set forth therein. The Post-Effective Date Committee shall be bound in all respects by the terms of the Plan and by any and all order(s) entered in the Chapter 11 Case or orders of the Bankruptcy Court after the Effective Date.

(b)      Nothing in this Section 12.4(B) shall confer on the Post-Effective Date Committee the general right to intervene in any claims objection, Avoidance Action, or other proceeding in any way related to the Plan or the administration of the affairs of the Reorganized Debtor.

(c)      The Post-Effective Date Committee shall not have power to modify, terminate, alter, amend, appeal or vacate any terms of the Plan or any orders entered in the Chapter 11 Case.

(d)      The Post-Effective Date Committee shall not seek leave of the Bankruptcy Court to expand its role or duration beyond that set forth in this Section 12.4(B).

(vi)      <u>Post-Effective Date Committee Compensation and Expense Reimbursement</u>.

(a)      Post-Effective Date Committee Member Expense Reimbursement: The members of the Post-Effective Date Committee shall serve without compensation. Subject to the limitations of Section 12.4(B)(vi)(c), the members of the Post-Effective Date Committee shall be reimbursed by Reorganized Debtor in the ordinary course of business for their reasonable and necessary out of pocket expenses incident to the performance of their duties. In the event that Reorganized Debtor objects to the amount of expenses requested by a member to be reimbursed, the Reorganized Debtor shall pay any undisputed portion and the member shall file a motion with the Bankruptcy Court seeking allowance of the disputed portion.

(b)      Professional Compensation: Subject to the limitations of
Section 12.4(B)(vi)(c), the Post-Effective Date Committee may retain such attorneys,
accountants and other Professionals (including the Professionals retained by the Creditors'
Committee) as are reasonable and necessary to assist the Post-Effective Date Committee in the
performance of its duties; *provided, however*, that the Post-Effective Date Committee shall
provide Reorganized Debtor with five Business Days' notice of any such retention.  Subject to
the limitations of Section 12.4(B)(vi)(c), such Professionals shall be compensated and
reimbursed by the Reorganized Debtor in the ordinary course of business for their reasonable
fees and necessary out of pocket expenses on written invoice.  In the event that the Reorganized
Debtor or the Post-Effective Date Committee objects to the amount of fees and/or expenses
sought by any of the Post-Effective Date Committee's Professionals, the Reorganized Debtor
shall pay any undisputed portion and the relevant Professional shall file a motion with the
Bankruptcy Court seeking allowance of the disputed portion.

(c)      <u>Limitations on Compensation and Reimbursement</u>:  For the
duration of the existence of the Post-Effective Date Committee, the aggregate amount of fees and
expenses to be incurred by the Post-Effective Date Committee, its members and its Professionals
that the Reorganized Debtor shall be obligated to pay or reimburse shall not exceed the Post-
Effective Date Committee Expense Cap.

12.5    <u>Approval of Plan by Debtor's Board of Directors</u>.  The Debtor's Board of
Directors has approved the Plan and all matters and actions to be undertaken pursuant to and
implemented in connection with confirmation of the Plan, and, to the extent it deems it
appropriate to do so, shall meet to approve any amendments to the Plan; <u>provided</u>, <u>however</u>, that

nothing herein shall require the Debtor's Board of Directors to approve any amendments to the Plan or the Plan Documents.

12.6    <u>Post-Confirmation Date Fees and Expenses</u>.  From and after the Confirmation Date, the Debtor and the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of Professional Persons thereafter incurred by (A) the Debtor and the Reorganized Debtor, as the case may be, and (B) the Creditors' Committee until its termination in accordance with the provisions hereof, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

12.7    <u>Payment of Statutory Fees</u>.  All fees payable pursuant to section 1930 of the title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in Cash equal to the amount of such fees on the Effective Date.  The Reorganized Debtor shall timely pay post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until such time as the Bankruptcy Court enters a final decree closing the Chapter 11 Case, or enters an Order either converting this case to a case under Chapter 7 or dismissing this case.  After the Confirmation Date, the Reorganized Debtor shall file with the Bankruptcy Court and shall transmit to the United States Trustee a true and correct statement of all disbursements made by the Reorganized Debtor for each month, or portion thereof, that the Chapter 11 Case remains open in a format prescribed by the United States Trustee.

12.8    <u>Amendment or Modification of the Plan</u>.  Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtor, at any time before the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the

conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have

complied with section 1125 of the Bankruptcy Code.

12.9    <u>Severability</u>.  In the event that the Bankruptcy Court determines, before the

Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such

provision shall be invalid, void or unenforceable with respect to the Holder or Holders of such

Claims or Old Equity Interests as to which the provision is determined to be invalid, void or

unenforceable.  The invalidity, voidness or unenforceability of any such provision shall in no

way limit or affect the enforceability and operative effect of any other provision of the Plan.

12.10    <u>Revocation or Withdrawal of the Plan</u>.  The Debtor reserves the right to revoke or

withdraw the Plan before the Confirmation Date.  If the Debtor revokes or withdraws the Plan

before the Confirmation Date, then the Plan shall be deemed null and void.  In such event,

nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or

against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or

any Person in any further proceedings involving the Debtor.

