**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Telecopier
Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
David M. Bass, Esq.
Attorneys for Marcal Paper Mills, Inc.,
Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 06-21886 (MS)
HONORABLE MORRIS STERN

In re:

MARCAL PAPER MILLS, INC.,

Debtor-in-Possession.

Chapter 11

**AFFIDAVIT OF BERNARD A. KATZ ON BEHALF OF J.H. COHN LLP, THE DEBTOR'S FINANCIAL ADVISOR, IN SUPPORT OF DEBTOR'S MOTION FOR AN ORDER (I) APPROVING THE SALE OF SUBSTANTIALLY ALL THE DEBTOR'S ASSETS FREE AND CLEAR OF INTERESTS, CLAIMS, ENCUMBRANCES AND LIENS; (II) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN RELATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

STATE OF NEW JERSEY    )
                                             ss:
COUNTY OF MIDDLESEX    )

Bernard A. Katz, being first duly sworn, deposes and states:

1.    I am a partner in the accounting and consulting firm J.H. Cohn LLP, the Debtor's court-approved financial advisor.  I have personal knowledge of the facts set forth herein, except as otherwise noted, and submit this Affidavit in support of the Debtor's motion (the "Sale

Motion") for an Order: (i) approving the sale of substantially all the Debtor's assets (the "Assets") free and clear of interests, claims, encumbrances and liens; (ii) approving assumption and assignment of certain related executory contracts and unexpired leases; and (iii) granting related relief [Docket No. 1357]. The hearing on the Sale Motion has been scheduled for January 15, 2008 (the "Sale Hearing"). If called to testify at the Sale Hearing, I would state that:[1]

## BACKGROUND

2. On November 30, 2006 (the "Filing Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On the Filing Date, the Debtor filed an application to retain J.H. Cohn as its financial advisors pursuant to 11 U.S.C. § 327(a) and 328 [Docket No. 20]. On December 11, 2006, an Order was entered approving the Debtor's retention of J.H. Cohn [Docket No. 119]. Since the Filing Date, J.H. Cohn has provided all financial advisory services to the Debtor including, but not limited to, assisting the Debtor to operate within its approved budget and to meet its requirements under the DIP Credit Agreement (defined below) and monitoring the Debtor's cash expenditures, receivable collections, projected cash requirements and operating results.

3. After the Filing Date, the Debtor entered into negotiations with Highland, the CIT Group/Business Credit, Inc., the Foothill Group, Inc., and NexBank, as administrative agent to the DIP lenders (collectively, the "DIP Lender"). The DIP Lender agreed to provide funds necessary for the Debtor to pay its ongoing expenses and to satisfy, in full, the pre-petition claims of Wachovia Bank, National Association.

---

[1] All capitalized terms shall have the meanings ascribed to them in the Sale Motion.

4. On December 18, 2006, the Debtor filed a motion for an Order authorizing the Debtor to obtain post-petition financing (the "DIP Facility") and to use cash collateral. On January 5, 2007, the Court entered a Final Order: (i) Authorizing the Debtor to Incur Post-Petition Secured Indebtedness; (ii) Granting Security Interests and Superpriority Claims Pursuant to Sections 105(a), 364(c), 364(d), et al., of the Bankruptcy Code; (iii) Authorizing the Debtor to Use Cash Collateral Pursuant to Section 363(c)(2) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001; and (iv) Providing Related Relief Including the Payment of Senior Debt. The DIP Facility, as set forth in more detail in the credit agreement dated as of January 12, 2007 as amended, restated, supplemented or otherwise modified (the "DIP Credit Agreement"), consists of a $20 million revolving credit line (the "Revolver"), subject to certain reserves, and a term loan in an amount not to exceed $64.5 million (the "Term Loan"). Pursuant to the DIP Credit Agreement, the Debtor was required to operate in accordance with an approved budget (the "DIP Budget").

5. J.H. Cohn, pursuant to Section 4.11 and Section 4.14 of the DIP Credit Agreement communicated with representatives of the DIP Lender, predominantly through its financial advisor, Barrier Advisors ("Barrier"), in order to meet the Debtor's obligations under the DIP Credit Agreement and to keep the DIP Lender apprised of the Debtor's financial performance. J.H. Cohn's communications with Barrier included weekly reports of cash activity, accounts receivable collections, production and sales results for the week, and vendor credit. J.H. Cohn, with the knowledge and authority of the Debtor's management, engaged in additional dialogue with Barrier when the Debtor experienced operating results which would have led to a default under the DIP Facility.

