# EXHIBIT A

**EXECUTION VERSION**

# AMENDED AND RESTATED

# ASSET PURCHASE AGREEMENT

**by and between**

**Marcal Paper Mills, Inc.,**
**as Seller,**

**and**

**NexBank, SSB,**
**acting solely in its capacity as agent under the**
**Second Lien Loan Agreement**

**Originally Executed as of**
**November 5, 2007**

**Amended and Restated as of**
**November 19, 2007**

**EXECUTION VERSION**

## AMENDED AND RESTATED
## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*"), dated as of November 5, 2007 (the "*Execution Date*"), and amended and restated as of November 19, 2007, by and between Marcal Paper Mills, Inc., a New Jersey corporation ("*Seller*"), and NexBank, SSB, a Texas State savings bank acting solely in its capacity as agent under the Second Lien Loan Agreement ("*Agent*").

Capitalized terms used in this Agreement that are not otherwise defined herein shall have the meanings ascribed to those terms in <u>Section 10 below</u>.

## RECITALS

A.  Seller is a debtor and debtor in possession in Chapter 11 proceedings before the Bankruptcy Court and is entering into this Agreement in that capacity.

B.  Seller has its principal executive offices at One Market Street, Elmwood, New Jersey 07407 and is engaged in the Business.

C.  This Agreement is conditioned upon the Bankruptcy Court entering an order (i) Approving Sale Procedures in Connection With Sale of Substantially All the Debtors' Operating Assets; (ii) Scheduling Auction and Hearing to Consider Approval of Sale; (iii) Approving Notice of Respective Dates, Times, and Places for Auction and for Hearing on Approval of (a) Sale and (b) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (iv) Approving Forms of Notice; and (v) Granting Related Relief in respect of Seller (the "*Procedures Order*").

D.  Agent is the second lien agent under the Second Lien Loan Agreement pursuant to which the Majority Lenders have authorized, and provided written instructions to, Agent to enter into this Agreement as Agent for the Majority Lenders and cause a newly formed Delaware limited liability company ("*Purchaser*") to acquire substantially all of the assets used by Seller in connection with the Business on the terms and subject to the conditions set forth in this Agreement and the Procedures Order and otherwise effect the Contemplated Transactions.

E.  Pursuant to the Procedures Order and Sections 363 and 365 of the Bankruptcy Code, Seller wishes to sell and transfer to Purchaser, and Purchaser wishes purchase and acquire from Seller, substantially all of the assets used by Seller in connection with the Business, all on the terms and subject to the conditions set forth in this Agreement and the Procedures Order.

F.  In connection with the sale of substantially all of the Debtor's assets, the proceeds of such sale will be distributed pursuant to the Amended Plan, or as otherwise approved by the Bankruptcy Court, and the sale of the Seller's assets is essential and necessary to the consummation of the Amended Plan of Reorganization.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1.  Transfer of Assets.

1.1 Purchase and Sale of Assets.  On the terms and subject to the conditions of this Agreement, on the Closing Date, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Agent shall cause Purchaser to purchase, acquire and accept from Seller, free and clear of all Liabilities (other than Assumed Liabilities) and Liens, all of the assets of Seller including, without limitation, the assets described in Sections 1.1.1 through 1.1.10, inclusive, wherever located but excluding the Excluded Assets and Excluded Liabilities (such assets, other than any of the Excluded Assets and Excluded Liabilities, the "*Transferred Assets*"):

1.1.1  Owned Real Property and Improvements.  All Owned Real Property, including without limitation, that described on Schedule 1.1.1, but excluding the Owned Real Property located in Maine.

1.1.2  Improvements on Leased Real Property.  Seller's right, title and interest in improvements located on Leased Real Property.

1.1.3  Tangible Personal Property.  All Tangible Personal Property.

1.1.4  Intangible Property.  All Intangible Property, including without limitation the Seller Intellectual Property and Licenses and Permits described on Schedule 1.1.4.

1.1.5  Leases and Contracts.  Seller's right, title and interest (a) as lessee under the Real Property Leases, as described on Schedule 1.1.5-1, (b) as lessee, licensee, lessor, or licensor under those Personal Property Leases described on Schedule 1.1.5-2, and (c) as a party to those other Contracts described on Schedule 1.1.5-3 (collectively, the "*Other Contracts*") in each case, only as and to the extent designated by Purchaser on or before December 14, 2007 at 5:00 p.m. (EST) as a Section 365 Contract, subject to Section 7.4.1, and to be assumed by Purchaser at the Closing and, in the case of Intangible Property held pursuant to licenses from third parties, only to the extent the same are transferable over the licensor's objection pursuant to applicable law.

1.1.6  Receivables.  Any accounts receivable, notes receivable, refunds and all rights, claims and causes of action as of the Closing Date (collectively, the "*Receivables*").

1.1.7  Inventory.  The Inventory as of the Closing Date (the "*Closing Date Inventory*").

1.1.8  Business Records.  The Business Records.

1.1.9  Rights of Action.  All Rights of Action but excluding the Retained Rights of Action.

1.1.10 Liquid Assets.  All Liquid Assets.

1.2 <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement, the Transferred Assets shall not include any of the Excluded Assets or any of the Excluded Liabilities.

1.3 <u>Instruments of Transfer</u>.  The sale, assignment, transfer, and conveyance of the Transferred Assets to Purchaser shall be made by assignments, bills of sale, and other instruments of assignment, transfer and conveyance provided for in <u>Section 3 below</u> and such other instruments as may reasonably be requested by Purchaser to transfer, convey, and assign the Transferred Assets to Purchaser.

2.  <u>Consideration</u>.

2.1 <u>Purchase Price</u>.  Upon the terms and subject to the conditions contained in this Agreement, as consideration for the purchase of the Transferred Assets contemplated herein, Agent shall (i) cause Purchaser to pay to Seller cash in the Amended Plan Obligation Amount as set forth in <u>Schedule 2.1(i)</u>; (ii) cause Purchaser to credit bid of Thirty Five Million Dollars ($35,000,000) against the indebtedness of Seller owing under the Second Lien Loan Agreement (the "*Purchase Price*"); and (iii) shall cause Purchaser to assume the Assumed Liabilities as set forth in <u>Schedule 2.1(iii)</u> in accordance with <u>Section 3.8</u>, representing aggregate total consideration, including the assumption of the DIP Term Loan and Line of Credit, of approximately One Hundred Twenty One Million Six Hundred Thousand Dollars ($121,600,000), plus the assumption of certain other liabilities.

3.  <u>Closing</u>.

3.1 <u>Closing Conference</u>.  The completion of the purchase and sale of the Transferred Assets under this Agreement (the "*Closing*") shall take place at the offices of Haynes and Boone, LLP, 153 East 53rd Street, Suite 4900, New York, NY 10022 or such other location as may be mutually agreed upon by the parties. Select Title Agency, Inc., located at 71 Valley Street, Suite 103, South Orange, NJ 07079, as agent for the Title Company, shall serve as escrow agent to handle the portion of the Closing relating to the Owned Real Estate and Real Property Leases including, without limitation, recordation of the conveyance documents, allocation of revenues and expenses, and issuance of any title insurance requested by Purchaser. Purchaser shall have the right to request such title insurance as it desires, and Seller agrees to reasonably cooperate with Purchaser in that regard, provided, however, Purchaser shall bear the cost of any such title insurance.

3.2 <u>Closing Date</u>.  The Closing shall be held no later than the third Business Day following the satisfaction or waiver of all conditions precedent to the parties' obligations hereunder (the "*Closing Date*"), but in no event later than the Outside Date unless the parties hereto mutually agree in writing to an extension thereof.

3.3 <u>Diligent Efforts to Close</u>.  Until this Agreement is either terminated or the parties have agreed upon an extended Closing Date, the parties shall diligently continue to work to satisfy all conditions to Closing and the Contemplated Transactions shall close as soon as such conditions are satisfied or waived; provided that, in any event, Purchaser is not obligated to close

unless the Conditions to Purchaser's Obligations set forth in <u>Section 4.2</u> are satisfied or waived in writing.

3.4 <u>Closing Actions</u>.  All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

3.5 <u>Seller's Deliveries to Purchaser at Closing</u>.  Upon the Closing, Seller shall deliver to Purchaser the following items:

3.5.1    One or more special warranty deeds or warranty deeds with covenants against grantor's acts or their equivalent duly executed by Seller, pursuant to which Seller conveys to Purchaser good and indefeasible fee title to the Owned Real Property subject only to the Permitted Encumbrances as approved by Purchaser (the "***Conveyances of Real Property***").

3.5.2    Counterparts of each Assignment and Assumption of Real Property Lease, substantially in the form attached as <u>Exhibit 3.5.2</u> hereto, duly executed by Seller, pursuant to which Seller assigns the Real Property Leases and associated improvements to Purchaser (the "***Assignments of Real Property Leases***").

3.5.3    Counterparts of each Assignment and Assumption of Personal Property Leases and Contracts in the form attached as <u>Exhibit 3.5.3</u> hereto, duly executed by Seller, pursuant to which Seller assigns the Other Contracts to Purchaser (the "***Assignments of Other Contracts***").

3.5.4    One or more bills of sale, duly executed by Seller, in the form attached hereto as <u>Exhibit 3.5.4</u> pursuant to which Seller transfers any Tangible Personal Property, Closing Date Inventory, Receivables, and Business Records to Purchaser (the "***Bills of Sale***").

3.5.5    Titles and registration for any vehicles owned by the Seller and included in the Transferred Assets, duly endorsed and notarized.

3.5.6    Counterparts of each Assignment of Intangible Property, duly executed by Seller, in the form attached as <u>Exhibit 3.5.6</u> hereto, pursuant to which Seller assigns to Purchaser its interests, if any, in and to the Intangible Property (the "***Assignments of Intangible Property***").

3.5.7    A certificate of the Seller, duly executed by a senior officer of the Seller without personal liability to the executing officer, certifying as to the truth and correctness of the Seller's representations and warranties as of the date hereof and as the Closing Date, the Seller's compliance with and performance of its covenants and obligations to be performed or complied with at or before Closing, in a form reasonably satisfactory to the Purchaser ("***Officer's Certificate***").

4

3.5.8    All consents, authorizations, orders and approvals of (or filings or registrations with) any Governmental Entity or third party required to be obtained in connection with the execution, delivery and performance of this Agreement ("**Consents**"), including without limitation, evidence of compliance with ISRA obligations as required by Section 4.2.13.1.

3.5.9    Any other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Seller to Purchaser at the Closing.

3.6 As Is Sale. AGENT AND PURCHASER HEREBY ACKNOWLEDGE AND AGREE THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 5 HEREOF (AND ON THE SCHEDULES ATTACHED HERETO), SELLER MAKES NO REPRESENTATION OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE TRANSFERRED ASSETS, THE OWNED REAL PROPERTY OR THE LEASED REAL PROPERTY.  WITHOUT IN ANY WAY LIMITING THE FOREGOING SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE TRANSFERRED ASSETS, THE OWNED REAL PROPERTY AND THE LEASED REAL PROPERTY.  ACCORDINGLY, EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, THE TRANSFERRED ASSETS, THE OWNED REAL PROPERTY, THE LEASED PROPERTY AND THE OTHER TRANSFERRED ASSETS AT THE CLOSING WILL BE TRANSFERRED "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

3.7 Purchaser's Deliveries to Seller at Closing.  Upon the Closing, Agent shall cause Purchaser to make or cause to be made the following payments and deliveries to Seller:

3.7.1    The Purchase Price, except that if the cash component of the Purchase Price that is allocated to expenses described on Schedule 2.1(i) is not used at Closing to pay those expenses, then such excess cash shall be returned to Purchaser as a reduction of the Purchase Price.  Amounts not used in any specific category of expenses described on Schedule 2.1(i) can be used to pay other administrative expenses (other than professional fees) in other category or categories shown on Schedule 2.1(i), to fund purchase of additional tail coverage, and to increase the amount of the initial funding of the liquidating trust (up to $100k), in the discretion of the Debtor.

3.7.2    Counterparts of each of the Assignments of Real Property Leases, substantially in the form attached as Exhibit 3.5.2 hereto, duly executed by Purchaser, except to the extent that any Real Property Lease will not be transferred to Purchaser pursuant to the Contemplated Transactions.

3.7.3    Counterparts of each of the Assignments of Other Contracts, in the form attached as Exhibit 3.5.3 hereto, duly executed by Purchaser.

3.7.4    Counterparts of each of the Assignments of Intangible Property, in the form attached as Exhibit 3.5.6 hereto, duly executed by Purchaser.

3.7.5    An Assumption Agreement, substantially in the form attached hereto as Exhibit 3.7.5 with respect to the Assumed Liabilities, duly executed by Purchaser (the "**Assumption Agreement**").

3.7.6    A Remediation Agreement substantially in the form attached hereto as Exhibit 3.7.6, duly executed by Purchaser and the NJDEP, and if, and only if, ISRA requires the establishment of a Funding Source (as that term is used in ISRA) contemporaneously with the execution of a Remediation Agreement, evidence that Purchaser has established a Funding Source, as provided in Section 7.12, where such Remediation Agreement is the method of ISRA compliance provided for by Section 4.2.13.1.

3.7.7    Appropriate evidence of all necessary action by Purchaser in connection with the Contemplated Transactions, including, without limitation: (i) certified copies of resolutions duly adopted by Purchaser's managers approving the Contemplated Transactions and authorizing and assuming the performance by Purchaser under this Agreement and (ii) a certificate as to the incumbency of the managers or officers of Purchaser executing this Agreement and any instrument or document delivered in connection with the Contemplated Transactions.

3.7.8    Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Purchaser to Seller at the Closing.

3.8 Assumed Liabilities.  On the Closing Date, pursuant to the Assumption Agreement, Agent shall cause Purchaser to assume and agree to perform, and indemnify Seller in respect of, all of the Assumed Liabilities but excluding the Excluded Liabilities.

3.9 Transferred Employees.  With respect to each Business Employee, Schedule 3.9 lists, to the extent such information is permitted to be disclosed under applicable law, (i) each such person's title or job/position; (ii) such person's 2007 salary; and (iii) each such person's location of employment.

3.9.1    Not later than 7 days before the Closing Date, Seller will provide Purchaser with an updated Schedule 3.9.

3.9.2    Not later than 5 days before the Closing Date, and effective as of the Closing Date, Agent shall cause Purchaser to offer employment on an "at will" basis to substantially all Business Employees identified on Schedule 3.9 (as updated in accordance with Section 3.9.1). Each such offer of employment shall comply with the requirements of this Section 3.9. The employment of each Business Employee who accepts Purchaser's offer of employment shall commence and be effective from the later of the Closing or the date of acceptance. Subject to applicable laws, on and after the Closing Date, Purchaser shall have the right to dismiss any or all Transferred Employees at any time, with or without cause, and to change the terms and conditions of their employment (including any compensation and benefits provided to such Transferred Employees**)**.

3.9.3    Purchaser's offer of employment to Business Employees will be at a level of base compensation of not less than the level of base compensation as applied to such Person immediately before the Closing Date.

3.9.4    At Purchaser's option it may, rather than accept any Collective Bargaining Agreement or agreements, continue with the Contemplated Transactions and not recognize and/or assume any Collective Bargaining Agreements, including, but not limited to, the Agreement dated September 25, 2006 between Seller and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union AFL-CIO, CLC ("*USW*") and Local Union Number 870 and any amendments thereto, and the Agreement dated September 16, 2004 to September 15, 2007 between Seller and Local Union Number 560 affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehouseman and Helpers of America ("*Teamsters Union*") and any amendments thereto. Purchaser will not assume and Seller will not assign any obligations or liabilities of Seller of any nature whatsoever resulting from any provision of such labor agreements.  Offers of employment shall be made to substantially all of Seller's Bargaining Unit Employees and Non-Union Represented Employees.  Such offers will be in accordance with the new terms and conditions of employment established by Purchaser, and shall be contingent on such employees satisfactorily passing a pre-employment screening and drug test and indicating a willingness to work under Purchaser's new terms and conditions of employment.

3.10    Purchase Price Allocation.  Before Closing, the Agent and the Seller shall use reasonable efforts to agree upon a statement ("*Allocation Statement*") setting forth the value of the Transferred Assets that will be used for the allocation of the Purchase Price (including the Assumed Liabilities) among the Transferred Assets; except that if Agent and Seller are not able to agree, the Allocation Statement shall as determined by Agent or Purchaser.  The Allocation Statement shall be determined in accordance with Section 1060 of the Internal Revenue Code and the applicable Treasury Regulations.  The Seller and the Purchaser will report an allocation of such Purchase Price among the Transferred Assets in a manner entirely consistent with the Allocation Statement and will act in accordance with such Allocation Statement in the preparation of financial statements and filing of all Tax Returns (including filing Internal Revenue Service Form 8594 with its federal income Tax Return for the taxable year that includes the Closing Date) and in the course of any Tax audit, Tax review or Tax litigation matter relating hereto.  Nothing in the Allocation Statement shall be binding upon creditors of the Seller or in any way bind any party in interest to the Case other than the Seller and Purchaser.

3.11    Possession.  Right to possession of, and control over, the Transferred Assets shall transfer to Purchaser on the Closing Date.  On the Closing Date, Seller shall:

3.11.1    Transfer and deliver to Purchaser such login information, passwords, administrative and control rights, keys, locks and safe combinations and other similar items as Purchaser may reasonably require to obtain occupation and control of the Facilities and the other Transferred Assets;

3.11.2    Make available to Purchaser at their then-existing locations the originals of all documents in Seller's possession that are required to be transferred to Purchaser by this Agreement; and

3.11.3    Transfer to Purchaser, in a format acceptable to Purchaser, and provide Purchaser with access and control over, all electronic data related to the Business, including, without limitation, data relating to customers, sales prospects, sales history, inventory,

accounts receivable, vendors, employees (except to the extent prohibited by law with respect to certain employee records) and accounts payable.

4.  Conditions Precedent to Closing.

4.1 Conditions to Seller's Obligations. Seller's obligation to make the deliveries required of Seller at the Closing and otherwise to complete the Contemplated Transactions, shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, unless any such unsatisfied condition is waived in writing by Seller:

4.1.1    Agent and Purchaser shall have performed and complied with, in all material respects, each and every covenant or other obligation required to be performed by them before the Closing.

4.1.2    All of the representations and warranties of Agent and Purchaser contained herein shall continue to be true and correct at the Closing.

4.1.3    All items required under Section 3.7 of this Agreement to be paid, delivered or funded by Purchaser or Agent on or before the Closing shall have been paid, delivered or funded.

4.1.4    The Procedures Order shall have become a Final Order.

4.1.5    The Bankruptcy Court shall have entered the Sale Order in accordance with Section 7.4.2 below, which shall have become a Final Order.

4.1.6    No action, suit or other proceedings shall be pending before any Government Entity seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Government Entity.

4.1.7    There shall be no injunction or court order restraining consummation of the Contemplated Transactions and there shall not have been adopted any law or regulation making all or any portion of the Contemplated Transactions illegal.

4.1.8    Any waiting period required under the Hart-Scott-Rodino Law, as modified by Section 363(b)(2) of the Bankruptcy Code, including any extensions thereof, shall have expired.

4.1.9    To the extent a Remediation Agreement is required by NJDEP as to any parcel of Real Property in New Jersey that is a Transferred Asset and is the applicable method of ISRA compliance required under Section 4.2.13.1, Purchaser shall have received from the NJDEP, and provided to Seller a copy of, such NJDEP-approved Remediation Agreement executed by Purchaser and NJDEP, and if, and only if, ISRA requires the establishment of a Funding Source contemporaneously with the execution of a Remediation Agreement, evidence that Purchaser has established a Funding Source by the Purchaser in accordance with Section 7.12. If a Funding Source is not required contemporaneously with the execution of the

Remediation Agreement, Purchaser will upon its initial establishment of a Funding Source, provide a copy of the documentation thereof to the Seller.

4.1.10    All of the environmental issues described in Sections 4.2.13, 4.2.14 and 7.12 shall have been resolved to the satisfaction of Seller and Purchaser, each in its sole discretion.

4.2    Conditions to Purchaser's Obligations.    Purchaser's obligation to make the deliveries required of Purchaser at the Closing, and otherwise to close the Contemplated Transactions, shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, unless any such unsatisfied condition is waived in writing by Purchaser:

4.2.1    Seller shall have performed and complied with, in all material respects, each and every covenant or other obligation required to be performed by it before the Closing.

4.2.2    All representations and warranties of Seller contained herein shall continue to be true and correct at the Closing.

4.2.3    Seller shall have delivered all items required under Section 3.5 above of this Agreement to be delivered by Seller on or before the Closing.

4.2.4    The Procedures Order shall have become a Final Order.

4.2.5    The Bankruptcy Court shall have entered the Sale Order in accordance with Section 7.4.2 below, which shall have become a Final Order.

4.2.6    No action, suit or other proceedings shall be pending before any Government Entity seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Government Entity, or seeking or threatening or asserting a claim to or Lien against the Transferred Assets.

4.2.7    There shall be no injunction or court order restraining consummation of the Contemplated Transactions and there shall not have been adopted any law or regulation making all or any portion of the Contemplated Transactions illegal.

4.2.8    Any waiting period required under the Hart-Scott-Rodino Law, as modified by Section 363(b)(2) of the Bankruptcy Code, including any extensions thereof, shall have expired.

4.2.9    All required third party consents, approvals or authorizations of, or declarations to or filings with, any Government Entity or any other Person required for the valid transfer of the Transferred Assets shall have been obtained, given, submitted or filed, as required and all permits required for the operation of the Business have either been transferred to Purchaser or have been obtained by Purchaser.