12.11    <u>Binding Effect</u>.  The Plan shall be binding upon and inure to the benefit of the

Debtor, the Holders of Claims, and Old Equity Interests, and their respective successors and

assigns, including, without limitation, the Reorganized Debtor.

12.12    <u>Notices</u>.  All notices, requests and demands to or upon the Debtor or the

Reorganized Debtor to be effective shall be in writing and, unless otherwise expressly provided

herein, shall be deemed to have been duly given or made when actually delivered or, in the case

of notice by facsimile transmission, when received and telephonically confirmed, addressed as

follows:

| If to the Debtor<br>or Reorganized<br>Debtor: | Marcal Paper Mills, Inc.<br>1 Market Street<br>Elmwood Park, NJ 07407<br>Attn:  Nicholas R. Marcalus, Chairman and CEO<br>Telephone: (201) 796-4000<br>Facsimile: (201) 703-6425 |
|---|---|
| with copies to: | Cole, Schotz, Meisel,<br>Forman & Leonard, P.A.<br>25 Main Street<br>P.O. Box 800<br>Hackensack, NJ 07602-0800<br>Attn:   Michael D. Sirota, Esq.<br>Telephone:  (201) 489-3000<br>Facsimile:  (201) 489-1536 |
| If to the Apollo Investor or<br>the Note Purchasers: | Marcal Investors, LLC<br>c/o Apollo Capital Management<br>9 West 57th Street, 41st Floor<br>New York, New York  10019<br>Attention:  Matthew Constantino<br>cc:  Sam F. Hines<br>Telephone:  (212) 515-3200<br>Facsimile:  (212) 515-3288 |
| with copies to: | O'Melveny & Myers LLP<br>Times Square Tower<br>7 Times Square<br>New York, New York  10036<br>Attention:  Douglas Freeman, Esq.<br>Telephone:  (212) 326-2000<br>Facsimile:  (212) 326-2061 |
| If to the Creditors'<br>Committee: | Lowenstein Sandler<br>65 Livingston Avenue<br>Roseland, New Jersey 07068<br>Attn:   Kenneth A. Rosen, Esq.<br>Telephone:  (973) 597-2548<br>Facsimile:  (973) 597-2549 |

12.13   <u>Governing Law</u>.  Except to the extent the Bankruptcy Code, Bankruptcy Rules or

other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise, the

rights and obligations arising under the Plan shall be governed by, and construed and enforced in

accordance with, the laws of the State of New Jersey, without giving effect to the principles of conflicts of law of such jurisdiction.

     12.14   <u>Withholding and Reporting Requirements</u>.  In connection with the consummation of the Plan, the Debtor or the Reorganized Debtor, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

     12.15   <u>Plan Supplement</u>.  Forms of the documents relating to the Amended and Restated Debtor Certificate of Incorporation, the Amended Debtor Bylaws, the Holding Company Certificate of Incorporation, the Holding Company Bylaws, the Registration Rights Agreement, the Notes, the Note Purchase Agreement, the Mortgage, and all other material agreements or documents related to any such agreement or to the Plan, shall be contained in the Plan Supplement.  The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court and served on counsel to the Creditors' Committee no later than ten (10) days before the Confirmation Hearing.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims, or Old Equity Interests may obtain a copy of the Plan Supplement upon written request to the Debtor's counsel.

     12.16   <u>Allocation of Plan Distributions Between Principal and Interest</u>.  To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

12.17    <u>Headings</u>.  Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

12.18    <u>Exhibits/Schedules</u>.  All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

12.19    <u>Filing of Additional Documents</u>.  On or before substantial consummation of the Plan, the Debtor shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.20    <u>No Admissions</u>.  Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed as an admission by any Entity with respect to any matter set forth herein.

12.21    <u>Successors and Assigns</u>.  The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

12.22    <u>Reservation of Rights</u>.  Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtor with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Old Equity Interests before the Effective Date.

12.23    <u>Section 1145 Exemption</u>.  Pursuant to section 1145(a) of the Bankruptcy Code, the offer, issuance, transfer or exchange of any security under the Plan, or the making or delivery of an offering memorandum or other instrument of offer or transfer under the Plan, shall be

exempt from section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer or a security.

12.24    Implementation.  The Debtor shall take all steps, and execute all documents, including appropriate releases, necessary to effectuate the provisions contained in this Plan.

12.25    Inconsistency.  In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, the Plan Supplement, or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

12.26    Jurisdiction over the Reorganized Debtor.  Notwithstanding the jurisdiction retained in Article XI hereof, from and after the Effective Date, the Bankruptcy Court shall not have the power to issue any Order which modifies the New Common Stock or the rights of the Holders thereof with respect to such New Common Stock.

NY1:1693390.5
39517/0001-2341013v15

12.27    <u>Compromise of Controversies</u>.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Reorganized Debtor, the Estate, and all Holders of Claims and Old Equity Interests against the Debtor.

MARCAL PAPER MILLS, INC., a New Jersey corporation


By:    */s/ Nicholas R. Marcalus*
       Name:  Nicholas R. Marcalus
       Title: Chairman and CEO

Dated: June 25, 2007