6.  J.H. Cohn also communicated on a regular basis with the financial advisors to the Official Committee of Unsecured Creditors (the "Committee"). J.H. Cohn's weekly communications with the Committee's financial advisors focused on the Debtor's financial performance including discussions about weekly cash activity, sales and production results, vendor credit and delinquent customer accounts. Additionally, J.H. Cohn communicated with the Committee with respect to events of defaults and amendments to the DIP Credit Agreement.

7.  Finally, J.H. Cohn assisted the Debtor and its counsel in assembling financial information contained in the Purchaser APA with the Proposed Purchaser (i.e. schedule of assumed liabilities and administrative expenses). Such information was posted into the electronic data room as directed by the investment banker. In conjunction with the Proposed Purchaser's due diligence process and transaction, J.H. Cohn fulfilled numerous information requests relating to the Debtor's operations (i.e. contracts, union and payroll analyses, insurance etc.).

## THE AMENDMENTS TO THE DIP CREDIT AGREEMENT

8.  In the first quarter of 2007, the Debtor achieved sales in excess of the forecast. As a result, the Debtor was forced to increase its ordinary purchase levels for raw material and factory overhead material. Unfortunately, the price of those materials increased significantly in the first quarter of 2007, causing the Debtor to come close to exceeding the amount budgeted for cumulative disbursements under the DIP Facility. To lessen the potential of a covenant default with respect to disbursements, on April 6, 2007, the Debtor and NexBank executed a First Amendment to the DIP Credit Agreement (the "First Amendment"), providing for, among other things, an additional $1.7 million in budgeted cumulative disbursements for the material and factory overhead subcategory of the disbursement covenant. The First Amendment achieved its

intended purpose, namely, preventing the Debtor from defaulting or violating the disbursements covenant under the DIP Facility.

9. Thereafter, on May 21, 2007, the Debtor and DIP Lender entered into a Second Amendment to the DIP Credit Agreement (the "Second Amendment"), effective May 11, 2007. The Second Amendment provided for a reforecasting of the Debtor's performance and financial covenants including minimum collections, maximum disbursements, maximum disbursements for the material and factory overhead subcategory, and minimum cumulative EBITDAR.

10. During the summer months, the Debtor's sales declined and, as a result, collections decreased, ultimately falling below the Debtor's minimum collections covenant set forth in the DIP Facility. As a result, on August 8, 2007, the DIP Lender issued a notice of default to the Debtor.[2] The DIP Lender and the Debtor agreed to a series of temporary waivers of the default. These waivers were in place during September 2007, with a view of bridging the Debtor to confirmation of the pending plan of reorganization and, if necessary, negotiating a permanent amendment to the DIP Facility to address the default. The temporary waivers, together with the Debtor's prior draw on the DIP Revolver and cash on hand was sufficient to meet all of its obligations during this time.

11. In addition, and although the DIP Lender never declared an event of default as a result, the Debtor did not achieve certain financial and performance covenants in accordance with Section 7 of the DIP Credit Agreement. Attached as **Exhibit A** is a comparative analysis of the Debtor's DIP Budget EBITDAR and the Debtor's actual EBITDAR on both a monthly and

---

[2] The Debtor's collections are tested weekly on a cumulative basis. For the week ended August 3, 2007, the Debtor fell short of the cumulative test by $1,455,000 with receipts of $167,564,000 versus the test of $169,000,000. Upon the Debtor's reporting of the default, as required by the DIP Credit Agreement, the DIP Lender issued a notice of default.

cumulative basis. From the Filing Date through July 31, 2007, the Debtor's cumulative EBITDAR was budgeted to be $9,551,000. As of July 31, 2007, the Debtor had achieved $1,046,000 better than budget, with an actual cumulative EBITDAR of $10,597,000.00. However, in August 2007, the Debtor's sales declined significantly. Actual net sales in the month of August were $4.1 million below budget. Furthermore, the Debtor incurred an additional energy expense as a result of energy reconciliation charges reducing the Debtor's EBITDAR for August 2007 below the amount required by the DIP Facility. Additionally, the Debtor's financial performance during the applicable period fell short of the requisite targeted performance in the Subscription Agreement, allowing the Apollo Investor to terminate its obligations under that agreement.

12. In connection with the existing, noticed default (as described above), on September 28, 2007, the Debtor and DIP Lender entered into a Limited Waiver and Third Amendment to the DIP Credit Agreement ("Third Amendment"). The Third Amendment extended the maturity date of the DIP Facility to October 12, 2007, and sought to redefine and expand the powers and responsibilities of the Approved Consultant.