4.2.10  Amendments to the MPMI Lease and the MPMI Operating Agreement, in form and substance satisfactory to the Purchaser in its sole discretion, shall have been delivered by the Seller or, at the instruction of the Agent or Purchaser, Seller shall have rejected in the Case the MPMI Lease and the MPMI Operating Agreement.

4.2.11  Amendments to all Insider Leases, in form and substance satisfactory to the Purchaser in its sole discretion, shall have been delivered by the Seller.

4.2.12  Amendments to the Collective Bargaining Agreements, in form and substance satisfactory to the Purchaser in its sole discretion, shall have been executed by Seller and all labor unions and delivered by the Seller or, at its sole discretion, Purchaser may waive this requirement and continue with the Contemplated Transaction as referenced at Section 3.9.4.

4.2.13  All environmental issues relating to the Real Property and/or the Business shall have been resolved to Purchaser's satisfaction in its sole discretion, including without limitation the following:

4.2.13.1  Purchaser shall have received evidence of one of the following with respect to each parcel of Real Property in New Jersey that is a Transferred Asset: (i) a non-applicability letter from NJDEP stating that the transfer of that parcel of Real Property is not subject to the requirements of ISRA, or (ii) written approval by NJDEP of Seller's negative declaration or "No Further Action Letter" and "Covenant Not to Sue" as to all areas of concern related to that parcel of Real Property, or, only if neither (i) nor (ii) above is available, then (iii) a Remediation Agreement for that parcel of Real Property, signed by Purchaser and the NJDEP in a form substantially similar to that in Exhibit 3.7.6, in accordance with Section 7.12.

4.2.13.2  By December 14, 2007, Purchaser shall have (i) agreed to assume upon Closing the currently-proposed settlement with the United States of all environmental claims and liabilities involving or related to Seller with respect to Releases of contaminants allegedly affecting the Lower Passaic River Study Area, but only with and subject to such amendments to that settlement as may be satisfactory to Purchaser in its sole discretion; (ii) agreed to waive in writing the satisfaction of the condition relating to the resolution of all environmental claims and liabilities involving or related to Seller with respect to Releases of contaminants allegedly affecting the Lower Passaic River Study Area to Purchaser's satisfaction in its sole discretion; or (iii) terminated this Agreement and, upon such termination, shall not be obligated to close the Contemplated Transactions.

4.2.14  To the extent the Bankruptcy Court deems the Liabilities, if any, of Seller associated with or arising out of the pending action entitled NJDEP v. Marcal, Top Soil Depot and Allan Rombough, Superior Court of New Jersey, Passaic County, Chancery Division, Docket Number C-178-06 or the related proceedings before the Office of Administrative Law now on appeal before the Appellate Division of the Superior Court to be post-petition administrative expenses, the amounts of such Liabilities shall be acceptable to Purchaser in its sole discretion.

4.2.15  Seller shall have requested and used its reasonable efforts to obtain and provide to Purchaser Tax clearance or similar certificates from each of the states in which Seller has operated the Business.

4.2.16  There shall not have occurred any Material Adverse Change.

5.  Seller's Representations and Warranties.  Seller hereby represents and warrants to Purchaser as follows:

5.1 Due Organization.  Seller is a corporation duly organized and validly existing under the laws of the State of New Jersey.

5.2 Power and Authority.  Schedule 5.2 contains a true and complete list of each jurisdiction where the Seller is qualified to do business.  Subject to the authority of the Bankruptcy Court and the provisions of the Bankruptcy Code, the Seller has all requisite corporate power and authority to own, lease and operate its properties used in the Business, to carry on the Business and, upon obtaining the Sale Order, to execute, deliver and perform this Agreement.

5.3 Authorization and Validity of Agreement.  Upon the approval of the Bankruptcy Court and obtaining the Sale Order, (a) all corporate action on the part of Seller necessary to approve the execution, delivery and performance of this Agreement by Seller will have been duly taken and (b) this Agreement, when executed and delivered by Seller, shall constitute the valid and binding obligation of Seller enforceable in accordance with its terms, terms, except as such enforcement may be limited by (i) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (ii) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.4 No Conflicts.  Except as set forth on Schedule 5.4 and subject to the approval of the Bankruptcy Court, the Seller's execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party, the consummation of the Contemplated Transactions, and its compliance with the provisions hereof and thereof will not upon the entry of the Sale Order: (i) violate any provision of any applicable law; (ii) conflict with or result in any breach of any of the terms or conditions of, or constitute (with due notice or lapse of time, or both) a default or give rise to any right of termination, cancellation or acceleration under: (A) the organizational documents of the Seller; or (B) any Permit or order to which the Seller is, or any of its properties are, bound; and (iii) result in the creation of any Lien upon the assets or the property of the Seller.

5.5 No Consent or Approval Required. Except as set forth on Schedule 5.5 and except for the Sale Order, no consent, approval or authorization of, or declaration to or filing with, any Government Entity or any other Person is required for the valid authorization, execution and delivery by the Seller of this Agreement or any other document or for consummation by the Seller of the Contemplated Transactions.

5.6 <u>Title to Assets, Properties and Rights</u>. The Seller owns, leases or has the legal right to use all properties and assets that are included in the Transferred Assets, including, without limitation, the Seller Intellectual Property, Owned Real Property, Leased Real Property and Tangible Personal Property, wherever located, except to the extent that ingress and egress to the Owned Real Property located at 41 Slater Drive, Elmwood Park, New Jersey is across a portion of the Leased Real Property located at 35 Market Street, Elmwood Park, New Jersey and the Greenacres property located in Elmwood Park, New Jersey.. The Seller has good, valid and indefeasible title to, or, in the case of leased or subleased personal property, valid and subsisting leasehold interests in, all the Transferred Assets, free and clear of all Liens, except for those Liens set forth on <u>Schedule 5.7</u> and Permitted Encumbrances. At the Closing, Purchaser will acquire all of Seller's right, title and interest in and to all the Transferred Assets, free and clear of any Liabilities and Liens (other than Permitted Encumbrances).

5.7 <u>Disclosed Liens</u>. <u>Schedule 5.7</u> lists all Liens on the Transferred Assets (other than Permitted Encumbrances).

5.8 <u>Condition and Sufficiency of Assets</u>. If the Purchaser assumes the Seller's obligations (as they may be amended) under the MPMI Lease and MPMI Operating Agreement pursuant to the Sale Order, as of the Closing the Transferred Assets constitute all assets and rights, tangible and intangible, of any nature whatsoever, necessary to operate the Business as currently conducted. Except for MPMI's assets used under the MPMI Lease and MPMI Operating Agreement, no Person other than the Seller owns any equipment or other tangible assets or properties situated on the premises of the Seller or necessary to the operation of the Business except for items leased or used by the Seller pursuant to Contracts and either (a) disclosed on <u>Schedule 1.1.5</u> or (b) entered into in the Ordinary Course of the Business consistent with past practice and not otherwise required to be disclosed on <u>Schedule 1.1.5</u>.

5.9 <u>No Subsidiaries</u>. The Seller does not own any Subsidiaries and the Seller does not otherwise own or Control, directly or indirectly, any equity or voting interest in, or other Securities of, any Person, nor has the Seller made any commitment or subscribed for the purchase of any such equity or voting interest or other Securities. <u>Schedule 5.9</u> contains a true and complete list of all Subsidiaries that were owned by the Seller at any time during the prior five (5) year period and each jurisdiction where any such Subsidiary was organized. Each such Subsidiary has been legally and validly dissolved or merged and the Seller has provided the Purchaser with certified documentation evidencing each such dissolution or merger.

5.10    <u>Transferred Contracts</u>. A true and complete copy of each material Contract of Seller, including without limitation those described in <u>Section 1.1.5</u>, shall have been delivered or made available to the Purchaser on or before December 4, 2007. Each such Contract is, and, subject to the rejection of any such Contract pursuant to the Amended Plan, after giving effect to the Closing shall be (to the extent such Contract is assumed by Purchaser and Cure Amounts, if any, are paid), a legal, valid and binding agreement of Seller and in full force and effect in all respects in accordance with its terms. Except as set forth on <u>Schedule 5.10</u> or as a result of the filing of the Case but not otherwise relating to the financial position of the Debtor, with respect to each such Contract, (i) the Seller, and (ii) to the Knowledge of the Seller, each other party to such Contract, is not in breach or in default under (and no event has occurred which with notice or the passage of time, or both, would constitute a breach or default under)

such Contract. To the Seller's Knowledge, there exists no condition, event or act (other than the filing of the Case) which constitutes, or which, after notice, lapse of time or both, would constitute, a default of the Seller under any such Contract (to the extent such Contract is assumed by Purchaser and Cure Amounts, if any, are paid). The Seller has not received notice of the intention of any Person to terminate any such Contract. To the Knowledge of the Seller, no party to any such Contract has any rights of setoff, bankers lien or similar rights with respect to any amounts due under any such Contract that would be material to the Business, except as set forth on Schedule 5.10 and the Second Lien Loan Agreement. Except as set forth on Schedule 5.7 and under the DIP Agreement, there are no Liens with respect to any such Contract (other than Permitted Encumbrances). Each such Contract was entered into on an arm's-length basis and on market terms.

5.11    Brokers. Except for payment to the Broker as contemplated in Section 7.11, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Contemplated Transactions based upon arrangements made by or on behalf of the Seller.

5.12    Complete Disclosure. No representation or warranty made by the Seller in this Agreement contains or will contain any untrue statement of a material fact or omits a material fact necessary to make the statements contained herein and therein not misleading.

5.13    Real Property.

5.13.1    All Real Property. The Owned Real Property listed on Schedule 1.1.1 and the Leased Real Property listed on Schedule 1.1.5-1 is all of the real property used in the Business as presently conducted; and the Seller is not party to any Contract to sell, purchase or lease, or creating any option to sell, purchase or lease, any real property or interest therein (other than this Agreement or any agreement as to the Maine Real Property).

5.13.2    Title to Owned Real Property. All of the Owned Real Property (excluding only the Maine Real Property) is listed or described on Schedule 1.1.1. Title to the Owned Real Property is, and at Closing shall be, insurable and indefeasible, fee simple, held in the name of the Seller free and clear of all Liens, excepting only any Liens disclosed on Schedule 5.7 and any Permitted Encumbrances. The Liens are presented on Schedule 5.7 in a manner so that the Owned Real Property to which they relate is readily identifiable. Except as set forth on Schedule 5.7, or as to the Maine Real Property or pursuant to the MPMI Lease or the MPMI Operating Agreement, no Person other than the Seller will be leasing, using or occupying any portion of the land, property, structures, fixtures and improvements covered by the Owned Real Property or any part of any thereof as of the Closing Date.

5.13.3    Survey/Title Policies and Insurance-Owned Real Property. Schedule 5.13.3 identifies, for each Owned Real Property, the date of the most recent survey of each parcel of Owned Real Property, the preparer of each such survey, and the most recent owner's policy of title insurance procured for each parcel of Owned Real Property. Seller shall have provided or made available to Purchaser on or before December 4, 2007 true, correct and complete copies of all such surveys and title insurance policies.

5.13.4 <u>Leased Real Property</u>.

5.13.4.1    <u>Schedule 1.1.5-1</u> describes each Real Property Lease by listing the names of the parties thereto and a description of the Leased Real Property. The Seller shall have provided the Purchaser on or before December 4, 2007 true, complete and correct copies of all written Real Property Leases, including all amendments thereto, and a true, correct and complete description of all oral Real Property Leases and oral amendments to Real Property Leases.

5.13.4.2    Subject to the assumption and assignment thereof pursuant to the Sale Order, each Real Property Lease is, and at Closing shall be, legal, valid and binding and in full force and effect and has not and will not have been assigned, modified, supplemented or amended.  The Seller has performed all of the obligations required to be performed by it to date under the Real Property Leases, and neither the Seller nor to the Knowledge of the Seller, any other party to any Real Property Lease is in default under any of the Real Property Leases.  To the Knowledge of the Seller, no circumstance or state of facts (other than the filing of the Case) presently exists which, with the giving of notice or passage of time, or both, would constitute a default by the Seller under any Real Property Lease or would permit the landlord or tenant, as applicable, under any Real Property Lease to terminate any Real Property Lease.

5.13.4.3    Except as set forth on <u>Schedule 1.1.5-1</u>, no Person other than the Seller will be leasing, using or occupying any portion of the land, property, structures, fixtures and improvements covered by the Real Property Leases where the Seller is the tenant as to any part thereof as of the Closing Date.

5.13.4.4    Subject to the assumption and assignment thereof pursuant to the Sale Order, except as set forth on <u>Schedule 1.1.5-1</u>, where the Seller is the tenant under any Real Property Lease, the Seller has the right to quiet enjoyment and exclusive use and occupancy of each parcel of Leased Real Property and related Improvements for the full term of the applicable Real Property Lease (and any renewal option related thereto), and it will continue to have such rights upon consummation of the transactions contemplated hereby and the leasehold or other interest of the Seller in such Leased Real Property is not subject to any Liens (except for Permitted Encumbrances).  The Seller has the right to use all of the Leased Real Property in accordance with the applicable Real Property Lease as it is and has been used in the conduct of the Business.  Except as set forth on <u>Schedule 1.1.5-1</u>or as to any proposed modifications of any Insider Lease, no written or unwritten notice has been received by Seller indicating the desire or intention of any other party to a Real Property Lease to amend, modify, rescind or terminate the same.

5.13.4.5    With respect to the Real Property, (i) except as set forth on <u>Schedule 5.13.5</u> or <u>Schedule 5.14</u>, no portion thereof is subject to any pending or, to the Knowledge of the Seller, threatened fire, health, safety, building, zoning or other land use regulatory Rights of Action or proceeding by any Government Entity or any quasi-public authority; (ii) except as set forth on <u>Schedule 5.13.4.5</u> and except with respect to adjustments to assessed valuations related to normal course reassessments, no notice of any increase in the assessed valuation of the Real Property and no notice of any contemplated special assessment

has been received by the Seller and, to the Knowledge of the Seller, there is no threatened increase in assessed valuation or threatened special assessment pertaining to any of the Real Property except with respect to the aforementioned normal course reassessments, and (iii) except as set forth on <u>Schedule 5.13.4.5</u> or <u>Schedule 5.14</u>, the Seller has not received any notice of a violation or claimed violation of any applicable law affecting the Real Property.

        5.13.4.6      Notwithstanding anything to the contrary contained in the representations and warranties set forth in this <u>Section 5.13.4</u>, because certain of the Seller's landlords under the Insider Leases either have or may have on or prior to the Closing revoked their consent to the extension of the period during which the Seller must assume or reject a particular Insider Lease, such Insider Lease may be deemed rejected as a matter of law and the Seller will be unable to assume and therefore assign certain of the Insider Leases to the Purchaser as of the Closing

        5.13.5  <u>Zoning</u>. Except as set forth on <u>Schedule 5.13.5</u>, the classification of the Owned Real Property and Leased Real Property under applicable zoning laws, ordinances and regulations permits, to the Knowledge of the Seller, the use and occupancy of all such real property and the operation of the Business therein, and permits the improvements located thereon as currently constructed, used and occupied, and there are no pending or, to the Knowledge of the Seller, threatened actions or Rights of Action which could result in a modification or termination of such zoning and other land use requirements.

        5.13.6  <u>No Damage</u>. No portion of the Real Property has suffered any material damage by fire or other casualty which has not been repaired before the Closing.

      5.14    <u>Environmental Matters</u>.

        5.14.1  Except as set forth on <u>Schedule 5.14</u>, the Seller is in compliance in all material respects with all applicable Environmental Laws; the Seller possesses all Environmental Permits required under any Environmental Laws for the conduct of the business, is in compliance in all material respects with the terms and conditions thereof, and has timely filed all renewal applications relating thereto; and such Environmental Permits are in full force and effect, are not appealable, have not been contested by any entity, and contain no restrictions on the transfer of any such permit to a subsequent owner or operator of the business or the facility, except for compliance with the usual procedures of NJDEP for the transfer of Environmental Permits. <u>Schedule 5.14</u> sets forth a complete list of such Environmental Permits.

        5.14.2  Except as set forth on <u>Schedule 5.14</u>, (a) there are no Rights of Action under any Environmental Laws pending, or, to the Knowledge of the Seller, threatened against or by the Seller, or affecting the Seller or any of its Businesses, properties, or Transferred Assets; (b) Seller has received no communication from any Government Entity or other person alleging any material liability under Environmental Law; (c) Seller has received no request for information under Environmental Law from any Government Entity; and (d) the Seller has not entered into, and no Real Property is subject to, any material agreement, order (including any consent orders or agreed orders) or other material obligations related to Environmental Laws, remediation, monitoring, or post-closure care.

5.14.3 Except as set forth on Schedule 5.14, the Seller has not expressly assumed or undertaken any Liability of any other Person under any Environmental Laws, including with respect to any former Subsidiary listed on Schedule 5.9.

5.14.4 Except as set forth on Schedule 5.14, on the Real Property the Seller has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled or Released any Hazardous Substance, in a manner that has given rise, or could reasonably be expected to give rise, to material Liabilities pursuant to CERCLA, ISRA or any other Environmental Law, including any material Liability for response costs, corrective action costs, personal injury, property damage, natural resources damage or attorney fees, or any investigative, corrective or remedial obligations. Except as set forth on Schedule 5.14, there has been no Release or threatened Release to, from, on or about the Real Property in quantities or concentrations that could reasonably be expected to give rise to a material Liability under Environmental Law. With respect to Seller's representations in this Section 5.14.4, Seller has informed Purchaser that it has not conducted a comprehensive investigation of contamination at the Facilities and as such may it may not be aware of the presence of Hazardous Substances at, on, under, or migrating from any real property owned, occupied, operated or leased by Seller. Purchaser shall have as its sole remedy for a breach of this Section 5.14.4 termination of this Agreement and, upon such a breach by Seller, shall have no obligation to close the Contemplated Transactions.

5.14.5 Except as set forth on Schedule 5.14, no Hazardous Substances (other than Hazardous Substances ordinarily used in the course of operation of the Facilities and where such Hazardous Substance has not been Released at the Facility in a manner not in compliance with Environmental Law) are present at, on, under, or migrating from any real property owned, occupied, operated or leased by Seller. With respect to Seller's representations in this Section 5.14.5, Seller has informed Purchaser that it has not conducted a comprehensive investigation of contamination at the Facilities and as such may it may not be aware of the presence of Hazardous Substances at, on, under, or migrating from any real property owned, occupied, operated or leased by Seller. Purchaser shall have as its sole remedy for a breach of this Section 5.14.5 termination of this Agreement and, upon such a breach by Seller, shall have no obligation to close the Contemplated Transactions.

5.14.6 The Seller has made or will make available to the Purchaser prior to Closing all material written environmental assessments, audits, investigations, studies, reports or other documents (including material written correspondence with Government Entities) in its possession or control relating to all properties currently owned or leased by the Seller.

5.15    Intellectual Property Rights.

5.15.1 Schedule 1.1.4 includes a true and complete list of all Registered Intellectual Property. The Registered Intellectual Property is valid and subsisting. Except as set forth on Schedule 5.15, the Seller is the exclusive owner of, and enjoys all rights of ownership with respect to, the Seller Intellectual Property, free and clear of any Lien, and no royalties, honoraria or fees are payable by the Seller to other Persons by reason of the ownership or use of the Seller Intellectual Property.

5.15.2  Except as disclosed on <u>Schedule 5.15</u>, the Seller has not asserted any claim: (A) based upon, challenging, or seeking to deny or restrict the use by any third party of any of the Seller Intellectual Property; (B) alleging that any third party is infringing, misappropriating or otherwise violating the Seller Intellectual Property; or (C) alleging that any third party is using the Seller Intellectual Property in conflict with the terms of any Contract.

5.15.3  The Seller has taken all commercially reasonable steps necessary to maintain the validity of the Seller Intellectual Property, including paying all necessary fees and making all necessary filings with the appropriate Government Entity.

5.15.4  The Seller Intellectual Property and the operation of the Business does not infringe, misappropriate or otherwise violate the rights of any third party in such third party's Intellectual Property. The Seller has licensed copies of all third-party software products used in the Seller's business and does not possess any pirated, illegally copied or otherwise non-licensed copies of any such software.

5.15.5  Except as disclosed in <u>Schedule 5.15</u>, no Rights of Action have been asserted or are pending or, to the Knowledge of the Seller, threatened against the Seller (i) based upon, challenging, or seeking to deny or restrict the use by the Seller of any of the Seller Intellectual Property, (ii) alleging that any of the Seller Intellectual Property infringes, misappropriates or otherwise violates the Intellectual Property of any third party, or (iii) alleging that any of the Seller Intellectual Property is being used by the Seller in conflict with the terms of any agreement concerning Intellectual Property.

5.15.6  To the knowledge of the Seller, the continued operation of the Business as currently conducted will not give rise to any claims that allege that the operations of the Business, including, without limitation the manufacture, use or sale of any product or service or the use of any process now used or offered by the Seller, infringes, violates, misappropriates or conflicts with any Intellectual Property of any third party, or constitutes unfair competition with any third party, and no royalty or other payment will accrue or be due following the Closing based on the continued operation of the Business as presently conducted.

5.15.7  Seller has not licensed any Seller Intellectual Property to any Person on an exclusive basis, nor has the Seller entered into any Contract materially limiting its ability to exploit fully any Seller Intellectual Property.

5.15.8  <u>Schedule 1.1.5-2</u> contains a complete and accurate list of all Contracts where Seller is a licensor or licensee of any Seller Intellectual Property. Seller is not, nor will it be as a result of the execution and delivery of this Agreement or the performance of its obligations under this Agreement, in breach of any Contract relating to Seller Intellectual Property.