13. Notwithstanding the Third Amendment, the Debtor required additional time to complete its reorganization. However, in light of the aforementioned outstanding event of default and the looming EBITDAR default, the Debtor could not avail itself of its unilateral right in the DIP Facility which would have permitted the Debtor to extend the maturity date of the DIP Facility through December 31, 2007. Accordingly, the Debtor reached an agreement with the DIP Lender through execution of the Fourth Amendment to the DIP Credit Agreement (the "Fourth Amendment"). The Fourth Amendment required the sale of the Assets pursuant to Section 363 of the Bankruptcy Code and extended the maturity date of the DIP Facility through

December 31, 2007.  Later, among other things, to further extend the maturity date of the DIP Facility, the parties entered into that certain Fifth Amendment to the DIP Credit Agreement (the "the Fifth Amendment"), dated November 30, 2007, effective as of November 14, 2007.  The Fifth Amendment extends the maturity date of the DIP Facility from December 31, 2007, to January 31, 2008.

## THE DEBTOR'S DECLINING FINANCIAL PERFORMANCE

14. In connection with the Fourth Amendment, the Debtor was required to initiate an extensive marketing campaign of the Assets for sale as a going concern.  J.H. Cohn assisted the Debtor with due diligence communications as directed by the investment banker.  J.H. Cohn's assistance included obtaining and/or analyzing information requests and providing same to the Debtor's investment banker.  Data requests furnished to prospective buyers pursuant to the investment banker's instructions were placed into the electronic data room.

15. The Debtor's financial performance further deteriorated during this marketing process.  For example, as set forth above, the Debtor did not achieve certain financial and performance covenants in accordance with Section 7 of the DIP Credit Agreement.  As detailed on **Exhibit A**, the DIP Budget EBITDAR for the fiscal year ended September 30, 2007 was $14.1 million.  The Debtor, however, significantly underperformed, reporting EBITDAR of only $10.7 million.  The Debtor's financial performance has continued to weaken.  Budgeted EBITDAR for the months of October and November 2007 was $1.2 million and $1.1 million, respectively.  The Debtor's actual reported EBITDAR for October and November 2007 was $59,000 and a negative $1.2 million, respectively for a combined shortfall to budget of $3.4 million.

16. Attached hereto as **Exhibit B** is the Debtor's consolidated income statement for the fiscal year ended September 30, 2007.  Net sales for the fiscal year ended September 30,

2007 were $4.6 million below budget and $12.4 million below net sales for fiscal year 2006. As set forth on **Exhibit B**, the contribution margin for the fiscal year ended September 30, 2007 was $8.8 million below the DIP Budget as a result of the net sales shortfall of $4.6 million and increased manufacturing inefficiencies and materials and packaging costs of $4.2 million. Moreover, the Debtor's consolidated income statement for the fiscal year ended September 30, 2007, illustrates a net loss of $36.6 million, $9.2 million worse than budget and $29.0 million worse than fiscal year 2006.

17. In the fiscal year ended September 30, 2007, the Debtor sold 115,000 of Elmwood Park converted tons, 8,000 tons less than budget and 14,2000 tons less than fiscal year 2006. The decreased tons sold, however, did not result in any materials or packaging cost savings. In fact, as a result of manufacturing inefficiencies and raw materials price, materials and packaging expense increased from 34.7% of sales in fiscal year 2006 to 40.7% of sales in fiscal 2007.

18. Attached as **Exhibit C** is the Debtor's cash flow activity for the 52 week period ended December 28, 2007. During that 52 week period, the Debtor disbursed $11.0 million more than it collected, even after receiving a one time refund from the IRS of $7.9 million. Absent receipt of the IRS refund, the Debtor's net cash flow would have been negative $18.9 million. The Debtor covered this shortfall through borrowings from the DIP Revolver. As of December 28, 2007, the Debtor had borrowed approximately $80.3 million under the DIP Facility (comprised of the Term Loan of $64.5 million, borrowings under the DIP Revolver of $12.5 million, letters of credit issued in the amount of $2.3 million, and a professional fee carve-out of $950,000).

19. Without the additional liquidity under the Revolver, the Debtor will be unable to generate sufficient cash after January 31, 2008 under the DIP Facility. Current estimated cash

flow projections indicate that the Debtor will spend approximately $5.6 million more than it will collect in the month of February 2008.

20. As a result of the continued losses and cash bleed, the Debtor has no other options other than the current sale process. Failure to consummate the sales process in a timely manner will result in a liquidity crunch which could cause curtailment of operations and the loss of a significant number of jobs.

BERNARD A. KATZ

Sworn to before me this
10th Day of January, 2008

Notary Public of New Jersey
My Commission expires: 10/21/08

Rosellen Martoken
A Notary Public of New Jersey
My Commission Expires October 21, 2008