5.16    <u>Labor Relations</u>.

5.16.1  Except as set forth on <u>Schedule 5.16</u>, the Seller is not a party to any Collective Bargaining Agreements and there are no labor unions or organizations representing any employee of the Seller.

5.16.2  Except as set forth on Schedule 5.16, there are no labor unions or organizations that have filed a petition with the NLRB or any other Government Entity seeking certification as the collective bargaining representative of any employee of the Seller, and, to the Knowledge of the Seller, no labor union or organization is engaged in any organizing activity with respect to any employee of the Seller.

5.16.3  Except as set forth on Schedule 5.16, there has not been, there is not presently pending or existing, and there is not currently threatened (i) any labor dispute, strike, lockout, slowdown, picketing, or work stoppage with respect to the employees of the Seller; or (ii) any unfair labor practice charge against the Seller.

5.16.4  No labor union or other organization has made any claim that the Seller jointly employs the employees of any third party, including any contractor or concessionaire of the Seller.

5.16.5  Except as set forth on Schedule 5.16, the Seller is presently in compliance, with in all material respects all applicable contracts, Collective Bargaining Agreements and Labor Rules.

5.16.6  Except as set forth on Schedule 5.16, Seller is not under investigation and is not a defendant or respondent or potential defendant or respondent and there are no charges, complaints, investigations or allegations pending of which the Seller has notice or to the Seller's knowledge threatened Rights of Action, including before administrative agencies including, but not limited to the NLRB, the DOL, the EEOC and OFCCP or Government Entity, administrative complaints, or lawsuit or pending grievances or arbitration under Collective Bargaining Agreements alleging that the Seller is not in compliance with any Collective Bargaining Agreement or applicable laws and regulations regarding labor, employment, equal opportunity, discrimination, harassment, retaliation, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health and/or privacy rights of employees or any of the Labor Rules.

5.16.7  Except as set forth on Schedule 5.16, with respect to each current and former employee of the Seller, during the three (3) years before the Closing Date, the Seller (i) has withheld and reported all material amounts required by applicable law or by agreement to be withheld and reported with respect to wages, salaries and other payments; (ii) has no outstanding material liability, or any potential material liability, for any arrears of wages, severance pay or any penalty relating thereto for failure to comply with any of the foregoing; and (iii) has no outstanding material liability, or any potential liability, for any payment to any trust or other fund governed by, or maintained by or on behalf of, any Government Entity, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the Ordinary Course of the Business consistent with past practices). Currently, and during the three (3) years before the Closing Date, the Seller has no material liability with respect to misclassification of any person as (x) an independent contractor rather than as an employee, or with respect to any employee leased from another employer, or (y) an employee exempt from state or federal overtime regulations.

5.16.8 Purchaser will not be deemed to be a "successor employer" for any purpose, except to the extent set forth in the first sentence of Section 5.16.9. Purchaser shall not be under any obligation to assume any Employee Plans or any liabilities under or with respect to Employee Plans (except, in Purchaser's sole discretion, as to any permitted "rollover" accepted by the applicable plan of Purchaser or one of its Affiliates that is elected by a Transferred Employee under an Employee Plan intended to be qualified under Section 401(a) of the Internal Revenue Code).

5.16.9 Seller hereby acknowledges that Purchaser qualifies as a successor employer for Federal Insurance Contributions Act ("*FICA*") and Federal Unemployment Tax Act ("*FUTA*") tax purposes with respect to the Transferred Employees. In connection with the foregoing, the parties agree to follow the Alternative Procedures.

5.16.10    Within the last five (5) years, the Seller has never implemented any plant closing or mass layoff of employees as those terms are defined in the WARN Acts or any similar state or local law or regulation.

5.16.11    Except as required by COBRA or other similar law and except as set forth on Schedule 5.16, there are no retired employees, officers or directors of the Seller, or their dependents, receiving benefits or scheduled to receive benefits from the Seller in the future.

5.16.12    Except as set forth on Schedule 5.16, the Seller is in compliance in all material respects with all Labor Rules and Collective Bargaining Agreements and is not a party to any Proceeding in which the Seller was alleged to have violated any Labor Rules or Collective Bargaining Agreements.

5.16.13    Except as set forth on Schedule 5.16, the Seller is not a party to any contract, agreement, or arrangement with any employee of the Seller that (i) restricts the Seller's right to terminate the employment of any employee without cause or without a specified notice period, or (ii) obligates the Seller to pay severance to any employee of the Seller upon termination of such employee's employment with the Seller.

5.16.14    The Seller will have delivered or made available to the Purchaser on or before December 4, 2007, all Prior Privileges as set forth in Section 34 of the Collective Bargaining Agreement between Seller and the USW, and all Maintenance of Standards, as set forth in Section 17 of the Collective Bargaining Agreement between Seller and the Teamsters Union.

5.17    Employee Benefits Matters.

5.17.1    Except as set forth on Schedule 5.17, each Employee Plan, in both form and operation, has been maintained, funded, and administered in all material respects in accordance with its terms and applicable law, including ERISA and the Internal Revenue Code, and would not subject Seller to any Liability or penalty.

5.17.2    Schedule 5.17 sets forth a true and complete list of each Employee Plan and true and complete copies of each Employee Plan have been provided to

Purchaser. Any Employee Plan (and the associated trust) intended to qualify under Section 401(a) or 501(c)(9) of the Internal Revenue Code has been determined by the Internal Revenue Service to be so qualified, and no event or omission could reasonably be expected to cause any such Employee Plan to lose such qualification. Seller shall have delivered or made available to the Purchaser, on or before December 4, 2007, true and complete copies of (i) the determination letter(s) for each Employee Plan, if applicable, (ii) all Form 5500 Series annual reports for each Employee Plan filed for the past three (3) most recent plan years, together with all schedules, attachments, and related opinions and (iii) any correspondence from or to the Internal Revenue Service, the Department of Labor or other U.S. Government Entity relating to an audit or penalty assessment with respect to any Employee Plan or relating to requested relief from any liability or penalty relating to any Employee Plan.

    5.17.3    Except as set forth on Schedule 5.17, all contributions, premiums or payments required to be made or accrued with respect to any Employee Plan have been made on or before their due dates. Except as set forth in Schedule 5.17, each employee and independent contractor of Seller is properly classified as such. No Employee Plan is maintained outside of the United States or covers any employee residing outside of the United States.

    5.17.4    Except as set forth in Schedule 5.17, Seller does not have any Liability with respect to any program or arrangement providing or promising any health or other welfare benefits to employees after employment termination (except as required by COBRA or other similar law).

    5.17.5    Except as set forth in Schedule 5.17, with respect to each Employee Plan that is subject to Title IV or Section 302 of ERISA or Section 412 or 4971 of the Internal Revenue Code, within the three (3)-year period immediately prior to the Closing Date: (i) there has not existed any accumulated funding deficiency within the meaning of Section 412 of the Internal Revenue Code or Section 302 of ERISA, whether or not waived; (ii) the fair market value of the assets of such Employee Plan equaled or exceeded the actuarial present value of all accrued benefits under such Employee Plan (whether or not vested); (iii) no "reportable event" within the meaning of Section 4043(c) of ERISA for which the 30-day notice requirement has not been waived has occurred, and the consummation of the transactions contemplated by this Agreement will not result in the occurrence of any such reportable event; (iv) all premiums to the Pension Benefit Guaranty Corporation ("*PBGC*") have been timely paid in full; (v) no Liability (other than for premiums to the PBGC) under Title IV of ERISA has been or is expected to be incurred by Seller; (vi) no Employee Plan has been completely or partially terminated; and (vii) the PBGC has not made inquiries with respect to any Employee Plan or instituted Rights of Action to terminate any Employee Plan and, except as disclosed on Schedule 5.17 and to the Knowledge of Seller, no condition exists that presents a risk that such Rights of Action will be instituted or that would constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Employee Plan. Copies of any items described on Schedule 5.17 have been provided to Purchaser.

    5.17.6    Except as set forth in Schedule 5.17, within the three (3)-year period immediately prior to the Closing Date, neither Seller nor any ERISA Affiliate has maintained, sponsored or contributed to any "multiemployer plan" (as such term is defined in

Section 3(37) of ERISA) nor have they incurred any material liability, including, without limitation, withdrawal liability, with respect to any such plan that remains unsatisfied.

5.17.7   Except as set forth and quantified in Schedule 5.17, within the three (3)-year period immediately prior to the Closing Date, with respect to each Employee Plan that is a "multiemployer plan" (as such term is defined in Section 3(37) of ERISA), if Seller or any of its Subsidiaries were to experience a withdrawal or partial withdrawal from such Employee Plan, no withdrawal liability would be incurred, and Seller has not received any notification, nor has any reason to believe, that any such Employee Plan is in reorganization, has been terminated, is insolvent, or may reasonably be expected to be in reorganization, to be insolvent, or to be terminated.

5.17.8   Seller has not engaged in any transaction described in Section 4069, 4204 or 4212 of ERISA.

5.17.9   Each Employee Plan that is an employee welfare benefit plan under Section 3(1) of ERISA either (i) is funded through an insurance company contract and is not a "welfare benefit fund" within the meaning of Section 419 of the Internal Revenue Code or (ii) is unfunded.

5.17.10   Except as set forth and quantified in Schedule 5.17, there are no pending or, to Seller's Knowledge, threatened claims by or on behalf of any Employee Plans, by any person covered thereby (other than ordinary claims for benefits submitted by participants or beneficiaries) or any Government Entity and Seller has no obligations under any Employee Plan or with respect to which Purchaser would have any liability or that could result in a Lien attaching to the Transferred Assets. None of Seller nor any other Person, including any fiduciary, has engaged in any "prohibited transaction" (as defined in Section 4975 of the Internal Revenue Code or Section 406 of ERISA) that would subject any Employee Plan, its related trust, Seller or any person Seller has an obligation to indemnify, to any material tax or penalty imposed under Section 4975 of the Internal Revenue Code or Section 502 of ERISA.

6.   Purchaser's Warranties and Representations.  Agent and Purchaser represent and warrant to Seller as follows:

6.1 Due Organization.  At Closing, Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

6.2 Power and Authority.  At Closing, Purchaser has all requisite power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement.

6.3 Authorization and Validity of Agreement.  All action on the part of Agent necessary to approve the execution, delivery and performance of this Agreement by Purchaser has been taken. This Agreement, when executed and delivered by Agent, will constitute the valid and binding obligation of Agent enforceable in accordance with its terms. This Agreement, when assumed by Purchaser, will constitute the valid and binding obligation of Purchaser enforceable in accordance with its terms.

6.4 <u>No Conflicts</u>. The execution, delivery and performance of this Agreement by Agent and Purchaser do not and will not: (i) conflict with or result in a breach of the certificate of formation or limited liability company agreement of Purchaser; (ii) materially violate any material statute, law, rule or regulation, or any order, writ, injunction or decree of any Government Entity binding on Agent or Purchaser; or (iii) materially violate or conflict with or constitute a material default under any agreement, instrument or writing of any nature to which Agent or Purchaser is a party or by which Agent or Purchaser or its assets or properties may be bound.

6.5 <u>Brokers</u>. No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's financial advisor's or other similar fee or commission in connection with the Contemplated Transactions based upon arrangements made by or on behalf of Agent or Purchaser.

7. <u>Other Agreements of the Parties</u>.

7.1 <u>Conduct of Business Before Closing</u>. During the period before the Closing Date, Seller shall carry on the Business diligently and in the Ordinary Course of the Business only, and shall use its diligent and commercially reasonable efforts (taking into account its status as a Debtor under chapter 11 and the financial and other constraints that such status may impose upon Seller) to preserve its current business organization intact and to preserve its current relationships with customers and other persons having business dealings with the Business.

7.2 <u>Hart-Scott-Rodino Cooperation</u>. Purchaser and Seller shall cooperate with each other to comply with, and provide the information required by, the pre-merger notification and waiting period rules of the Hart-Scott-Rodino Law. In that connection, if a joint pre-merger notification filing is required by the Hart-Scott-Rodino Law, Purchaser and Seller shall use diligent efforts to make their joint pre-merger notification filing with the applicable Government Entities no later than five days following the Execution Date. Purchaser shall pay for all filing fees in connection with compliance with the Hart-Scott-Rodino Law.

7.3 <u>WARN Acts</u>. The duties and obligations of the parties regarding the WARN Acts shall be as defined by law, except that Purchaser shall bear any and all obligations under the WARN Acts that result from actions taken by Purchaser or from Purchaser's failure to comply with duties and obligations imposed on it by the WARN Acts.

7.4 <u>Bankruptcy Court Approvals</u>.

7.4.1    <u>Procedures Order</u>. The Procedures Order shall be in form and substance acceptable to Purchaser. The Seller will use diligent efforts to cause the Procedures Order to be entered by the Bankruptcy Court on or before November 19, 2007. A copy of the proposed Procedures Order is attached hereto as <u>Exhibit 7.4.1</u> and incorporated herein by this reference. The sale procedures governing the sale of the Transferred Assets shall be those set forth in the Procedures Order. In the event of any conflict between the terms and provisions hereof and those of the Procedures Order, the terms and provisions of the Procedures Order shall govern and control. Purchaser shall designate in writing, on or before December 14, 2007 at 5:00 p.m. (EST) the Real Property Leases and all Other Contracts to be assumed and assigned to

Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code (collectively, the "*Section 365 Contracts*"). Such designation is subject to Purchaser's right, by written notice to Seller from time to time on or before January 14, 2008 (at 5:00 PM prevailing Eastern time), to exclude from or add to the list of previously designated Section 365 Contracts additional Contracts or Real Property Leases.

7.4.2    Sale Order. Both Purchaser's and Seller's obligations to consummate the Contemplated Transactions shall be conditioned upon the entry by the Bankruptcy Court of an order (the "*Sale Order*"), which Sale Order, among other things, (i) is acceptable to Seller and Purchaser, (ii) becomes a Final Order, (iii) approves the sale of the Transferred Assets to Purchaser on the terms and conditions set forth in this Agreement and authorizes the Seller to proceed with the Contemplated Transactions, (iv) includes a specific finding that Purchaser is a good faith purchaser of the Transferred Assets and is not a successor of the Seller under applicable law, (v) states that the sale of the Transferred Assets to Purchaser shall be free and clear of all Liabilities and Liens, except for Assumed Liabilities, (vi) provides that the Transferred Assets are exclusive of all Liabilities, including without limitation, the Excluded Liabilities, except for the Assumed Liabilities, (vii) approves the Seller's assumption and assignment of the Section 365 Contracts (subject to Purchaser providing adequate assurance of future performance to the counter-party thereto); (viii) orders the transactions contemplated hereby be exempt from Transfer Taxes pursuant to Section 1146(a) of the Bankruptcy Code, and (ix) is enforceable against a subsequent chapter 7 or chapter 11 trustee. Seller shall file the Sale Motion (as defined in the Procedures Order) with the Bankruptcy Court on or before November 5, 2007 and the hearing date on the Sale Motion (as defined in the Procedures Order) shall be set no later than January 15, 2008. Seller shall use commercially reasonable efforts to obtain the Sale Order and the Sale Order shall be entered by the Bankruptcy Court no later than January 15, 2008.

7.5 Executory Contracts. Seller shall take all steps necessary under the Bankruptcy Code to seek authority to assume and assign to the Purchaser the Section 365 Contracts. Purchaser shall provide adequate assurance of future performance, contingent on the consummation of the Closing, as necessary to allow Seller to assume and assign all Section 365 Contracts and Purchaser shall pay, as and when required by the Sale Order, as applicable, the Cure Amounts for the assumption of the Section 365 Contracts. Pursuant to the Procedures Order, Seller shall notify all parties to the Section 365 Contracts of the Cure Amounts for each such contract in accordance with the Procedures Order, so as to enable any such party to object to the proposed Cure Amounts and the Bankruptcy Court to determine such Cure Amounts as promptly as reasonably possible.

7.6 Certain Notices. Seller shall provide notice of the Sale Motion (as defined in the Procedures Order) to (i) all parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Transferred Assets, (ii) all applicable federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested in the Sale Motion and (iii) all other parties required to receive notice pursuant to the Procedures Order.

7.7 Pre-Closing Access to Information of Seller. From and after the date of this Agreement until the Closing Date, Seller shall, upon reasonable advance notice, afford to

Purchaser and its Representatives reasonable access during normal business hours to the Facilities and all records pertaining to the Facilities or the Business. Purchaser shall not exercise its rights to access in any manner that unreasonably interferes with the conduct of the Business by Seller. Purchaser, however, shall not be entitled to access to any materials containing: (i) communication or information subject to attorney-client, work product or any other privilege or requirement to maintain confidentiality, except for such information as may relate to environmental matters, to which Purchaser shall be provided access; (ii) communications or information about employees, disclosure of which might violate an employee's reasonable expectation of privacy or any applicable law; or (iii) information with respect to any items excluded from the definition of Business Records. Purchaser shall have the right hereunder to conduct any environmental or other assessment of the Facilities including sampling of environmental media, including but not limited to a Phase I environmental site assessments of the Real Property and at Purchaser's discretion a Phase II site investigation, to be conducted by an environmental consultant of Purchaser's choice. Any Phase II site investigation shall be pursuant to a mutually acceptable access agreement between Purchaser and Seller or any landlord under the Real Property Leases. Seller shall cooperate with Purchaser's activities, including without limitation, making available to be interviewed personnel knowledgeable about the operations and history of the Facilities. Purchaser shall indemnify and hold harmless the Seller from any liability or damage caused to any Real Property in conducting such environmental assessments, except that no such indemnity shall extend to or include any liability or damages that results from or relates to (1) the discovery of contamination or other impairment of the property existing prior to the date of Purchaser's investigation; (2) the negligence or willful misconduct of Seller (3) any claim for damages relating to the subsequent inability to sell the Real Property or any assets to another party; or (4) work typically incidental to the performance of such environmental assessments, unless the claimed damages result from Purchaser's or its consultants' negligence or willful misconduct.

       7.8 <u>Post-Closing Access to Information and Other Cooperation</u>. Purchaser shall permit Seller, Seller's Representatives, and other professionals employed in the Case reasonable access to the Business Records in the control of Purchaser for the purposes of concluding the Contemplated Transactions, preparing or filing Tax Returns or responding to audits, to wind up the affairs of Seller, to close the Case, to satisfy other legal requirements, or to prosecute or defend third party claims (including, without limitation, the pursuit of any of the Retained Rights of Action). Seller's access shall include (a) the right of such Persons to copy, at the Seller's expense, such documents and records as they may request in furtherance of such purposes and (b) Purchaser's copying and delivering to such Persons such documents and records as it may request, but only to the extent such Persons furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the Seller reimburses Purchaser for the reasonable costs and expenses thereof. Purchaser shall not dispose of or destroy any of the transferred Business Records before the second anniversary of the Closing Date and will provide Seller with notice before doing so thereafter through the sixth anniversary of the Closing Date. From the date of execution of this Agreement forward, Seller shall afford Purchaser and its representatives full access to payroll records, personnel records, labor cost information, accounts, books, records, and files of or relating to Seller and its labor relations and conduct of collective bargaining negotiations. Further, Seller shall also make such records available for inspection and copying and permit its representatives and key employees who have responsibilities for labor

management relations matters, to meet with Purchaser's representatives and to answer any and all questions its representatives may have concerning labor and employment matters.

7.9 <u>Post-Closing Retention of Data</u>.  Seller shall not, and shall use its commercially reasonable efforts to cause its employees who are not Transferred Employees and Affiliates not to, retain any copies, in any format, of Business Records.

7.10    <u>Taxes</u>.

7.10.1  <u>Tax Matters Cooperation</u>.  Subject to execution of an applicable confidentiality agreement, Seller and Purchaser agree to furnish to each other upon request, as promptly as practicable, such information and assistance relating to the Transferred Assets and the Business (including access during regular business hours and on reasonable advance notice to the Owned Real Property, Leased Real Property and Business Records and to any employees) as is appropriate for the filing of all Tax Returns and other Tax filings, the making of any election related to Taxes, the preparation for any audit by any Taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.  Seller and Purchaser shall cooperate with each other in the conduct of any audit or other proceeding related to Taxes. Seller and Purchaser shall provide timely notice to each other in writing of any pending or threatened Tax audits, assessments or litigation with respect to the Transferred Assets or the Business for any taxable period for which the other party may have Liability under this Agreement.

7.10.2  <u>Transfer Taxes</u>.  To the extent that the transfer of the Transferred Assets is a transfer pursuant to Section 1146(a) of the Bankruptcy Code, the making, delivery, filing and recording of various instruments of transfer to be recorded in connection with the sale by Seller of the Transferred Assets to Purchaser shall not be taxed under any law imposing a recording tax, stamp tax, transfer tax or similar tax.  To the extent that any transfer, registration, stamp, documentary, sales, use or similar Tax is assessed in connection with the transfer of the Transferred Assets, all such Taxes (including, but not limited to all applicable real estate transfer or gains Taxes), any penalties, interest and additions to Tax, and court, registration and filing fees incurred in connection with the Agreement shall be the responsibility of and be timely paid by Purchaser.  Seller and Purchaser shall cooperate in the timely making of all filings, returns, report and forms as may be required in connection therewith.

7.10.3  <u>Property Taxes</u>.  All real property Taxes, personal property Taxes, or similar *ad valorem* obligations (collectively, "***Property Taxes***") that are levied with respect to the Transferred Assets relating to periods beginning on or before and ending after the Closing Date shall be allocated on a *per diem* basis to Seller and Purchaser in accordance with Section 164(d) of the Internal Revenue Code.  All Property Taxes relating to periods ending on or before the Closing Date shall be allocated solely to Seller and, to the extent not already paid as of the Closing Date, payable as part of the Amended Plan Obligation Amount.  All Property Taxes relating to the periods beginning after the Closing Date shall be allocated solely to Purchaser to the extent not already paid as of the Closing Date.

7.10.4  <u>Tax Effect</u>.  None of the parties (nor such parties' counsel or accountants) has made or is making in this Agreement or any of the Transaction Documents any

representation to any other party (or such party's counsel or accountants) concerning any of the Tax effects or consequences on the other party of the transactions provided for in this Agreement. Each party represents that it has obtained, or may obtain, independent Tax advice with respect thereto and upon which it, if so obtained, has solely relied.

7.10.5 <u>Payroll Tax Reporting</u>. In connection with the application of the "Alternative Procedures," (i) Seller and Purchaser each shall report on a predecessor-successor basis as set forth in such Revenue Procedure, (ii) to the extent that Seller provides or makes available to Purchaser all necessary payroll records for the calendar year that includes the Closing Date, Seller shall be relieved from furnishing Forms W-2 to Transferred Employees, and (iii) to the extent that Seller provides or makes available to Purchaser all necessary payroll records for the calendar year that includes the Closing Date, Purchaser shall assume the obligations of Seller to furnish such Forms W-2 to such employees for the full calendar year in which the Closing Date occurs.

7.11    <u>Brokerage Obligations</u>. Except for the Broker, which Seller has engaged in connection with the Contemplated Transactions and whose Broker Compensation Seller shall be responsible to pay or cause to be paid at Closing out of the Amended Plan Obligation Amount, Seller and the Purchaser each represent and warrant to the other that, such party has incurred no Liability to any broker or agent with respect to the payment of any commission regarding the consummation of the Contemplated Transactions. Other than any commission payable to the Broker (for which Seller shall be solely responsible), if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions, are ever asserted against Purchaser or the Seller in connection with the Contemplated Transactions, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify, defend (with counsel reasonably satisfactory to the party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the Contemplated Transactions.

7.12    <u>ISRA Closing Compliance</u>.

7.12.1 Within three (3) Business Days after the date of this Agreement, the Seller shall submit a general information notice to NJDEP pursuant to the requirements of ISRA with respect to the transactions contemplated herein. The notice shall name the Purchaser as the person responsible for remediation pursuant to ISRA, however, Seller will include a rider to the general information notice noting that the obligation is subject to Closing and that the property is subject to an auction proceeding in the Bankruptcy Court which may result in a change in the Purchaser. Seller shall promptly provide to Purchaser copies of all documents received by Seller from NJDEP or provided to NJDEP by Seller with respect to Real Property, within twenty four (24) hours of receipt of any such documents by Seller or submission of any such document by Seller. Until the Closing Date, Purchaser shall promptly provide to Seller copies of all documents received by Purchaser from NJDEP or provided to NJDEP by Purchaser with respect to Real Property, within twenty four (24) hours of receipt of any such documents by Purchaser or submission of any such document by Purchaser.

7.12.2  Upon Closing, the Purchaser shall have entered into a remediation agreement pursuant to N.J.S.A. 13:1K-9(e) (the "***Remediation Agreement***"), in form and substance acceptable in Purchaser's sole discretion, if such a Remediation Agreement is required by NJDEP as to any parcel of Real Property in New Jersey (except for Leased Real Property that is not being transferred to the Purchaser pursuant to the Contemplated Transactions) and is the applicable method of ISRA compliance required under Section 4.2.13.1.  The Purchaser shall provide any Funding Source required by such a Remediation Agreement or the regulations of the NJDEP.  The preparation of and obtaining of the Remediation Agreement is the responsibility of the Seller, provided that Purchaser will have the right to participate in discussions with the NJDEP regarding any Remediation Agreement, and Purchaser will execute a Remediation Agreement which is in form and substance acceptable in Purchaser's sole discretion.

7.12.3  Prior to the Closing, the Seller shall reasonably cooperate in executing and reviewing any documents reasonably requested by the Purchaser and/or NJDEP or which require execution by the Seller.

7.12.4  With respect to all Real Property located in New Jersey that is not the subject of a Remediation Agreement, Seller shall deliver to Purchaser at Closing evidence as specified in Section 4.2.13.1 of full compliance with ISRA in the form of either (i) a non-applicability letter indicating that the subject property is not an industrial establishment for the purposes of ISRA, or (ii) written approval by the NJDEP of Seller's negative declaration or "No Further Action letter" and "Covenant Not to Sue" as to such Real Property.

7.12.5  Upon Closing, Seller shall assign and transfer to Purchaser all rights, claims, counterclaims, causes of action, lawsuits, judgments, demands of any nature, rights of set-off, rights of payment or to enforce payment and credits to the extent relating to the Real Property, including without limitation those arising under Environmental Law, except that Seller reserves nonexclusive use of the foregoing to the extent required to protect its rights and interests as a former owner or tenant of the Real Property.

7.13    Further Assurances.  Each party hereto shall execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other party hereto for the purpose of giving effect to the Contemplated Transactions or the intentions of the parties with respect thereto.  Each party hereto shall act in good faith in connection with the performance of any obligations under this Agreement to the other parties hereto, whether before or after the Closing.

7.14    Employee Benefits for Transferred Non-Union Employees.

7.14.1  With respect to those Business Employees hired by Purchaser who are not covered by a collective bargaining agreement between Purchaser and any union (the "***Transferred Non-Union Employees***"), Purchaser shall either (i) assume one or more of the Employee Plans that provide benefits to the Transferred Non-Union Employees or (ii) provide, or cause one or more of its subsidiaries to provide, employee benefits substantially similar in the aggregate to those employee benefits to which the Transferred Non-Union Employees were entitled immediately prior to Closing Date; provided, however, that in no event shall Purchaser assume obligations of Seller with respect to any severance or change in control agreements or

benefits with respect to any employees of Seller, including, without limitation, the Transferred Non-Union Employees.

7.14.2   Except as otherwise expressly provided herein, for all purposes under each employee benefit plan maintained by Purchaser (or any subsidiary thereof) in which the Transferred Non-Union Employees become eligible to participate on or after the Closing Date, Purchaser shall cause such employee benefit plans to give credit to such Transferred Non-Union Employees for all service with Seller to the same extent as if such services had been rendered to Purchaser.  Notwithstanding the foregoing, such credit shall not be used for benefit accrual purposes, except with respect to vacation benefits.

7.14.3   As to the plan years in which the Closing Date occurs, Purchaser shall, or shall cause any subsidiary of Purchaser that employs such Transferred Non-Union Employees, to use all best efforts to: (i) waive all limitations as to pre-existing conditions, exclusions, evidence of insurability requirements and waiting periods with respect to participation and coverage requirements applicable to such Transferred Non-Union Employees under any welfare or fringe benefit plan in which such Transferred Non-Union Employees may be eligible to participate after the Closing Date; and (ii) provide each such Transferred Non-Union Employee with credit under any general leave, welfare plan or fringe benefit plan in which such Transferred Non-Union Employee becomes eligible to participate after the Closing Date for any co-payments and deductibles paid by and out of pocket requirements satisfied by such to such Transferred Non-Union Employee for the then current plan year under the corresponding welfare or fringe benefit plan maintained by Seller prior to the Closing Date.

7.14.4   Notwithstanding the foregoing, this Section 7.14 does not amend any provision of any Employee Plan, and is not intended to and shall not require Purchaser to assume or continue any Employee Plan beyond the time when it otherwise lawfully could be terminated or modified, or to provide any Transferred Non-Union Employee (or any legal representative thereof) with any remedies or any rights to continued employment, severance pay or similar benefits following any termination of employment.

7.15   Supplementation and Amendment of Schedules.  From time to time prior to the Closing, the Seller shall have the right to supplement and amend, and Purchaser shall have the right to comment upon and approve such supplementation and amendment of, the Schedules to this Agreement with respect to any matter, including but not limited to, Schedules 2.1(i) and 2.1(iii); provided, however, that for purposes of determining whether the conditions set forth in Section 4.2 have been fulfilled, the Schedules shall be deemed to exclude all information contained in any amendment or supplement thereto delivered pursuant to this Section 7.15 to the extent that any such supplements or amendments individually or in the aggregate reflects a Material Adverse Change with respect to the Seller.

8.  Fees and Expenses.

8.1 <u>Transaction Expenses</u>.  In consideration of Agent's, Purchaser's, Highland's and their respective Affiliates' due diligence, and good faith negotiations of and entering into this Agreement, and in recognition of the Agent's work that may be viewed as (i) establishing a bid standard or minimum for other bidders; (ii) placing estate property in a sales configuration mode attracting other bidders; and (iii) serving, by its name and its expressed interest, as a catalyst for other bidders, each of Agent, Purchaser, Highland and their respective Affiliates reserve their right to seek their Transaction Expenses at or after the Sale Hearing.  The Transaction Expenses shall be subject to Bankruptcy Court approval.  Upon approval by the Bankruptcy Court, the Transaction Expenses shall be paid to Purchaser (on behalf of Purchaser, Agent, Highland and/or their respective Affiliates, as applicable) three (3) days after the date of closing of an Alternate Transaction or such other arrangement pursuant to which all or a substantial part of the Transferred Assets are sold.

8.2 <u>Obligation for Fees and Expenses</u>.  Except with respect to the Transaction Expenses and as otherwise provided in this Agreement, Seller and Purchaser each shall bear its own expenses in connection with the negotiation and execution of the Transaction Documents and the consummation of the Contemplated Transactions.

8.3 <u>Manner of Payment</u>.  Payment of the Transaction Expenses will be made by wire transfer of immediately available funds in U.S. dollars to the account specified by the Purchaser.  The Transaction Expenses will be nonrefundable and non-avoidable when paid.  Purchaser will endeavor to notify Seller of the wire transfer instructions at least 24 hours before any such payment is due.

8.4 <u>Integral Term</u>.  The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and without such provision the Agent would not have entered into the Agreement.  Upon Bankruptcy Court approval, the Transaction Expenses shall constitute an allowed administrative expense of the Seller under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

9.  Termination.

9.1 <u>Grounds for Termination</u>.  This Agreement may be terminated before Closing, if the terminating party is not in breach of this Agreement, only as follows:

9.1.1    by mutual written consent of Purchaser and Seller;

9.1.2    by Seller, at any time that there has been (i) a material breach by Purchaser of any of its representations and warranties herein or (ii) a material failure on the part of Purchaser to comply with its obligations herein, which breach or failure has not been cured within five (5) Business Days of receipt of notice of such breach or failure, provided that such five (5) Business Day cure period shall apply only if a cure is possible and Purchaser is diligently pursuing a cure;

9.1.3    by Seller, if any of the conditions in <u>Section 4.1</u> has not been or will not be satisfied (other than by reason of the failure of Seller to comply with Seller's

obligations under this Agreement) by the Outside Date, and Seller has not waived such condition;

        9.1.4   by Seller in the event of an Alternate Transaction;

        9.1.5   by Purchaser, at any time that there has been (i) a material breach by Seller of any of its representations and warranties herein or (ii) a material failure on the part of Seller to comply with its obligations herein which breach or failure has not been cured within five (5) Business Days of receipt of notice of such breach or failure, provided that such five (5) Business Day cure period shall apply only if a cure is possible and Seller is diligently pursuing a cure;

        9.1.6   by Purchaser, if any of the conditions in <u>Section 4.2</u> has not been or will not be satisfied (other than by reason of the failure of Purchaser to comply with Purchaser's obligations under this Agreement) by the Outside Date, and Purchaser has not waived such condition;

        9.1.7   by Purchaser in the event of an Alternate Transaction; or

        9.1.8   by Purchaser or Seller if the Closing shall not have occurred before the Outside Date.

        9.2  <u>Manner and Effect of Termination</u>.  Any termination of this Agreement pursuant to <u>Section 9</u> shall be effected by written notice from the terminating party to the other party, which notice shall specify the basis for the termination.  Upon termination of this Agreement, this Agreement shall forthwith become null and void and of no further force and effect and all rights and obligations of the parties hereunder shall terminate without any Liability by any party to any other party, except for the rights and obligations described in <u>Section 11.1</u>.

        10. <u>Definitions</u>.  For purposes of this Agreement, the following terms have the meanings set forth below:

        "<u>Affiliate</u>" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.  For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 50% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.

        "<u>Agent</u>" means NexBank, SSB acting solely in its capacity as agent under the Second Lien Loan Agreement.

        "<u>Agreement</u>" means this Asset Purchase Agreement. (See also "Purchase Agreement".)

        "<u>Allocation Statement</u>" has the meaning ascribed to that term in <u>Section 3.10</u>.

"Alternate Transaction" means that the Seller has (i) paid off, restructured or refinanced its obligations under the Second Lien Loan Agreement and DIP Term Loan and Line of Credit, (ii) entered into a letter of intent, memorandum of understanding, agreement in principle, definitive agreement or other Contract (other than an agreement limited to confidentiality or a standstill arrangement or both) with respect to a transaction or series of transactions that is or are inconsistent with this Agreement or the Contemplated Transactions, (iii) taken an action to seek Bankruptcy Court approval for any transaction or series of transactions that is or are inconsistent with this Agreement, but excluding a conversion of the Case to a proceeding under chapter 7 of the Bankruptcy Code, or (iv) selected a Prevailing Bidder (as defined in the Procedures Order) other than Purchaser, at any auction of substantially all of the, or any substantial portion of, the Transferred Assets conducted pursuant to the Procedures Order.

"Alternative Procedures" means the procedures set forth in Section 5 of Revenue Procedure 96-60, 1996-2-C.B.399.

"Amended Plan" means the amended plan of reorganization filed in the Debtor's Case.

"Amended Plan Obligation Amount" means cash in an amount not to exceed Six Million One Hundred Thousand Dollars ($6,100,000) to provide for the payment of the categories of expenses set forth on Schedule 2.1(i), including the projected allowed priority claims, administrative claims, reclamation claims and the statutory fees payable pursuant to 28 U.S.C. § 1930, subject to the limitations set forth in Section 3.7.1, plus any Property Taxes payable under the second sentence of Section 7.10.3.

"Assignments of Intangible Property" has the meaning ascribed to that term in Section 3.5.6.

"Assignments of Other Contracts" has the meaning ascribed to that term in Section 3.5.3.

"Assignments of Real Property Leases" has the meaning ascribed to that term in Section 3.5.2.

"Assumed Liabilities" means, to the extent any such Liability is outstanding on the Closing Date, the Liabilities set forth on the Schedule of Assumed Liabilities attached hereto as Schedule 2.1(iii) and (a) all Liabilities to pay any Cure Amounts with respect to the Section 365 Contracts as and when required in accordance with the Sale Order; (b) all Liabilities of Seller accruing under the Section 365 Contracts on or after the Closing Date; (c) all Liabilities of Seller for post-petition ordinary course obligations and trade payables of the Business as of the Closing Date (excluding any expenses incurred with respect to the administration of the Case) which would qualify as allowed administrative priority expenses under Section 503(b) of the Bankruptcy Code; (d) the DIP Term Loan and Line of Credit (including, without limitation, all outstanding letters of credit issued thereunder); (e) liabilities of Seller that are allowed by the Bankruptcy Court pursuant to 11 U.S.C. §503(b)(9), which such allowed claims shall be paid by Purchaser within 120 days from the later of the Closing Date or date such claims are allowed by the Bankruptcy Court; (f) obligations assumed by Purchaser under Section 7.12 hereof; (g) any withdrawal liability with respect to the Multiemployer Pension Plan for Local Union No. 560 titled "Trucking Employees of North Jersey Pension Fund" or any under-funded liability with

respect to the Marcal Paper Mills, Inc. Retirement Plan Number 1 for Union Employees that is determined to be a post-petition administrative expense, and which in each case is not otherwise included in the Amended Plan Obligation Amount; and (h) Liabilities, if any, of Seller associated with or arising out of the pending action entitled NJDEP v. Marcal, Top Soil Depot and Allan Rombough, Superior Court of New Jersey, Passaic County, Chancery Division, Docket Number C-178-06 or the related proceedings before the Office of Administrative Law now on appeal before the Appellate Division of the Superior Court that is determined to be a post-petition administrative expense.

"Assumption Agreement" has the meaning ascribed to that term in Section 3.7.5.

"Bankruptcy Code" means title 11 U.S.C. §101, *et seq.*, as now in effect or hereafter amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of New Jersey having jurisdiction over the Case, or if the Bankruptcy Court ceases to exercise jurisdiction over the Case, such other court that exercises jurisdiction over the Case.

"Bargaining Unit Employees" means those employees represented by and covered under either: (a) the Collective Bargaining Agreement between Seller and the USW or (b) the Collective Bargaining Agreement between Seller and the Teamsters Union.

"Bill of Sale" has the meaning ascribed to that term in Section 3.5.4.

"Broker" means NatCity Capital Markets.

"Broker Compensation" means all fees and compensation to which the Broker is entitled from the Seller under its engagement letter with Seller.

"Business" means the Seller's business of manufacturing for sale paper products, tissue products, and waxed paper products, and of providing services related thereto, as and where that business was conducted in the Ordinary Course of the Business.

"Business Day" means any day of the year on which national banking institutions in the State of New Jersey are open to the public for conducting business and are not required or authorized to close.

"Business Employee" means any individual who is employed by the Seller immediately before the Closing and whose name is listed on Schedule 3.9, but excluding any and all Bargaining Unit Employees and Non-Union Represented Employees.

"Business Records" means business records (in any form or medium), including, without limitation, all books, ledgers, files, reports, plans, records, manuals, sales and credit records, studies, surveys, reports, advertising and sales material, customer lists, customer records, lists of sales prospects or potential customers, sales histories and other sales records, inventory data, accounts receivable records, accounts payable records, vendor lists, test records, financing records, and personnel and payroll records, to the extent not related primarily to an Excluded Asset, other than (a) any Bankruptcy Court filings or documents related to or necessary for

winding up of the Seller and the administration of the Case, (b) any materials about employees, disclosure of which would violate an employee's reasonable expectation of privacy or in violation of law, (c) any materials that are subject to attorney-client or any other privilege or requirement to maintain confidentiality, except for such information as may relate to environmental matters, which shall be included in the definition of Business Records or (d) that relate to events or periods before the Closing and are reasonably necessary for purposes of the prosecution, settlement or enforcement by Seller of the Retained Rights of Action.

"Case" means those proceedings before the Bankruptcy Court designated as Case No. 06-21886 (MS).

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§9601, *et seq.*, as amended, and the rules and regulations promulgated thereunder.

"Closing" has the meaning ascribed to that term in Section 3.1.

"Closing Date" has the meaning ascribed to that term in Section 3.2.

"Closing Date Inventory" has the meaning ascribed to that term in Section 1.1.7.

"COBRA" means the health insurance and health benefit continuation provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§1161, *et seq.*, and any similar, applicable state laws, including without limitation those in New Jersey and Illinois.

"Collective Bargaining Agreement" means any Contract between the Seller and a labor union or organization which defines the terms and conditions of employment for Bargaining Unit Employees, including, but not limited to, the agreement dated September 25, 2006 between Seller and USW, and any amendments thereto, and the agreement dated September 16, 2004 to September 15, 2007 between Seller and Teamsters Union, and any amendments thereto.

"Consents" has the meaning ascribed to that term in Section 3.5.8.

"Contemplated Transactions" means the purchase and sale of the Transferred Assets and all other transactions contemplated by the Agreement or Transaction Documents.

"Contract" means any written or unwritten agreements, documents, contracts, contract rights, leases, subleases, indentures, license agreements, franchise rights and agreements, policies, purchase and sales orders, quotations and executory commitments, instruments, guaranties, indemnifications, arrangements, obligations, commitments or similar understandings (other than this Agreement or any instruments executed or delivered in connection herewith) in effect as of the Closing, whether written or oral, except to the extent included in the Excluded Assets.

"Control" means (including, with correlative meaning, the terms "controlling," "controlled by" and "under common control with") with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or

investment decisions of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Cooperating Parties Group" means the group of potentially responsible parties cooperating with and providing funding for the environmental remediation of the Lower Passaic River Study Area.

"Copyrights" has the meaning ascribed to that term in the definition of Intellectual Property.

"Cure Amounts" means all cure amounts owing under any of the Section 365 Contracts as of the Closing Date that the Bankruptcy Court orders to be paid as a condition to Purchaser's assumption and assignment of any of the Section 365 Contracts.

"Debtor" means the Seller in its capacity as debtor and debtor-in-possession under the Bankruptcy Code.

"DIP Agreement" means the Debtor-In-Possession Credit Agreement, dated as of January 12, 2007, as amended, among the Seller, the lenders from time to time parties thereto, including Highland Financial Corp. or any of its affiliates, NexBank, SSB, as administrative agent, and The CIT Group\Business Credit, Inc., as documentation agent.

"DIP Term Loan and Line of Credit" means all indebtedness outstanding under the DIP Agreement.

"DOL" means the U.S. Department of Labor.

"EEOC" means the U.S. Equal Employment Opportunity Commission.

"Employee Plan" means each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), including any such plan that is subject to Title IV of ERISA or Section 412 of the Internal Revenue Code), each deferred compensation and each bonus, retention, incentive compensation, stock purchase, stock option, restricted stock, phantom stock and other equity compensation plan, program, agreement, or arrangement; each severance or termination pay, medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA; each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each "multiemployer plan" (as such term is defined in Section 3(37) of ERISA), each employment, consulting, retention, change in control, termination or severance agreement; and each other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Seller or by any ERISA Affiliate, or to which any Seller or any ERISA Affiliate is party, whether written or oral, for the benefit of any director, employee or former employee of Seller or with respect to which Seller or any ERISA Affiliate otherwise has Liability or reasonable expectation of Liability (contingent or otherwise).

"Environmental Law" means applicable federal, state and local statutes, ordinances, regulations, rules, orders and requirements of common law concerning the protection of human

health, safety or the environment, including, without limitation, CERCLA, the Resource Conservation and Recovery Act, 42 U.S.C. §§6901, *et seq.*, and ISRA and any other applicable law concerning discharges or Releases to the air, soil, surface water or groundwater or concerning the use, reporting, labeling, testing, handling, processing, transport, generation, storage, treatment, disposal, investigation, removal or remediation of any waste, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, lead paint, polychlorinated biphenyls, noise, bacterial and viral matter, toxic mold, odor or radiation or any Hazardous Substances, or concerning the protection of or damage to threatened or endangered species or environmentally sensitive areas or natural resources.

"Environmental Permits" means any Permit required under any Environmental Law.

"EPA" means the U.S. Environmental Protection Agency.

"ERISA Affiliate" means any trade or business, whether or not incorporated, that together with any of Seller, is or at any time within the six (6)-year period preceding the date of this Agreement would have been deemed a "single employer" within the meaning of Section 40019b) of ERISA or Section 414 of the Internal Revenue Code.

"ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§1101, *et seq.*, as amended.

"Estate" means the estate created pursuant to Section 541(a) of the Bankruptcy Code upon the commencement the Debtor's bankruptcy case.

"Excluded Assets" means the following: (a) all minute books, stock transfer records and corporate seals of Seller; (b) all Tax Returns of Seller and all Business Records of Seller relating thereto, including working papers; (c) all Retained Rights of Action; (d) the Seller's rights under, and all cash and non-cash consideration payable to Seller pursuant to the terms and provisions of this Agreement or any other agreements between Seller, on the one hand, and Purchaser or any of its Affiliates, on the other hand, entered into on or after the date of this Agreement; (e) any rights, claims, and causes of action relating to any Excluded Asset; (f) all Employee Plans of Seller and all rights in connection therewith or with respect to the assets thereof; (g) any Contract or permit that terminates or expires before the Closing Date in accordance with its terms or in the Ordinary Course of the Business, or that is not a Section 365 Contract assumed by Purchaser; (h) the Retained Contracts; and (i) Inventory sold or consumed by Seller in the Ordinary Course of the Business before the Closing Date.

"Excluded Liabilities" means all liabilities except the Assumed Liabilities. Without limiting the generality of the foregoing, Purchaser shall have no liability, legal duty or obligation for, and shall not be responsible for, any of the following:

        (a)      the Collective Bargaining Agreements;

        (b)      any Right of Action, claim or claims of an employee or former employee of the Seller arising on or prior to the Closing as a result of the individual's termination in conjunction with the sale of the Transferred Assets to Purchaser;

(c)    any Right of Action, legal duty or obligation of the Seller related to or arising out of the Seller's employment of its employees, former employees or retirees, including without limitation any alleged obligation to pay wages, severance pay, vacation pay, WARN Acts claims for which Seller is obligated under law, benefits or for any other payments to employees, former employees or retirees of the Seller;

(d)    any legal duty or obligation for any Rights of Action or claims arising through the Closing related to Seller's labor practices, including without limitation any alleged charges of violations of any Labor Rules or any unfair labor practice charge, grievance or arbitration claim, claims asserted under Section 301 of the Labor Management Relations Act;

(e)    any Rights of Action, or claims that any labor union or organization may have had, now has, or which could have been asserted arising out of any labor union's or collective bargaining organization's Collective Bargaining Agreement (including without limitation a Collective Bargaining Agreement) with the Seller;

(f)    any Rights of Action, legal duty or obligation of the Seller related to or arising out of the Seller's merging of its operations, or for any insurance or welfare programs, or employment practice, or any claim of the Pension Benefit Guaranty Corporation arising under any pension, medical, health, or employee benefit law, including ERISA;

(g)    obligations for Taxes arising before the Closing, or as a result of the Closing, or relating to periods before the Closing, except as otherwise expressly assumed by Purchaser;

(h)    any legal duty or obligation under Environmental Laws related to or arising out of the Seller's operation, ownership or occupancy of the Business (whether or not conducted in the Ordinary Course of the Business) or Facilities before the Closing, Seller's activities prior to Closing, Seller's operation, ownership or occupancy of any other locations before Closing, or the condition (including without limitation, the presence or Release of any Hazardous Substances and the subsequent migration thereof) existing on or about the Facilities or other locations previously owned, operated or occupied by Seller at any time prior to or as of Closing, except as and only to the extent as expressly assumed in writing by Purchaser;

(i)    any legal duty or obligation for natural resources damages related to or arising out of the Seller's operation, ownership or occupancy of the Business (whether or not conducted in the Ordinary Course of the Business) or Facilities before the Closing, Seller's activities prior to Closing, Seller's operation, ownership or occupancy of any other locations before Closing, or the condition (including without limitation, the presence or Release of any Hazardous Substances and the subsequent migration thereof) existing on or about the Facilities or other locations previously owned, operated or occupied by Seller at any time prior to or as of Closing, except as and only to the extent as expressly assumed in writing by Purchaser;

(j)    any products liability or other tort claims related to or arising out of the Seller's operation of the Business before the Closing; or

(k)    any Financial Instruments.

"Facilities" means the Owned Real Property and Leased Real Property specified in Schedule 1.1.5-1, including all improvements and fixtures.

"FICA" means Federal Insurance Contributions Act, 26 U.S.C. §§3101, *et seq.*

"Final Order" means an order or judgment of the Bankruptcy Court: (a) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired; (b) as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Purchaser; or (c) in the event of an appeal, writ of certiorari, or motion for reargument or rehearing has been filed, such judgment or order has not been reversed, modified, stayed, or amended; *provided, however,* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order does not prevent such order from being a Final Order.

"Financial Instruments" means any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller (other than those issued under the DIP Term Loan and Credit Agreement).

"FUTA" means Federal Unemployment Tax Act, 26 U.S.C. §§3301, *et seq.*

"GAAP" means generally accepted accounting principles in the United States, consistently applied throughout the periods involved.

"Government Entity" means any domestic or foreign government or political subdivision thereof, whether on a Federal, state or local level and whether executive, legislative or judicial in nature, including any agency, authority, board, bureau, commission, court, department or other instrumentality thereof.

"Hart-Scott-Rodino Law" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, title 15 U.S.C. §§ 18(a), *et seq.*, and any related regulations.

"Hazardous Substances" means all materials, wastes, chemicals or substances defined by, or regulated as a hazardous waste, hazardous material, hazardous substance, hazardous constituents, extremely hazardous waste, restricted hazardous waste, contaminant, pollutant, toxic waste, toxic substance or words of similar meaning and regulatory effect or regulated because of their effect or potential effect on human health or the environment, including, without limitation, asbestos, lead paint, toxic mold, radon, petroleum or any fraction thereof, natural gas liquid, and polychlorinated biphenyls.

"Highland" means Highland Capital Management, LP, and its Affiliates.

"Insider Lease" means each Real Property Lease as to which the lessor to Seller is an Affiliate of Seller, a shareholder of Seller or an Affiliate of any shareholder of Seller.

"Intangible Property" means all intangible personal property of Seller, including, without limitation, all goodwill of the Business; all Seller Intellectual Property; all Business Records; all guaranties, warranties, indemnities and similar rights in favor of Seller to the extent related to any of the Transferred Assets; all credits, prepaid expenses, deferred charges, security deposits, prepaid items and duties to the extent related to the Transferred Assets; all licenses and permits issued to Seller by any Government Entity, to the extent such licenses and permits are assignable under the Bankruptcy Code; all income, royalties or payments due and payable, including, without limitation, all claims for damages by reason of past, present and future infringement, and all legal privileges associated therewith; all suits, claims, charges and causes of action against third parties; and, to the extent transferable or assignable, telephone exchange numbers identified with the Business. Intangible Property shall in all events exclude, (i) any Excluded Asset; (ii) any Bankruptcy Court filings or documents related to or necessary for winding up of the Seller and the administration of the Case, (iii) any materials containing communications or information about employees, disclosure of which would violate an employee's reasonable expectation of privacy; and (iv) any other materials subject to attorney-client, work product or any other privilege or requirement to maintain confidentiality.

"Intellectual Property" means the following: (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, domain names, logos, symbols, trade dress, rights of publicity, domain names, assumed names, fictitious names, trade names and other indicia of origin, all applications and registrations for the foregoing, including all renewals of same (collectively, "*Trademarks*"); (ii) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues (collectively, "*Patents*"); (iii) trade secrets, confidential information and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists (collectively, "*Trade Secrets*"); (iv) published and unpublished works of authorship, whether copyrightable or not (including without limitation databases and any compilations or information) (collectively "*Copyrights*"); and (v) any other intellectual property or proprietary rights.

"Internal Revenue Code" means the Internal Revenue Code of 1986, 26 U.S.C.A. §§1, *et seq.*, as amended.

"ISRA" means the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K and N.J.A.C. 7:26B, and any related NJDEP regulations.

"Inventory" means all supplies, goods, materials, raw and finished goods, work in process, inventory and stock in trade owned by Seller as of the Closing Date exclusively for use or sale in the Ordinary Course of the Business, including but not limited to spare parts, supplies of business forms, and packing materials, other than any Excluded Assets.

"Knowledge" means, with respect to Seller, the actual knowledge or the knowledge that such person would reasonably be expected to have upon due inquiry (except that, with respect to

environmental matters, due inquiry is not required only to the extent such inquiry would require testing) or that a person in like position would reasonably be expected to have through the performance of his duties, of each of Lee Bingham, Robert S. Lynch, Alec Marcalus, Nicholas R. Marcalus, Peter A. Marcalus, Robert L. Marcalus, Ron Sinkovitz, and Bill Reilley.

"Labor Rules" means any laws, orders, judgments, decrees or arbitration awards of any court, arbitrator or Government Entity, touching upon or concerning the employment relationship or relating to the hiring, firing and treatment of employees, or any legal obligation or duty under any federal or state statute, ordinance, regulation or law regarding employment and employment practices, terms and conditions of employment, equal opportunity, nondiscrimination, immigration, anti-harassment, anti-retaliation, wages, hours, benefits, collective bargaining, income tax withholding, the payment of social security and other similar taxes, occupational safety and health and/or privacy rights of employees, workers' compensation, and protections against whistle blowing, including, without limitation, Title VII of Civil Rights Act of 1964, 42 U.S.C. §§2000, *et seq.*, as amended, the Fair Labor Standards Act, 29 U.S.C. §§201, *et seq.*, the Age Discrimination in Employment Act, 29 U.S.C. §§621, *et seq.*, the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.*, the Equal Pay Act, 29 U.S.C. §§206(d), the Uniformed Services Employment and Reemployment Act, 38 U.S.C. §§4301, *et seq.*, the Family Medical Leave Act, 29 U.S.C. §§2601, *et seq.*, the Occupational Safety and Health Act, 29 U.S.C. §§651, *et seq.*, the Immigration Reform and Control Act, 8 U.S.C. §§1101, *et seq.*, Executive Order 11246, 30 F.R. 12319 (Sept. 24, 1965), the WARN Acts, the National Labor Relations Act, 29 U.S.C. §§141, *et seq.*, the Employee Retirement Income Security Act, 29 U.S.C. §§1001, *et seq.*, and any similar or equivalent state law, including but not limited to any New Jersey law against discrimination or retaliation, any New Jersey law regarding payment of wages, or any other Federal or State statute, ordinance or regulation governing, touching upon, or concerning the employment relationship and all guidelines, standards, rules and regulations interpreting or applying to any of the foregoing.

"Leased Real Property" means the real property leased by the Seller, as tenant, together with, to the extent leased by the Seller, all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of the Seller attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"Lenders" means the financial institutions who are signatories to the Second Lien Loan Agreement as Lenders and other persons made a party to the Second Lien Loan Agreement as a Lender in accordance with Section 16.1 thereof, and their respective successors and assigns.

"Liability" means any claim, debt, liability or obligation of any kind whatsoever, whether arising under contract or applicable law or in connection with a business, and whether conditioned or absolute, liquidated or unliquidated, contingent or non-contingent, known or unknown.

"Lien" means any encumbrance or restriction of any nature, including without limitation any lien, claim, preference, charge, claim, pledge, hypothecation, equity interest, trust, equitable interest, encumbrance, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, right of possession, lease, tenancy, license,

covenant, interference, option, proxy, right of first refusal, right of first option, preemptive right, community property interest, legend, defect, impediment, exception, limitation, impairment, imperfection of title; the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction); any restrictions on the voting of any Security; any restriction on the transfer of any Security or other asset; any restriction on the receipt of any income derived from any asset; any restriction on the use of any asset; and any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset, or any other interest.

"Liquid Assets" means the following assets of Seller (a) cash, cash on hand, and cash equivalents, including accounts at any bank or financial institution, (b) Securities (whether capital stock or debt) owned or held by Seller; (c) retainers paid by Seller for legal, accounting or other professional services; and (d) deposits or prepayments by Seller for goods or services.

"Lower Passaic River Study Area" means the portion of the Lower Passaic River, which currently includes the 17-mile tidal area from the Dundee Dam to Newark Bay in northern New Jersey, that is the subject of environmental remedial investigations by EPA and certain private parties.

"Maine Real Property" means the Owned Real Property located at (i) Raspberry Hill Road, Mechanic Falls, Maine and (ii) Tax Map 15, Lot 39A, Poland, Maine, which lot is adjacent to the parcel located at Raspberry Hill Road, Mechanic Falls, Maine.

"Majority Lenders" means Lenders holding an aggregate pro rata share of the outstanding principal balance of the loan that is the subject of the Second Lien Loan Agreement or DIP Term Loan and Line of Credit, as applicable, in an amount in excess of 51 % of the total outstanding principal balance of such loan.

"Material Adverse Change" means any occurrence, event or effect occurring in whole or in part after the date of the Agreement which individually or together with other occurrences, events or effects has, or could be reasonably expected to have, a materially adverse affect on (a) the business, assets, operation, condition (financial or otherwise) or results of operations of the Business (whether or not conducted in the Ordinary Course of the Business) or the Transferred Assets or (b) the ability of the Seller to consummate the Proposed Transactions; provided, however, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Change: any change, development or event resulting from, arising out of or relating to (i) any act or omission of the Seller taken with the prior written consent of the Purchaser, (ii) changes affecting the Seller's industry generally that do not materially and disproportionately adversely affect the Seller's business as compared to other companies providing similar products to those of Seller, (iii) changes in the United States economy that do not materially and disproportionately adversely affect the Seller's business as compared to other companies providing similar products to those of Seller, (iv) changes as a result of the announcement of the Contemplated Transactions, or (v) any action approved by the Bankruptcy Court with the consent of the Purchaser. Without limitation, a Material Adverse Change includes a reasonable determination by the Agent or Purchaser that the environmental condition (including without limitation, the nature, extent, quantity, type or cost to remediate, clean up or otherwise address such condition)

on any Real Property is materially worse or greater in extent or cost than expected by Agent or Purchaser, whether as a result of additional contamination of the Real Property or additional information about a pre-existing condition.

"MPMI" means MPMI, Inc., an unconsolidated, affiliated special purpose entity of the Seller which leases or licenses certain property to the Seller.

"MPMI Lease" means the Agreement of Lease dated as of January 1, 1994 between the Seller and MPMI.

"MPMI Operating Agreement" means the License and Operating Agreement dated as of January 1, 1994 between the Seller and MPMI.

"NexBank" means NexBank, SSB, a Texas State savings bank.

"NJDEP" means New Jersey Department of Environmental Protection.

"NLRB" means National Labor Relations Board.

"Non-Union Represented Employees" means all of Seller's non-union represented production and maintenance employees and truck drivers and warehousemen.

"OFCCP" means Office of Federal Contract Compliance Programs.

"Officer's Certificate" has the meaning ascribed to that term in Section 3.5.7.

"Ordinary Course of the Business" means conducting the Business in the ordinary course and excludes other business, action or activity of Seller or its Representatives.

"Other Contracts" has the meaning ascribed to that term in Section 1.1.5.

"Outside Date" means January 31, 2008.

"Owned Real Property" means the real property in which the Seller has fee title (or equivalent) interest, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of the Seller attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing, but excluding the Maine Real Property.

"Patents" has the meaning ascribed to that term in the definition of Intellectual Property.

"Permits" means all licenses, certifications, approvals, registrations, consents, authorizations, franchises, qualifications, variances, exemptions, certificates of occupancy and other permits, consents, notices and approvals required by any Government Entity (including any pending applications for such licenses, certifications, approvals, registrations, consents, authorizations, franchises, qualifications, variances, exemptions, certificates of occupancy and other permits, consents, notices and approvals).

"Permitted Encumbrances" means, solely with respect to Owned Real Property: (i) encumbrances for Taxes and other governmental charges and assessments that are not yet due and payable; (ii) the Real Property Leases; (iii) any state of facts as shown on the surveys of the Real Property provided to Purchaser by Seller, in form and substance reasonably acceptable to the Purchaser, provided the same does not render title uninsurable; (iv) encumbrances, easements, rights-of-way, covenants, conditions, restrictions and other matters affecting title to real property which do not materially detract from the value of such real property or use thereof and which are recorded in the appropriate real property records; and (v) those matters shown as exceptions on the Title Policy for any Owned Real Property which are reasonably acceptable to the Purchaser.

"Person" means an individual, partnership, corporation, limited liability company, limited liability partnership, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity or other entity of whatever nature.

"Personal Property Leases" means any equipment, personal property or intangible property leases, subleases, rental agreements, licenses, contracts and similar arrangements, except to the extent included in the Excluded Assets.

"Procedures Order" means the Order of the Bankruptcy Court, as amended from time to time, referred to in the recitals to this Agreement and in Section 7.4.1.

"Property Taxes" means all real property Taxes, personal property Taxes, or similar *ad valorem* obligations.

"Purchase Agreement" means this Asset Purchase Agreement.  (See also "Agreement".)

"Purchase Price" has the meaning ascribed to that term in Section 2.1.

"Real Property" means Owned Real Property and Leased Real Property.

"Real Property Lease" means the Contract, as amended, pursuant to which Seller is the lessee of Leased Real Property.

"Receivables" has the meaning ascribed to that term in Section 1.1.6.

"Registered Intellectual Property" means all Seller Intellectual Property that constitutes registered Trademarks, applications to register Trademarks, domain names, Issuer Patents, applications for Patents, and registrations of and applications to register Copyrights.

"Release" means any release, spill, emission, discharge, leaking, pumping, pouring, dumping, injection, deposit, disposal, dispersal, leaching or migration of Hazardous Substances on, above, under, onto, in or into the environment (including, ambient air, surface water, groundwater and surface or subsurface strata).

"Remediation Agreement" has the meaning ascribed to that term in Section 7.12.2

"Representatives" of any Person means that Person's officers, independent public accountants, legal counsel, consultants and other representatives.

"Retained Contracts" means any Contracts or Real Property Leases that are not Section 365 Contracts assumed by the Purchaser.

"Retained Rights of Action" means (i) the right to object to Claims, pursuant to Bankruptcy Code Section 362; (ii) all avoidance powers, actions, rights, remedies or affirmative defenses under Bankruptcy Code Sections 544 through 553 and Section 724, under any similar or related law, or under fraudulent transfer or preference laws; and (iii) all claims against directors and officers of Seller and all proceeds of any errors and omissions and/or similar insurance policies maintained by or on behalf of Seller.

"Rights of Action" means any and all causes of action, grievances, arbitrations, actions, suits, demands, demand letters, claims, complaints, notices of non-compliance or violation, enforcement actions, investigations or proceedings.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court at which Seller will seek approval of the sale of the Transferred Assets pursuant to the Procedures Order.

"Sale Order" has the meaning ascribed to that term in Section 7.4.2.

"Second Lien Loan Agreement" means that certain Loan and Security Agreement dated as of December 30, 2005, among the Debtor, certain lenders thereto, and NexBank SSB, as second lien agent.

"Section 365 Contracts" has the meaning ascribed to that term in Section 7.4.1.

"Securities" has the meaning ascribed to that term in Section 2(1) of the Securities Act of 1933 as amended, or any successor Federal statute, and the rules and regulations of the Securities and Commission promulgated thereunder, all as the same shall be in effect from time to time, and includes, with respect to any Person, such Person's capital stock or other equity interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such Person's capital stock or other equity or equity-linked interests, including phantom stock and stock appreciation rights. Whenever a reference herein to Securities is referring to any derivative Securities, the rights of a Stockholder shall apply to such derivative Securities and all underlying Securities directly or indirectly issuable upon conversion, exchange or exercise of such derivative securities.

"Seller Intellectual Property" means all Intellectual Property owned by Seller or licensed by Seller and all goodwill associated therewith.

"Subsidiary" means, at any time, with respect to any Person (the "Subject Person"), any other Person of which either (a) more than fifty percent (50%) of the Securities or other interests entitled to vote in the election of directors or comparable governance bodies performing similar functions or (b) more than a fifty percent (50%) interest in the profits or capital of such Person, are at the time owned or controlled directly or indirectly by the Subject Person or through one or more Subsidiaries of the Subject Person. For purposes of this definition, the term "controlled"

means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"Tangible Personal Property" means all furniture, fixtures, furnishings, equipment, machinery, motor vehicles, tools, computers, computer hardware, photocopiers, facsimile machines and other business equipment and devices (including data processing hardware and related telecommunications equipment, media, and tools), tools, racking, molds, forms, dies and tooling and miscellaneous items and other tangible personal property of Seller; *provided, however,* that Tangible Personal Property shall not include Excluded Assets or any tangible property subject to a Personal Property Lease or other Contract unless such Personal Property Lease or other Contract is a Section 365 Contract assumed by Purchaser.

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any schedule, attachment or other related or supporting information) filed or required to be filed with any Government Entity in connection with the determination, assessment or collection of any Tax (whether or not such Tax is imposed on Seller) or the administration of any laws, regulations or administrative requirements relating to any Tax, including any such document prepared on a consolidated, combined or unitary basis and including any amendment of a Tax Return.

"Tax" means all taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, local or foreign governmental authority, including income, gross receipts, excise, property, sales, use, license, custom duty, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, any amounts attributable to any failure to comply with any requirement regarding Tax Returns and any transferee or secondary Liability in respect of Taxes, including, in any case, any interest, penalty or addition thereto, whether disputed or not.

"Teamsters Union" has the meaning ascribed to that term in Section 3.9.4.

"Title Company" means a nationally recognized title company acceptable to the Purchaser.

"Title Policy" means one or more title insurance policies, as requested by Purchaser, in form and substance acceptable to Purchaser in its sole discretion, issued by the Title Company for the benefit of Purchaser.

"Trademarks" has the meaning ascribed to that term in the definition of Intellectual Property.

"Transaction Documents" means this Agreement, as amended, including any schedules or exhibits hereto and any agreements, instruments, certificates or other documents executed and delivered in connection herewith, including but not limited to the Procedures Order and the Sale Order.

"Transaction Expenses" means all reasonable costs and expenses incurred and/or allocable before the date of this Agreement and/or through and including the date of the Sale Hearing, by Purchaser, Highland and/or Agent arising out of, in connection with or otherwise

relating to the Contemplated Transactions (in whole or in part) and the Case as it relates to the Contemplated Transactions, including without limitation, costs and expenses relating to or consisting of (i) performing any investigation, analysis and/or other diligence and/or other labor of any kind or nature as to Seller as it relates to the Contemplated Transactions, including, without limitation, as to Seller's assets, liabilities, past, current and expected income and expenses, prospects, actual and contingent obligations (under contracts and otherwise), competitors and/or customers; (ii) establishing a purchase price for the Contemplated Transactions; (iii) negotiating this Agreement and/or one or more documents relating to this Agreement; (iv) any other aspects of the Contemplated Transactions; (v) other proceedings, judicial, regulatory or otherwise relating to the Contemplated Transactions; (vi) fees, costs and expenses of legal counsel, accountants, independent consultants and other independent advisors; (vii) filing fees relating to the Hart-Scott Rodino law; (viii) travel costs and expenses; and (viii) reimbursement of the allocable salary based on actual time spent by each individual employed by the Purchaser, Highland and/or Agent and/or their Affiliates related to the Contemplated Transactions.

"Transferred Assets" has the meaning ascribed to that term in Section 1.1.

"Transfer Tax" means any sales, purchase, transfer, stamp, stamp duty, documentary stamp, use, value added, or similar Tax under applicable state laws which may be payable by reason of the purchase and sale of assets.

"Transferred Employee" means each former employee of Seller who is hired and becomes an employee of the Purchaser, but excluding any and all Bargaining Unit Employees and Non-Union Represented Employees.

"Transferred Non-Union Employees" means the Business Employees hired by Purchaser who are not covered by a collective bargaining agreement between Purchaser and any union.

"Treasury Regulations" means the Federal tax regulations, providing the official interpretation of the Internal Revenue Code by the U.S. Department of Treasury.

"USW" has the meaning ascribed to that term in Section 3.9.4.

"WARN Acts" means the U.S. Worker Adjustment and Retraining Notification Act of 1988, as amended, 29 U.S.C. §§2101, *et seq.*, or any similar foreign, state or local law, regulation or ordinance (including, for the avoidance of doubt, the New Jersey Worker Adjustment and Retraining Notification Act, as amended, N.J.A.C. 12:40-1.1 – 1.2, and the Illinois Worker Adjustment and Retraining Notification Act 820 ILCS 65/1 et seq.).

      10.1    Interpretation.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

          10.1.1  This Agreement shall not be deemed to have been drafted by either party hereto but rather drafted as the result of negotiations between the parties.

          10.1.2  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is

the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

10.1.3 Any reference in this Agreement to $ shall mean U.S. dollars.

10.1.4 The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full therein. Any capitalized terms used in any schedule or exhibit but not otherwise defined herein shall be defined as set forth in this Agreement.

10.1.5 Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

10.1.6 The division of this Agreement into articles, sections or other subdivisions, and the insertion of captions, titles or headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding section or subsection of this Agreement unless otherwise specified.

10.1.7 The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a clause, subsection or subdivision in which such words appear unless the context otherwise requires.

10.1.8 The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

11. Miscellaneous.

11.1    Survival. Except as set forth in the following sentence, all representations, warranties and covenants of Seller made hereunder or in connection with any of the Transaction Documents shall terminate and expire, and shall cease to be of any force or effect, on the Closing Date and all Liability of Seller with respect to any such representations, warranties and covenants shall thereupon be extinguished. All covenants of Seller or Purchaser that contemplate actions to be taken or obligations in effect after the Closing or termination of this Agreement, as the case may be, shall survive in accordance with their terms and to the extent so contemplated, including those described in Sections 5.11, 7.10, 7.11, 8.1, 8.2, 8.3, 8.4, 10.1, 11.2, 11.3, 11.4, 11.5, 11.6, 11.7, 11.8, 11.9, 11.10, 11.11, 11.12, 11.13, 11.15, 11.16 and 11.17.

11.2    Liability of the Seller's Agents. No past, present or future officer, director, employee, stockholder, Affiliate, agent or attorney of the Seller will have any Liability by reason of the breach of any term, provision or representation set forth in this Agreement, with the Purchaser's recourse, if any, under such circumstances being limited to the assets of the Estate.

11.3    Attorneys' Fees. In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the

prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees through all levels of appeal) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

      11.4   Notices. All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (c) sent by reputable next-day or overnight mail or courier or (d) sent by facsimile transmission. All such notices, requests, demands, waivers and other communication shall be deemed to have been received (i) if by personal delivery, upon delivery, (ii) if by certified or registered mail, on the third business day after the mailing thereof, (iii) if by next-day or overnight mail or courier, on the business day after such mailing, (iv) if by facsimile, three hours after the sender receives a fax confirmation, unless the fax is sent after 5:00 p.m. on a business day or on a non-business day, in which case it shall be deemed received on the next business day.

| | |
|---|---|
| If to Seller: | Marcal Paper Mills, Inc.<br>One Market Street<br>Elmwood Park, New Jersey 07407<br>Attention: Nicholas R. Marcalus<br>Telephone: (201) 703-6218<br>Facsimile: (201) 703-6425 |
| With a copy (which shall not constitute notice) to: | Cole, Schotz, Meisel, Forman & Leonard, P.A.<br>Court Plaza North<br>25 Main Street<br>Hackensack, NJ 07601<br>Attention: Michael D. Sirota, Esq. and Marc P. Press, Esq.<br>Telephone: (201) 525-6271<br>Facsimile: (201) 678-6271 |
| With a copy (which shall not constitute notice) to: | Okin, Hollander & Deluca, L.L.P.<br>One Parker Plaza<br>Fort Lee, New Jersey 07024<br>Attention: Paul S. Hollander, Esq.<br>Facsimile: (201) 947-2663<br>Telephone: (201) 947-7500 |
| With a copy (which shall not constitute notice) to: | Charles V. Bonin, Esq.<br>133 Washington Street<br>Morristown, New Jersey 07960<br>Facsimile: (973) 538-8807<br>Telephone: (973) 267-2232 |

If to Agent:                          NexBank, SSB
                                      13455 Noel Road, Suite 2220
                                      Dallas, Texas 75240
                                      Attention: Jeff Scott
                                      Phone: (972) 934-4741
                                      Fax: (972) 934-4790

With a copy (which shall              Haynes and Boone LLP
not constitute notice) to:            901 Main Street
                                      Suite 3100
                                      Dallas, TX 75202
                                      Attention: Janice V. Sharry, Esq.
                                      Phone: 214.651.5000
                                      Fax: 214.651.5940

With a copy (which shall              Haynes and Boone LLP
not constitute notice) to:            1 Houston Center
                                      1221 McKinney, Suite 2100
                                      Houston, TX 77010
                                      Attention: Thomas A. Howley, Esq.
                                      Phone: 713.547.2000
                                      Fax: 713.236.5407

or in each case, to such other address as may be specified in writing to the other parties.

Any party may give any notice, instruction or communication in connection with this Agreement using any other means (including personal delivery, telecopy or ordinary mail), but no such notice, instruction or communication shall be deemed to have been delivered unless and until it is actually received by the party to whom it was sent. Any party may change the address to which notices, instructions, or communications are to be delivered by giving the other parties to this Agreement notice thereof in the manner set forth in this Section.

11.5    Entire Agreement. This Agreement and the other Transaction Documents (including any schedules or exhibits hereto and thereto) contain the entire understanding and agreement between the parties with respect to the subject matter hereof. All Exhibits and Schedules attached hereto are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement.

11.6    Amendment. This Agreement may be amended, modified or supplemented only by a written instrument duly executed by all the parties hereto and, where required, approved by the Bankruptcy Court.

11.7    Assignments. This Agreement shall not be assigned by either party hereto without the prior written consent of the other party hereto; except that Agent shall be permitted to assign its right to purchase all or any portion of the Transferred Assets to Purchaser or any one or more Affiliates of Purchaser.

11.8    Binding Effect. Subject to any restrictions hereunder on the assignment of this Agreement, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors and assigns of the parties.

11.9    Severability. Any term or provision of this Agreement that is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable or affecting the validity or enforceability of any of the other terms or provisions of this Agreement. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall be ineffective in such jurisdiction, without rendering invalid or unenforceable or effecting the validity or enforceability of any terms or provisions of this Agreement in any other jurisdiction.

11.10    Waiver. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by any party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

11.11    Bankruptcy Court Jurisdiction. **THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE TRANSFERRED ASSETS AND/OR ASSUMED LIABILITIES, AND THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.**

11.12    Governing Law. **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED, INTERPRETED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE NEW YORK WITHOUT REGARD TO THE CONFLICTS OF LAWS OR CHOICE OF LAWS PRINCIPLES THEREOF THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

11.13    Waiver of Jury Trial. **EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN**

**INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

11.14   Counterparts.  This Agreement may be executed by facsimile signature and in any number of counterparts, each of which shall be deemed an original and all which together shall constitute one and the same instrument.

11.15   Time is of the Essence.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

11.16   Third Party Beneficiaries.  Nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and their respective successors and permitted assigns.  Except Affiliates of Purchaser or Agent, there are no third party beneficiaries to this Agreement.

11.17   Confidentiality Agreement.  Any confidentiality agreement between Purchaser and Seller or any of their respective Affiliates executed in connection with this Agreement shall remain in full force and effect during the term specified therein.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, Agent and Seller have executed this Amended and Restated Asset Purchase Agreement as of the day and year first above written.

**AGENT:**                                      **SELLER:**

**NEXBANK, SSB,**                               **MARCAL PAPER MILLS, INC.,**
a Texas State savings bank,                     a New Jersey corporation,
acting solely in its capacity as agent under    Debtor and Debtor in Possession
the Second Lien Loan Agreement

By: _____            By: _____
                                                
Name:                                           Name:
Title:                                          Title:
Date:    11-19-07                               Date:


*[SIGNATURE PAGE TO*
*AMENDED AND RESTATED*
*ASSET PURCHASE AGREEMENT]*

**IN WITNESS WHEREOF,** Agent and Seller have executed this Amended and Restated Asset Purchase Agreement as of the day and year first above written.

<u>**AGENT:**</u>

**NEXBANK, SSB,**
a Texas State savings bank,
acting solely in its capacity as agent under
the Second Lien Loan Agreement

By: _____

Name:
Title:
Date:

<u>**SELLER:**</u>

**MARCAL PAPER MILLS, INC.,**
a New Jersey corporation,
Debtor and Debtor in Possession

By: ~~N R Marcalus~~ (signature)

Name: N R marcalus
Title: Chairman/CEO
Date: 11/20/07

*[SIGNATURE PAGE TO*
*AMENDED AND RESTATED*
*ASSET PURCHASE AGREEMENT]*

Nicholas R. Marcalus has executed this Asset Purchase Agreement solely in his capacity as the Chairman/C.E.O. of the Seller, upon the advice and recommendation of William Henrich, the Approved Consultant for the Seller. Pursuant to an Order of the Bankruptcy Court dated October 9, 2007, the Bankruptcy Court approved an Amended Engagement Letter for the Approved Consultant, which Amended Engagement Letter provided that the Approved Consultant "shall have primary responsibility for ... (b) overseeing the process for the sale of substantially all of the Assets of the Company that will be embodied in the plan of reorganization (the "Sale Process"). Mr. Henrich's advice and recommendation to Mr. Marcalus is based upon Mr. Henrich's exercise of his business judgment and his conclusion that execution of this Asset Purchase Agreement is in the best interests of the Company. Mr. Henrich's advice and recommendation is evidenced by his signature below.

The Purchaser acknowledges that Mr. Marcalus and members of his family either: (i) own, directly or indirectly, the equity interests in, or (ii) are beneficiaries of a trust, that own, the lessors (collectively, the "Insider Lease Lessors") under the Insider Leases. In executing this Asset Purchase Agreement on behalf of the Seller, Mr. Marcalus is not agreeing with, consenting to or otherwise ratifying any representation, warranty, covenant, definition, schedule, term or condition of this Asset Purchase Agreement or any other document related thereto, by or on behalf of the Insider Lease Lessors, and such Insider Lease Lessors are reserving all of their respective rights, claims, positions and defenses as they relate to the Insider Leases and the transactions contemplated by this Asset Purchase Agreement. Without limiting the foregoing, the Insider Lease Lessors are not waiving and are reserving all of their respective rights, claims, positions and defenses under Bankruptcy Code Section 365(d)(4).

The undersigned Approved Consultant hereby confirms his advice and recommendation to Mr. Marcalus to sign this Asset Purchase Agreement on behalf of the Seller.

_____ (signature)
William Henrich, Approved Consultant

Date: November 20, 2007

## Schedules and Exhibits

### Schedules

| Number | Title |
|--------|-------|
| Schedule 1.1.1 | Real Property Improvements |
| Schedule 1.1.3 | Tangible Personal Property |
| Schedule 1.1.4 | Intangible Property |
| Schedule 1.1.5-1 | Real Property Leases |
| Schedule 1.1.5-2 | Personal Property Leases |
| Schedule 1.1.5-3 | Other Contracts |
| Schedule 2.1(i) | Categories of expenses included in the Amended Plan Obligation Amount |
| Schedule 2.1(iii) | Assumed Liabilities |
| Schedule 3.8 | Business Employee Data |
| Schedule 5.2 | Qualified Jurisdictions |
| Schedule 5.4 | Conflicts |
| Schedule 5.5 | Consent or Approval Required |
| Schedule 5.7 | Disclosed Liens |
| Schedule 5.9 | Former Subsidiaries |
| Schedule 5.10 | Breaches Under Contracts |
| Schedule 5.13.3 | Survey/Title Policies and Insurance-Owned Real Property |
| Schedule 5.13.4.5 | Real Property Assessments; Violations of Laws affecting the Real Property |
| Schedule 5.13.5 | Zoning Matters |
| Schedule 5.14 | Environmental Matters |
| Schedule 5.14.4 | Rights of Action |

| Schedule 5.15 | Intellectual Property Rights |
| Schedule 5.16 | Labor Relations |
| Schedule 5.17 | Employee Benefits Matters |

## Exhibits

| **Number** | **Title** |
|---|---|
| Exhibit 3.5.2 | Assignment and Assumption of Real Property Lease |
| Exhibit 3.5.3 | Assignment and Assumption of Personal Property Leases and Contracts |
| Exhibit 3.5.4 | Bill of Sale |
| Exhibit 3.5.6 | Assignment of Intangible Property |
| Exhibit 3.7.5 | Assumption Agreement |
| Exhibit 3.7.6 | Form of Remediation Agreement |
| Exhibit 7.4.1 | Sale Procedures Order |

**SCHEDULES**

**TO THE**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**MARCAL PAPER MILLS, INC.,**
**AS SELLER,**

**AND**

**NEXBANK, SSB,**
**ACTING SOLELY IN ITS CAPACITY AS AGENT UNDER THE**
**SECOND LIEN LOAN AGREEMENT**

These Seller's Disclosure Schedules are dated as of November 2, 2007, and are being delivered pursuant to that certain Asset Purchase Agreement (the "*Agreement*"), dated as of November 2, 2007, by and between Marcal Paper Mills, Inc., a New Jersey corporation ("*Seller*") and NexBank, SSB, a Texas State savings bank acting solely in its capacity as agent under the Second Lien Loan Agreement ("*Agent*"). This Seller's Disclosure Schedule constitutes the Schedules referred to in the Agreement.

From time to time prior to the Closing, the Seller shall have the right to supplement and amend, and Purchaser shall have the right to comment upon and approve such supplementation and amendment of, these Schedules with respect to any matter, including but not limited to, Schedules 2.1(i) and 2.1(iii); *provided, however*, that for purposes of determining whether the conditions set forth in Section 4.2 of the Agreement have been fulfilled, these Schedules shall be deemed to exclude all information contained in any amendment or supplement thereto delivered pursuant to Section 7.15 of the Agreement to the extent that any such supplements or amendments individually or in the aggregate reflects a Material Adverse Change with respect to the Seller.

All capitalized terms used herein and not otherwise defined in this Seller's Disclosure Schedule will have the meanings assigned to them in the Agreement.

39517/0001-2364277v10

| Number | Title |
|---|---|
| **Schedule 1.1.1** | **Seller's Owned Real Property** |
| **Schedule 1.1.4** | **Intellectual Property and Licenses and Permits** |
| **Schedule 1.1.5-1** | **Real Property Leases – Marcal as Tenant** |
| **Schedule 1.1.5-2** | **Personal Property Leases** |
| **Schedule 1.1.5-3** | **Other Contracts** |
| **Schedule 2.1(i)** | **Amended Plan Obligation Amounts** |
| **Schedule 2.1(iii)** | **Assumed Liabilities** |
| **Schedule 3.9** | **Transferred Employees** |
| **Schedule 5.2** | **Qualified Jurisdictions** |
| **Schedule 5.4** | **Conflicts** |
| **Schedule 5.5** | **Consents** |
| **Schedule 5.7** | **Encumbrances** |
| **Schedule 5.9** | **Subsidiaries** |
| **Schedule 5.10** | **Breached Contracts** |
| **Schedule 5.13.3** | **Surveys & Title Insurance** |
| **Schedule 5.13.4.1** | **Leased Real Property – Marcal as Landlord and/or Tenant** |
| **Schedule 5.13.4.5** | **Increases in Assessed Valuation of Real Property** |
| **Schedule 5.13.4** | **Subleases on and Use of Leased Real Property; Right of Quiet Enjoyment; Notices of Amendments or Modification to Real Property Leases** |
| **Schedule 5.13.5** | **Zoning Restrictions** |
| **Schedule 5.14** | **Environmental Permits; Environmental Rights of Action; CERCLA, ISRA Liabilities** |

2

**Schedule 5.15**     **Intellectual Property Rights; Pending Rights of Action**

**Schedule 5.16**     **Labor Relations**

**Schedule 5.17**     **Employee Plans; Claims**

39517/0001-2364277v10

**Schedule 1.1.1**: **Seller's Owned Real Property.**

| Address |
| --- |
| One Market Street, Elmwood Park, NJ 07407 |
| 41 Slater Drive, Elmwood Park, NJ 07407 |
| 456-544 River Drive, Elmwood Park, NJ 07407 |
| Mechanic Falls (approximately 60 acres) and Poland, Maine (approximately 38 acres) - Unimproved vacant land |

The Seller owns a second manufacturing facility in Chicago, Illinois, which consists of approximately 40,000 square feet of office and manufacturing space. Address: 5401 S. Western Ave, Chicago, Illinois.

39517/0001-2364277v10

**Schedule 1.1.4**: **Intellectual Property and Licenses and Permits**

**Intellectual Property**

The following is a complete list of all United States and foreign patents, copyrights, trademarks, trade names and service marks registered or for which applications are pending in the name of Marcal:

| Patent Description | Registration Number | Registration Date |
|---|---|---|
| Floor absorbent granular product | 6,019,873 | 2/1/2000 |
| Apparatus for making granular material | 5,951,822 | 3/16/1999 |
| Absorbent granular product | 5,888,345 | 3/30/1999 |
| Process for making granular material | 5,882,480 | 9/15/1998 |
| Granular material containing recycled paper components | 5,807,465 | 9/15/1998 |
| Process for making the absorbent granular material | 5,728,270 | 3/17/1998 |

Trademarks - Domestic

| Trademark | Registration Number |
|---|---|
| KAOFIN | 2122948 |
| KAO-CLEAN | 2523832 |
| WORKFORCE | 1089580 |
| ASPEN | 1551844 |
| AT HOME AND IN THE OFFICE | 23305579 |
| BELLA | 1027037 |

5

| | |
|---|---|
| BELLA | 0861511 |
| BUY THE BUNDLE | 1672586 |
| BY THE BUNDLE | 1414918 |
| CAMELLIA | 0833704 |
| CAMELLA & DESIGN | 0847872 |
| DRAW AND STORE | 1634789 |
| EASY REACH | 1412269 |
| EMPIRE | 1505884 |
| FLORENTINE | 0843719 |
| FLORENTINE | 0866387 |
| FLUFF OUT | 0791037 |
| FLUFFY | 2261398 |
| MARCALULATE | 1757626 |
| MARCAL | 0372674 |
| MARCAL | 0425272 |
| MARCAL | 0501134 |
| MARCAL | 0573133 |
| MARCAL | 0667115 |
| MARCAL | 0949162 |
| PAPER FROM PAPER NOT FROM TREES | 1595334 |
| PAPER FROM PAPER NOT FROM TREES 100% | 2036006 |
| PAPER FROM PAPER NOT FROM TREES 100% RECYCLED WITHOUT | 1977939 |

39517/0001-2364277v10

| CHLORINE BLEACHING | |
|---|---|
| PAPERPAX | 0813473*** |
| PURSE 'N POCKET | 1627099 |
| QUALITY AWAY FROM HOME | 2491129 |
| SERVI-ETAS | 1117267 |
| SNOW LILY | 0723888 |
| SOFPAC | 1036445 |
| SUNRISE | 0348723 |
| SUNRISE | 1237287 |
| WORKFORCE | 2010772 |
| YELLOW ALERT | 1087719 |
| EASY REACH | 2221794 |
| ECOPAC | 1854174 |
| KITCHEN CHARM | 0309329 |
| MARCAL HANKIES | 0589555 |
| POLY-CASE | 1265703 |
| SANI-HANKS | 0582691 |
| SNAPACK & DESIGN | 2179179 |
| WORKFORCE | 1847360 |
| WORKFORCE | 2132053 |
| KAOBED | 2431471 |
| HUCK | 0822890*** |
| M'LADY | 0813472*** |

39517/0001-2364277v10

| COMPLIMENTS | 1431088*** |
| DECO LEAF | 1446365*** |
| DOLLAR-WISE | 2112472*** |
| TUXEDO | 1443140*** |

*** Although search results indicate that these trademarks are owned by Marcal, Marcal previously sold such trademarks and no longer has an ownership interest in same.

Trademarks – Foreign

| Country | Trademark | Registration Number |
|---|---|---|
| CA | BELLA | 378169 |
| CA | BUY THE BUNDLE | 417286 |
| CA | BY THE BUNDLE | 381,590 |
| CA | CAMELLIA | 381,934 |
| CA | EASY REACH | 379636 |
| CA | ECO | 389731 |
| CA | ECOPAC | 381681 |
| CA | FLORENTINE | 379637 |
| CA | FLUFF-IN | 380348 |
| CA | FLUFF-OUT | 381,683 |
| MX | FLUFFY | |
| CH | KAOFIN | 443205 |
| MX | KAOFIN | 531884 |
| CA | KITCHEN CHARM* | 390043 |
| CA | MADEIRA* | 391136 |
| CA | MARCAL | UCA23213 |

39517/0001-2364277v10

| CA | MARCAL* | UCA24270 |
|---|---|---|
| CA | MARCAL | 388605 |
| DO | MARCAL | 91987 |
| EU | MARCAL | 548339 |
| IT | MARCAL | 850490 |
| CA | MARCAL HANKIES | 381,684 |
| CA | PAPER FROM PAPER NOT FROM TREES & DESIGN | 516097 |
| MX | PAPER FROM PAPER NOT FROM TREES & DESIGN | 574204 |
| CA | POLY-CASE | 381,682 |
| CA | PURSE 'N POCKET | 398714 |
| CA | SANI-HANKS | TMA375,950 |
| MX | SERVICE | 549431 |
| CA | SERVI-ETAS* | 378168 |
| CA | SNAPAC* | 381,935 |
| CA | SNOW LILY | TMA376,940 |
| CA | SUNRISE | 378189 |
| EU | WORKFORCE | 000582668 |
| CA | YELLOW ALERT | TMA375,949 |

*Canadian database shows these trademarks as being expunged for failure to renew.


**Licenses and Permits**

9

39517/0001-2364277v10

| |
|---|
| Title V- Initial Operating Permit Application submitted to Bureau of Operating Permits Air Quality Permitting Program by Marcal Paper Mills, Inc., February 19, 1999. Issued 12/30/2005. |
| Discharge Prevention, Containment and Countermeasure Plan and Discharge Cleanup and Removal Plan for Marcal Paper Mill's Elmwood Park, New Jersey Facility, October 1998.  Revised May 2004. |
| Renewal of Authorization to Discharge Storm Water to Surface Water, Granted by Bureau of Nonpoint Pollution Control, New Jersey Department of Environmental Protection to Marcal Paper Mills, Inc., 1 Market Street facility, dated 01/01/05. |
| General Permit Storm Water Authorization to Discharge, granted by the State of New Jersey Department of Environmental Protection to Marcal Paper Mills, Inc., 41 Slater Drive facility.  Renewed 09/09/04. |
| Underground Storage Tank Registration Certificate to Marcal Paper Mills, Inc.; Effective 12/01/05, Diesel fuel. |
| Underground Storage Tank Registration Certificate to Marcal Paper Mills, Inc.; Effective 12/01/05; re:  storage of home heating oil. |
| U.S. Nuclear Regulatory Commission, Rules and Regulations, Part 31:  General Domestic Licenses for Byproduct Material. |
| EPA, Acknowledgement of Notification of Hazardous Waste Activity to Marcal Paper Mills, Inc. |
| Certification as a Registered and Regulated Medical Waste Generator, Granted by the State of New Jersey Department of Environmental Protection to Marcal Paper Mills, Inc., dated 11/07/97. |
| Water Allocation Permit #2100P, granted by the State of New Jersey Department of Environmental Protection to Marcal Paper Mills, Inc., dated May 21, 1993; Revised 9/02. |
| Permit to Divert Water #4006PS, granted by the State of New Jersey Department of Environmental Protection to Marcal Paper Mills, Inc.; Effective 10/01/84.  Renewed 2/24/03. |
| Sewer Use Permit, granted to Marcal Paper Mills, Inc. by Passaic Valley Sewerage Commissioners; Effective 05/01/2006. |

[Notices of Violation, dated June 13, 2007, were issued by NJDEP re registered underground storage tanks, one located at 41 Slater Drive (heating oil fuel tank), and one located at 1 Market Street (diesel fuel supply). The tanks had been temporarily taken out of service pending minor repairs and area maintenance. Return to full service for both tanks was allowed on August 30, 2007]

39517/0001-2364277v10

**Schedule 1.1.5-1:**     **Real Property Leases – Marcal as Tenant**

| PARTIES | DESCRIPTION OF THE PROPERTY | DATES OF CURRENT TERM | SECURITY DEPOSIT | RENT |
|---|---|---|---|---|
| GREEN ACRE WOODLANDS INC., LANDLORD AND MARCAL PAPER MILLS, INC TENANT** | GREEN ACRE WOODLANDS | ORAL MONTH TO MONTH LEASE | NONE | MONTHLY RENT $10,000 |
| 35 MARKET STREET, L.P. LANDLORD AND MARCAL PAPER MILLS, INC. TENANT** | 35 MARKET STREET, ELMWOOD PARK, NJ 07407 | JUNE 13, 1995 – APRIL 1, 2015 | NONE | MONTHLY RENT $177,083.00 |
| MARCALUS, ROBERT L. LANDLORD MARCAL PAPER MILLS, INC. TENANT** | 465 BOULEVARD, ELMWOOD PARK, NJ 07407 | NOVEMBER 6, 1991 – OCTOBER 31, 2011 | $430,000.00 | MONTHLY RENT $58,425.13 |
| HARTZ MOUNTAIN-ELMWOOD PARK, LANDLORD MARCAL PAPER MILLS, INC. TENANT | 397 EAST 54TH STREET, ELMWOOD PARK, NJ 07407 | DECEMBER 20, 1999 – FEBRUARY 28, 2014 | NONE | MONTHLY RENT $90,609.00  $99,238.77 as of 12/1/07 |
| ROBERT L. MARCALUS REVOCABLE INTER VIVOS TRUST (N&R PROPERTIES) LANDLORD MARCAL PAPER MILLS, INC. TENANT** | 5415 S. CLAREMONT AVE, 5417 S. CLAREMONT AVE, 5331 W. WESTERN AVE, 5339 W. WESTERN AVE, 5341 W. WESTERN AVE, CHICAGO, IL | JANUARY 1, 1994 – DECEMBER 31, 2024 | NONE | MONTHLY RENT $10,000 |
| RAILROAD LEASES (SEE BELOW) | | | | |
| MARCAL PAPER MILLS (H10318) | MAINTAINING CORRUGATTED STEEL TUNNEL UNDER TRACKS AT ELMWOOD PARK | ANNUAL | NONE | MONTHLY RENT $331.14 |

11

| MARCAL PAPER MILLS (H10318) | SITE FOR SIDING 647 FET WEST OF ELMWOOD PARK | ANNUAL | NONE | MONTHLY RENT $331.14 |
| --- | --- | --- | --- | --- |
| MARCAL PAPER MILLS (H10318) | ANNUAL FEE FOR ONE (1) 4" METALLIC ELECTRICAL CONDUIT ALONGSIDE A 4" LOW PRESSURE MATER LINE UNDER NYS&H BRIDGE 18.62 | ANNUAL | NONE | MONTLY RENT $762.12 |
| MARCAL PAPER MILLS (H10318) | SITE FOR MULTI PLATE ARCH TUNNEL UNDER TRACKS LARGE TUNNEL FOR 10 & 11 PM | ANNUAL | NONE | MONTLY RENT $2,794.60 |
| MARCAL PAPER MILLS (H10315) | SITE FOR 26.0 KV OVERHEAD FEEDER EXTENSION AT RIVER DRIVE | ANNUAL | NONE | MONTLY RENT $248.34 |
| MARCAL PAPER MILLS (H10315) | MAINTAINING SEWER LINE FROM MCLEAN BLVD. PATERSON OVER PASSAIC RIVER BRIDGE TO RIVER ROAD PVSC DISCHARGE | ANNUAL | NONE | MONTLY RENT $560.24 |
| MARCAL PAPER MILLS (H10318) | SITE FOR SIDETRACK, TRESTLE AND FENCE SERVES FDI | ANNUAL | NONE | MONTLY RENT $339.10 |

12

39517/0001-2364277v10

| MARCAL PAPER MILLS (H10318) | SITE FOR HANDLING FREIGHT MARKET STREET PLANT | ANNUAL | NONE | MONTLY RENT $233.13 |
|---|---|---|---|---|

    ** Seller's landlords under these Insider Leases have revoked their consent to the extension of the period during which the Seller must assume or reject this Lease and as such, and pursuant to Asset Purchase Agreement Section 5.13.4.6, Lease is deemed rejected as a matter of law and the Seller is unable to assume or assign these leases to the Purchaser as of the Closing.

| MORGAN & SAMPSON, INC. ATTN DANIEL B MORGAN, PRESIDENT 1651 SOUTH CARLOS AVENUE ONTARIO, CA  91710 | PUBLIC WAREHOUSE AGREEMENT NOTIFICATION AND ACKNOWLEDGEMENT OF SECURITY INTEREST AGREEMENT |
|---|---|

13
39517/0001-2364277v10

**Schedule 1.1.5-2:**   **Personal Property Leases**

| Letters of Credit 2007 | | | | |
|---|---|---|---|---|
| Recipient | Dollar Amount | Duration | Expires | Reason |
| General Electric Capital* | $231, 000.00 | Two years | April 7, 2008 | Leased Equipment |
| Hartford Insurance | $200,000.00 | One year | July 18, 2008 | Self-insured Medical |
| Roxcel | $250,000.00 | Five months | September 30, 2008 | Paper Vendor |
| Travelers | $1,050,000.00 | One year | February 17, 2008 | Workman's Comp Insurance |
| SFK Pulp | $650,000.00 | Five months | September 30, 2008 | Paper Vendor |

*J.P. Morgan Chase has issued its backstop Letters of Credit in favor of Wachovia Bank, National Association with respect to each of these Letters of Credit.

| | |
|---|---|
| NJ ECONOMIC DEVELOPMENT AUTHORITY CASINO REINVESTMENT DEVT. AUTHORITY PO BOX 18641 NEWARK, NJ 07191 | LEASE, LICENSE AND OPERATING AGREEMENT RELATED TO THE $12,955,000 WASTE PAPER RECYCLING REVENUE BONDS, SERIES 1990 |
| CitiCapital Trailer Rental, Inc. 250 E. John Carpenter Freeway Irving, TX 75062<br><br>Xtra Lease 15 Stockton Street Newark, NJ 07105 | Extended Trailer Rental Agreement dated October 14, 2002 |

39517/0001-2364277v10

| | |
|---|---|
| CANON BUSINESS SOLUTIONS, EAST, INC 300 COMMERCE SQUARE BLVD. BURLINGTON, NJ  08016 | COPIER LEASE AGREEMENT DATED SEPTEMBER 26, 2006 - ACQUISITION AGREEMENT (IR 6570) UNDATED - ACQUISITION AGREEMENT (IR 2270) UNDATED - ACQUISITION AGREEMENT (5570, 3570) DATED AUGUST 18, 2006 - ACQUISITION AGREEMENT (5570) DATED OCTOBER 4, 2006 AND ACQUIS |
| CANON FINANCIAL SERVICES, INC. PO BOX 4004 CAROL STREAM, IL  60197-4004 | LEASE AGREEMENTS  (IR 6570, IR 2270, 5570, 3570 AND 6570) UNDATED LEASE AGREEMENT (5570) DATED OCTOBER 4, 2006. |
| CIT TECHNOLOGY FINANCING SERVICES, INC. 650 CIT DRIVE LIVINGSTON, NJ  07039 | MASTER LEASE AGREEMENT - ONE ADT/FA SYSTEM - DATED AUGUST 23, 2004 |
| GE CAPITAL CORP 44 OLD RIDGEBURY ROAD DANBURY, CT  06810 | MASTER LEASE AGREEMENT (CONVERTING EQUIPMENT), DATED OCTOBER 5, 1995 |
| IBM CORPORATION PO BOX 643600 PITTSBURGH, PA  15264 | CAPITAL LEASE - COMPUTER EQUIPMENT |
| IBM CREDIT, LLC ATTN: BEVERLY H. SHIDELER TWO LINCOLN CENTER OAKBROOK TERRACE, IL  60181 | VALUEPLAN LEASE AGREEMENT DATED OCTOBER 11, 2005 |
| MIKE ALBERT LEASING, INC. 10340 EVENDALE DRIVE CINCINNATI, OH  45241-2564 | AUTO LEASES - MASTER LEASE AGREEMENT NO. 6947 |

39517/0001-2364277v10

**Schedule 1.1.5-3:    Other Contracts**

**Loan agreements, letters of credit, mortgages, notes, guarantees of
Indebtedness or other instruments evidencing Indebtedness of the Seller**

| Agreement | Date of Agreement | Other Parties to Agreement | Date of Expiration or Termination |
|---|---|---|---|
| $12,955,000 Waste Paper Recycling Revenue Bonds, Series 1990 | February 1, 1990 | New Jersey Economic Development Authority | February 1, 2010 |
| Loan and Security Agreement | December 30, 2005 | NexBank, SSB | December 30, 2010 |
| Debtor-in-Possession Credit Agreement | January 12, 2007 | NexBank, SSB; The CIT Group\Business Credit, Inc.; and The DIP Lenders | - |

| Letters of Credit 2007 | | | | |
|---|---|---|---|---|
| Recipient | Dollar Amount | Duration | Expires | Reason |
| Hartford Insurance* | $210,000.00 | One year | August 26, 2007 | Self-insured Medical |
| Roxcel | $250, 000.00 | Five months | September 30, 2007 | Paper Vendor |
| Travelers* | $1,050, 000.00 | One year | February 17, 2008 | Workman's Comp Insurance |
| SFK Pulp | $650,000.00 | Five months | September 30, 2007 | Paper Vendor |

16
39517/0001-2364277v10

| | |
|---|---|
| NEXBANK, SSB<br>13455 NOEL ROAD, SUITE 2220<br>DALLAS, TX 75240 | LOAN AND SECURITY AGREEMENT DATED<br>DECEMBER 30, 2005 |
| NEXBANK, SSB<br>13455 NOEL ROAD, SUITE 2220<br>DALLAS, TX 75240 | TRADEMARK COLLATERAL ASSIGNMENT AND<br>SECURITY AGREEMENT |
| NEXBANK, SSB<br>13455 NOEL ROAD, SUITE 2220<br>DALLAS, TX 75240 | PATENT COLLATERAL ASSIGNMENT AND<br>SECURITY AGREEMENT |
| WACHOVIA BANK<br>1133 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10036 | DEPOSIT ACCOUNT CONTROL AGREEMENT |

### RLM Notes

1.    Promissory Note, dated June 22, 2000, in a principal amount of $1,000,000 payable by the Seller to Robert L. Marcalus ("RLM").

2.    Promissory Note, dated July 5, 2000 in a principal amount of $1,000,000 payable by the Seller to RLM.

3.    Promissory Note, dated July 28, 2000 in a principal amount of $4,500,000 payable by the Seller to RLM.

4.    Promissory Note, dated June 22, 2000 in a principal amount of $500,000 payable by the Seller to RLM.

5.    Loan Modification Agreement dated October 31, 2001 between the Seller and RLM amending the Notes referred to in items 1 through 4 above (collectively, the "Notes").

6.    Second Loan Modification Agreement dated December 29, 2005 between the Seller and RLM amending the Notes.

39517/0001-2364277v10

**Real Property Leases**

| PARTIES | DESCRIPTION OF THE PROPERTY | DATES OF CURRENT TERM | SECURITY DEPOSIT | RENT |
|---|---|---|---|---|
| MARCAL PAPER MILLS, INC. AS LANDLORD, AND RENEWABLE POWER AND LIGHT, AS TENANT | | DATED NOVEMBER 11, 2005 – December 31, 2014 LEASE EXTENDS IF LONG-TERM STEAM AGREEMENT IS EXTENDED (Motion to reject has been filed) | NONE | MONTHLY RENT: $8,333.33 |
| MARCAL PAPER MILLS, INC. AS SUB-LANDLORD UNITED TRANSPORTATION AS TENANT | 465 BOULEVARD, ELMWOOD PARK, NJ 07407 | VERBAL AGREEMENT | NONE | MONTHLY RENT $550.00 |
| GREEN ACRE WOODLANDS INC., LANDLORD AND MARCAL PAPER MILLS, INC TENANT | GREEN ACRE WOODLANDS | ORAL MONTH TO MONTH LEASE | NONE | MONTHLY RENT $10,000 |
| SUBLEASE OF PROPERTY MARCAL PAPER MILLS, INC. LANDLORD CROMWELL LIQUORS, INC. TENANT | 465 BOULEVARD, ELMWOOD PARK, NJ 07407 | MONTH TO MONTH LEASE | $1916.16 | MONTHLY RENT $1,917.00 |
| SUBLEASE OF PROPERTY MARCAL PAPER MILLS, INC. IS LANDLORD AND METROPOLITAN TRUCKING, INC. IS TENANT | 465 BOULEVARD, ELMWOOD PARK, NJ 07407 | SUBLEASE DATED SEPTEMBER 30, 2005 – SEPTEMBER 30, 2010 (OPTION TO RENEW ONLY IF MASTER LEASE RENEWED) | $12,000.00 | MONTHLY RENT $6,000.00 |
| 35 MARKET STREET, L.P. LANDLORD AND MARCAL PAPER MILLS, INC. TENANT | 35 MARKET STREET, ELMWOOD PARK, NJ 07407 | JUNE 13, 1995 – APRIL 1, 2015 | NONE | MONTHLY RENT $177,083.00 |
| MARCAL PAPER MILLS, INC. AS SUB-LANDLORD BERGEN INDUSTRIES AS TENANT | 465 BOULEVARD, ELMWOOD PARK, NJ 07407 | VERBAL AGREEMENT | NONE | MONTHLY RENT $2,400.00 |

39517/0001-2364277v10

| MARCAL PAPER MILLS, INC., LANDLORD, AND BIO-REFERENCE LABS, INC., AS TENANT | 2ND AND 3RD FLOORS OF OFFICE SPACE AND PARKING SPACES AT 41 SLATER DRIVE, ELMWOOD PARK, NEW JERSEY 07407 | JULY 1, 2006 –JUNE 30, 2009 (TWO OPTIONS TO RENEW) | $15,725.00 | MONTHLY RENT $17,800.00 |
|---|---|---|---|---|
| MARCALUS, ROBERT L. LANDLORD MARCAL PAPER MILLS, INC. TENANT | 465 BOULEVARD, ELMWOOD PARK, NJ 07407 | NOVEMBER 6, 1991 – OCTOBER 31, 2011 | $430,000.00 | MONTHLY RENT $58,425.13 |
| MARCAL PAPER MILLS, INC. AS SUB-LANDLORD NEW JERSEY LANDSCAPING CONTRACTORS ASSOCIATION AS TENANT | 465 BOULEVARD, ELMWOOD PARK, NJ 07407 | VERBAL AGREEMENT BEGINNING APRIL 1, 2005 | NONE | MONTHLY RENT $1,450.00 |
| MARCAL PAPER MILLS, INC. LANDLORD MPMI, INC. TENANT | | JANUARY 1, 1994 EXPIRES WHEN BOND DEBIT IS PAID IN FULL | | MONTHLY RENT $1.00 |
| HARTZ MOUNTAIN-ELMWOOD PARK, LANDLORD MARCAL PAPER MILLS, INC. TENANT | 397 EAST 54TH STREET, ELMWOOD PARK, NJ 07407 | DECEMBER 20, 1999 – FEBRUARY 28, 2014 | NONE | MONTHLY RENT $90,609.00 $99,238.77 AS OF 12/1/07 |
| ROBERT L. MARCALUS REVOCABLE INTER VIVOS TRUST (N&R PROPERTIES) LANDLORD MARCAL PAPER MILLS, INC. TENANT | 5415 S. CLAREMONT AVE, 5417 S. CLAREMONT AVE, 5331 W. WESTERN AVE, 5339 W. WESTERN AVE, 5341 W. WESTERN AVE, CHICAGO, IL | JANUARY 1, 1994 – DECEMBER 31, 2024 | NONE | MONTHLY RENT $10,000 |
| RAILROAD LEASES (SEE BELOW) | | | | |

19

39517/0001-2364277v10

| | | | | |
|---|---|---|---|---|
| MARCAL PAPER MILLS (H10318) | MAINTAING CORRUGATTED STEEL TUNNEL UNDER TRACKS AT ELMWOOD PARK | ANNUAL | NONE | MONTHLY RENT $331.14 |
| MARCAL PAPER MILLS (H10318) | SITE FOR SIDING 647 FET WEST OF ELMWOOD PARK | ANNUAL | NONE | MONTHLY RENT $331.14 |
| MARCAL PAPER MILLS (H10318) | ANNUAL FEE FOR ONE (1) 4" METALLIC ELECTRICAL CONDUIT ALONGSIDE A 4" LOW PRESSURE MATER LINE UNDER NYS&H BRIDGE 18.62 | ANNUAL | NONE | MONTLY RENT $762.12 |
| MARCAL PAPER MILLS (H10318) | SITE FOR MULTI PLATE ARCH TUNNEL UNDER TRACKS LARGE TUNNEL FOR 10 & 11 PM | ANNUAL | NONE | MONTLY RENT $2,794.60 |
| MARCAL PAPER MILLS (H10315) | SITE FOR 26.0 KV OVERHEAD FEEDER EXTENSION AT RIVER DRIVE | ANNUAL | NONE | MONTLY RENT $248.34 |
| MARCAL PAPER MILLS (H10315) | MAINTAINING SEWER LINE FROM MCLEAN BLVD. PATERSON OVER PASSAIC RIVER BRIDGE TO RIVER ROAD PVSC DISCHARGE | ANNUAL | NONE | MONTLY RENT $560.24 |

39517/0001-2364277v10

| MARCAL PAPER MILLS (H10318) | SITE FOR SIDETRACK, TRESTLE AND FENCE SERVES FDI | ANNUAL | NONE | MONTLY RENT $339.10 |
| MARCAL PAPER MILLS (H10318) | SITE FOR HANDLING FREIGHT MARKET STREET PLANT | ANNUAL | NONE | MONTLY RENT $233.13 |

### Contracts for Supplies, Materials or Equipment

| | |
|---|---|
| Waterbury Felt Co.<br>107 River Street<br>Orisanky, NY 13424 | Continuous Replacement Order for Fabrics – 10/15/06 – 12/31/07 |
| Belmar Spring Water<br>410 Grove Street<br>Ridgewood, New Jersey 07450 | Contract for deionized water – 1/1/06 – 12/31/06 (Has Been Renewed) |
| Southern Container Corp.<br>115 Engineers Road<br>Hauppauge, NY 11788<br>Attn: Steven Hill | Amended and Restated Committed Purchase Agreement dated 12/31/05 regarding Committed Purchase Agreement dated 12/31/02 (1/1/06 – 12/31/09) |
| Frohling Sign Co.<br>419 East Route 59<br>Nanuet, NY 10954<br>Attn: Brian O'Connor | Purchase Order to maintain illuminated roof signs – 2/1/06 – 1/31/07 (Has Been Renewed) |
| GH Gunther Huettlin Manufacturing Inc.<br>101 Petrie Place<br>Belleville, Ontario<br>Canada K8N 5T3<br>Attn: Gunther Huettlin | Purchase Agreement of printed polyethylene double Drawstring Napkin Bags – 1/1/05 – 12/31/07 |
| Putney Paper Company<br>Mr. Jeff Miller, VP Sales<br>P.O. Box 226<br>Old Depot Road<br>Putney, VT 05346 | One Year Evergreen Contract (Packing C-fold and Multi-fold towels) – 7/1/06 – 6/30/07 (Will Be Renewed) |
| County of Ocean | Contract for marketing of mixed paper – |

21
39517/0001-2364277v10

| | |
|---|---|
| Board of Chosen Freeholders<br>P.O. Box 2191<br>Administration Building<br>Toms River, NJ 08754-2191 | 12/5/01 – 11/30/07 |
| Kuehne Chemical Company, Inc.<br>86 North Hackensack Avenue<br>South Kearny, NJ 07032-4675 | Supply Agreement for Sodium Hypochlorite – 1/1/05 – 12/31/05 with renewal for an additional year unless terminated in writing |
| PVS Chemical Solutions, Inc.<br>55 Lee Street<br>Buffalo, NY 14210 | Sales Contract for Sodium Bisulfite Solution – 10/1/05 – 9/30/09 |
| GE Betz, Inc.<br>P.O. Box 281729<br>Atlanta, GA 30384 | Contract – 1/1/07 – 6/30/07 |
| Belmar Spring Water<br>410 Grove Street<br>Glen Rock, NJ 07452-1932 | Contract for supply of spring water and cups – 7/1/06 – 6/30/07 (Will Be Renewed) |
| NewsAmerica Marketing<br>1211 Avenue of the Americas<br>New York, NY 10036 | Contract for newspaper coupons – 6/19/06 – 12/31/09 |
| Ashland Specialty Chemical Co.<br>One Drew Plaza<br>Boonton, NJ 07005<br>Attn: Mr. Keith Knauer | Contract 12/23/04 – 12/23/07 |
| Cartiera Carma<br>Via Tazio Nuvolari, 10<br>Carraia, Capannori<br>Italy 55012<br>Attn: Alberto Bracali | 2/1/07 – 1/30/08 |
| Electrical Equipment Solutions<br>445 East 16th Street<br>P.O. Box 2264<br>Paterson, NJ 07509<br><br>Rockwell Automation<br>3240 South 78th Street | Assigned Contract between Rockwell Automation and Marcal – 1/20/06 – 1/19/09<br><br>(Previous contract 1/20/03 – 1/20/06) |

39517/0001-2364277v10

| | |
|---|---|
| Philadelphia, PA 19153 | |
| Rohm & Haas<br>Mr. Rich Hebert<br>100 Independence Mall West<br>Philadelphia, PA 19106-2399 | Sales and Service Agreement – 7/1/05 – 6/30/09 |
| Advanced Service Providers<br>37 Green Tree Drive<br>Jackson, NJ 08527 | Contract for Supply and Service of Paper Machines – Dated 3/02/06 |
| Monsen Engineering<br>P.O. Box 10061<br>Fairfield, NJ 07004-6061 | Contract for Maintenance of HVAC Units – Dated 5/1/07 – 4/30/08 |
| Waste Management of NJ, Inc.<br>77 Brookside Place<br>Hillsdale, NJ 07642<br>Attn: Patrick Russell | Contract for Supply of Driver, Transport Equipment, and 30-yard Container, and for Waste Removal dated 1/1/07-12/31/07 |
| Western Pest Services<br>West 20 Ridgewood Ave<br>Paramus, NJ 07652<br>Attn: Ed McConnel | Contract for Pest Control Services Dated 6/1/07-5/31/08 |
| Kone Cranes & Hoists<br>225 West Howard Street<br>Stowe, PA 19464<br>Scot Eddinger | Order for Service & Supply of Cranes Dated August 1, 2007 through July 31, 2008 |
| ThyssenKrupp Elevator<br>125 Moen Avenue<br>Cranford, NJ 07016 | Contract for Elevator Maintenance Dated 3/1/07-2/28/10 |
| The Scotts Company<br>311 Reedville Road<br>Oxford, PA | Product Disposal Agreement for Marcal Kaofin Dated 2/1/05-1/31/07 |
| Summit Anthracite<br>512 Main Street<br>Good Spring, PA 17981 | Product Disposal Agreement for Marcal Kaofin Dated 2/1/06-1/31/07 |

### Energy Contracts

| | |
|---|---|
| RENEWABLE POWER AND LIGHT (RPL)<br>STANDON HOUSE<br>21 MANSELL STREET<br>LONDON E1 8AA | LONG TERM STEAM SALES AGREEMENT DATED NOVEMBER 11, 2005 |
| YANKEE PROPANE<br>19 INDUSTRIAL DRIVE | PURCHASE ORDER TO COVER BULK DELIVERY |

39517/0001-2364277v10

| P.O. BOX 486<br>FLORIDA, NY 10921 | OF PROPANE – DATED 7/1/07 – 6/30/07 |
|---|---|

24

## Contracts for Services of Distributors, Dealers, Sales Representatives, etc

| | |
|---|---|
| ATLANTIC COAST MARKETING<br>ATTN: ROSS PATE<br>1829 COOPER ROAD<br>VIRGINIA BEACH, VA 23454 | COMMISSION AGREEMENT DATED JANUARY 16, 2001 BETWEEN MARCAL PAPER MILLS, INC. AND ROSS PATE OF ATLANTIC COAST MARKETING |
| BCM SALES, INC.<br>47 VINTON TERRACE<br>ROCKLAND, MA 02370 | COMMISSION AGREEMENT DATED JANUARY 15, 1996 BETWEEN MARCAL PAPER MILLS, INC. AND BCM SALES, INC. |
| BUCKLEY THORNE MESSINA PIERCE CO.<br>23 STRATHMORE ROAD<br>NATICK, MA 01760 | COMMISSION AGREEMENT DATED JANUARY 15, 1996 BETWEEN MARCAL PAPER MILLS, INC. AND BUCKLEY THORNE MESSINA PIERCE CO. |
| BULLS EYE, INC.<br>73 CEDAR AVENUE<br>HERSHEY, PA 17033 | COMMISSION AGREEMENT DATED OCTOBER 18, 2004 BETWEEN MARCAL PAPER MILLS, INC. AND BULLS EYE, INC. |
| C. LLOYD JOHNSON, INC.<br>8031 HAMPTON BLVD<br>NORFOLK, VA 23505 | COMMISSION AGREEMENT DATED APRIL 1, 2001 BETWEEN MARCAL PAPER MILLS, INC. AND C. LLOYD JOHNSON, INC. |
| CROSSMARK-DETROIT<br>47548 HALYARD<br>PLYMOUTH, MI 48170 | COMMISSION AGREEMENT DATED AUGUST, 1999 BETWEEN MARCAL PAPER MILLS, INC. AND CROSSMARK-DETROIT |
| DUNBAR SALES CO., INC.<br>4616 MONTEVALLO ROAD<br>BIRMINGHAM, AL 35210 | COMMISSION AGREEMENT DATED APRIL 1, 2004 BETWEEN MARCAL PAPER MILLS, INC. AND DUNBAR SALES CO., INC. |
| DWYER ASSOCIATES<br>ATTN: GREG GIGLLO<br>ONE PRESIDENTIAL WAY, SUITE 103<br>WOBURN, MA 01801 | COMMISSION AGREEMENT DATED SEPTEMBER 1, 2006 BETWEEN MARCAL PAPER MILLS, INC. AND DWYER ASSOCIATES |
| EMPIRE STATE VENTURE CORPORATION<br>40 PINEVIEW DRIVE<br>BUFFALO, NY 14228 | COMMISSION AGREEMENT DATED NOVEMBER 5, 2003 BETWEEN MARCAL PAPER MILLS, INC. AND EMPIRE STATE VENTURE CORPORATION. |
| F.M. TURNER COMPANY<br>ATTN DAVE SCOTT/ROLTY LUFKIN<br>6325 COCHRAN ROAD SUITE 5<br>SOLON, OH 44139 | COMMISSION AGREEMENT DATED JUNE 18, 2004 BETWEEN MARCAL PAPER MILLS, INC. AND DAVE SCOTT/ROLTY LUFKIN OF F.M. TURNER COMPANY |
| HUGH T. GILMORE COMPANY<br>180 MAIN STREET<br>DURYEA, PA 18642 | COMMISSION AGREEMENT DATED AUGUST 1, 2004 BETWEEN MARCAL PAPER MILLS, INC. AND HUGH T GILMORE COMPANY |
| J. O'H METRO<br>218 ROUTE 17 NORTH<br>ROCHELLE PARK, NJ 07662 | COMMISSION AGREEMENT DATED MARCH 1, 2006 BETWEEN MARCAL PAPER MILLS, INC. AND J. O'H METRO. |
| MARKETING MANAGEMENT INCORPORATED | COMMISSION AGREEMENT DATED APRIL 1, 2004 |

39517/0001-2364277v10

| | |
|---|---|
| 4717 FLETCHER AVENUE<br>FORT WORTH, TX 76107 | BETWEEN MARCAL PAPER MILLS, INC. AND MARKETING MANAGEMENT INCORPORATED |
| MARKETING MANAGEMENT INCORPORATED<br>4717 FLETCHER AVENUE<br>FORT WORTH, TX 76107 | COMMISSION AGREEMENT DATED MARCH 21, 2005 BETWEEN MARCAL PAPER MILLS, INC. AND MARKETING MANAGEMENT INCORPORATED |
| PALMETTO MARKETING & SALES<br>902 GEORGE WARREN DRIVE<br>RUFFIN, SC 29475 | COMMISSION AGREEMENT DATED APRIL 1, 2004 BETWEEN MARCAL PAPER MILLS, INC. AND PALMETTO MARKETING & SALES, INC. |
| PICKRELL & CRAIG<br>1015 SOUTH FOURTH STREET<br>LOUISVILLE, KY 40203 | COMMISSION AGREEMENT DATED JANUARY 1, 2006 BETWEEN MARCAL PAPER MILLS, INC. AND PICKRELL & CRAIG |
| RETAIL ASSOCIATES<br>209 4TH STREET<br>MONTGOMERY CITY, MO 63361 | COMMISSION AGREEMENT DATED DECEMBER 1, 1999 BETWEEN MARCAL PAPER MILLS, INC. AND RETAIL ASSOCIATES |
| SALES SOLUTIONS<br>ATTN: STEVE SHURDUT<br>266N OLD OAKEN BUCKET ROAD<br>SCITUATE, MA 02066 | COMMISSION AGREEMENT DATED FEBRUARY 2005 BETWEEN MARCAL PAPER MILLS, INC. AND STEVE SHURDUT OF SALES SOLUTIONS |
| SONNY DAY SALES<br>ATTN: TONY CONDURSO<br>10 ROBERTA LANE<br>COMMACK, NY 11725 | COMMISSION AGREEMENT DATED OCTOBER 10, 2004 BETWEEN MARCAL PAPER MILLS, INC. AND TONY CONDURSO OF SONNY DAY SALES.SOLUTIONS |
| SHARIN FOOFSERVICE SALES | COMMISSION AGREEMENT DATED MAY 18, 2000 BETWEEN MARCAL PAPER MILLS, INC. AND SHARIN FOOFSERVICE SALES |
| SUPERMARKET BRANDS MARKETING<br>4801-A RIVERS AVENUE<br>CHARLESTON, SC 29406 | COMMISSION AGREEMENT DATED APRIL 1, 2004 BETWEEN MARCAL PAPER MILLS, INC. AND SUPERMARKET BRANDS MARKETING |
| VISION, LLC<br>ONE PRESIDENTIAL WAY, SUITE 103<br>WOBURN, MA 01801 | COMMISSION AGREEMENT DATED APRIL 16, 2004 BETWEEN MARCAL PAPER MILLS, INC. AND VISION LLC |
| VISION MARKETING ENTERPRISES, INC.<br>8866 CHERRY STREET COVE<br>CORDOVA, TN 38018 | COMMISSION AGREEMENT DATED MARCH 1, 2006 BETWEEN MARCAL PAPER MILLS, INC. AND VISION MARKETING ENTERPRISES, INC. |
| WORLD MARKETING<br>1420-D OLD LENIOR ROAD<br>HICKORY, NC 28601 | COMMISSION AGREEMENT DATED APRIL 1, 2004 BETWEEN MARCAL PAPER MILLS, INC. AND WORLD MARKETING |
| SUMMIT ENGERGY SERVICES<br>10350 ORMSBY PARK PLACE – SUITE 400<br>LOUISVILLE, KY 40223<br>STEVE WILHITE | ENERGY MANAGEMENT SERVICE DATED AUGUST 1, 2007 THROUGH JULY 31, 2010 |

26

| | |
|---|---|
| GE INTERNATIONAL INC. – GEII<br>THERMAL PERFORMANCE SERVICES<br>420 WILDWOOD PARKWAY<br>ATLANTA, GA 30339<br>GARY HASIS | ON SITE SUPPORT SERVICES DATED<br>NOVEMBER 1, 2007 THROUGH OCTOBER 31, 2009 |
| SOMERSET COUNTY<br>COUNTY ADMINISTRATION BUILDING<br>20 GROVE STREET BOX 3000<br>SOMERVILLE, NJ 08876 | AGREEMENT FOR MARKETING OF POST-<br>CONSUMER MIXED PAPER DATED DECEMBER 6,<br>2005 THROUGH DECEMBER 31, 2010 |
| NEWS MARKETING AMERICA<br>1211 AVENUE OF THE AMERICAS<br>NEW YORK, NEW YORK 10036 | MEDIA MARKETING AGREEMENT DATED JULY<br>27, 2007 FOR SUNDAY NEWSPAPER COUPON<br>INSERTION ON THE DATES SETFORTH:<br>FEBRUARY 3, 2008, APRIL 13, 2008, MAY 18, 2008,<br>JUNE 29, 2008, SEPTEMBER 7, 2008 |

Managed Care & Third Party Administration Services Agreement, between
Qualcare, Inc. and Marcal, dated May 15, 2007.

27

**Schedule 2.1(i):**        **Amended Plan Obligation Amounts**

SEE ATTACHED

Draft

**Marcal Paper Mills, Inc.**    **Amended Plan Obligation Amount**

($ 000's)

| Category (1) | | Proposed Amount |
|---|---|---|
| State taxes payable | $ | 200 |
| Reclamation | | 100 |
| Professional fees | | 4,925 |
| Cost of insurance tail policies | | 125 |
| Initial funding of liquidating trust | | 25 |
| Amendment fee | | 225 |
| Other | | 500 |
| Total | $ | 6,100 |

(1) Amounts not used in any specific category can be used to pay
other administrative expenses (other than professional fees), to
fund purchase of additional tail coverage, and to increase the
amount of the initial funding of the liquidating trust (up to
$100k), in the discretion of the Debtor.

**Schedule 2.1(iii):** **Assumed Liabilities**

SEE ATTACHED

Draft

| Marcal Paper Mills, Inc. | Assumed Liabilities (1) |
|---|---|
| ($ 000's) | |

**Debtor in Possession Financing**

| | |
|---|---:|
| DIP Revolver (2) | $ 4,000 |
| DIP Term Loan (2) | 64,500 |
| Letters of Credit (2) | 2,381 |
| **Total** | **70,881** |

**Post Petition Accounts Payable and Post Petition Accrued Expenses:**

| | |
|---|---:|
| Accounts payable | 2,193 |
| Un-vouchered materials | 1,198 |
| Un-vouchered waste disposal charges | 700 |
| Un-vouchered repairs | 55 |
| Accrued heat, light and power | 747 |
| Accrued freight | 1,237 |
| Accrued interest | 167 |
| Accrued commissions | 357 |
| Wires and felts | 257 |
| Accrued real estate | 100 |
| Accrued water & sewer | TBD |
| Accrued franchise tax | 4 |
| **Total** | **7,016** |

| | |
|---|---:|
| **S503B9 Claims** | 4,000 |
| **Executory Contract and Lease Cure Costs** | TBD |
| **MPMI, Inc.** | TBD |

**Accrued Selling and Promotional Expense:**

| | |
|---|---:|
| Accrued advertising & promo | 6,694 |
| Vol discount promo expense | 2,041 |
| Accrued Disc Credit Memo (coupons) | 665 |
| **Total** | **9,400** |

**Employee Related Obligations:**

| | |
|---|---:|
| Accrued payroll | 576 |
| Accrued taxes & earned benefits | 1,227 |
| Accrued holiday (3) | 372 |
| Accrued vacation (3) | 2,888 |
| Accrued pension (3) | 2,599 |
| Severance (3) | TBD |
| **Total** | **7,661** |

**Reserve for Self Insurance:**

| | |
|---|---:|
| Accrued workers compensation (4) | 1,516 |
| Accrued claims for employee health insurance (4) | 1,376 |
| **Total** | **2,892** |
| **Grand Total** | **$ 101,850** |

(1) Indicative amounts based on the balance sheet as of August 31, 2007. The actual liability will be the amounts as of the Closing Date.

(2) To the extent the DIP is not paid in full in cash, the Buyer will assume the liability.

(3) To the extent the union contracts are not assumed, this category will exclude union employee liability. However, Buyer will assume (i) any of these amounts that are determined to be post-petition administrative expenses, and (ii) the amounts set forth in clause (g) of the definition of Assumed Liabilities, if triggered and if determined to be a post-petition administrative expense.

(4) Buyer will assume only accrued liability for claims that have arisen prior to the Closing Date. Buyer reserves the right to either assume these programs, if acceptable, or establish new coverage for claims arising on or after the Closing Date consistent with existing state law.

For Discussion Purposes Only

**Schedule 3.9:**        **Transferred Employees**

**SCHEDULE OMITTED AS CONFIDENTIAL**

39517/0001-2364277v10